**FILED**

2010 Oct-22  AM 08:54
U.S. DISTRICT COURT
N.D. OF ALABAMA





16 OCT 27  AM 9:56

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ALABAMA

### SOUTHERN DIVISION

| | |
|---|---|
| LOCAL 703, I.B. OF T. GROCERY AND FOOD EMPLOYEES WELFARE FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>   vs.<br><br>REGIONS FINANCIAL CORPORATION, C. DOWD RITTER, IRENE M. ESTEVES and ALTON E. YOTHER,<br><br>              Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

<u>CLASS ACTION</u>

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

CV-10-J-2847-S

<u>DEMAND FOR JURY TRIAL</u>

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Regions Financial Corporation ("Regions" or the "Company") between February 27, 2008 and January 19, 2009, inclusive (the "Class Period"), against Regions, its Chairman and Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO") and its former CFO for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      During the Class Period defendants issued false and misleading statements regarding the Company's operations and financial performance. Specifically, defendants misled shareholders by failing to properly account for the goodwill carried on Regions' balance sheet, causing the Company's financial results to be materially false and misleading. As a result of defendants' false and misleading statements, Regions stock traded at artificially inflated prices throughout the Class Period.

3.      Toward the end of the Class Period and as its capital position deteriorated, Regions sought government help – announcing in October 2008 it would have to be bailed out via $3.5 billion of taxpayers' money. But with the government bailout came increased scrutiny and in January 2009 Regions was finally forced to write down its goodwill by more than $6 billion. *These charges wiped out 100% of the earnings Regions had reported during the prior eight years*.

4.      These revelations infuriated investors. Likewise, analysts roundly criticized Regions' management as the price of Regions stock declined dramatically. The ratings agencies reacted by reducing their ratings on the Company which had the effect of drastically increasing the Company's cost of capital.

5.      The true facts, which were known by the defendants but concealed from the investing public during the Class Period, were as follows:

(a)     that the more than the $6 billion in "goodwill" Regions carried on its books since the November 4, 2006 acquisition of AmSouth Corporation ("AmSouth") was grossly impaired and overstated;

(b)     that subsequent to the AmSouth acquisition Regions had failed to properly test for and write down impaired goodwill, causing the Company's balance sheet and reported financial results to be artificially inflated; and

(c)     that Regions was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures in violation of Generally Accepted Accounting Principles ("GAAP"), including improperly reporting its goodwill.

6.     On February 29, 2009, defendants acknowledged in the Company's Form 2008 Form 10-K filing with the SEC that the deteriorating real estate market was the cause of these huge charges (especially in Florida and Georgia) and that it had been a problem for the Company since at least 2007.

7.     As a result of defendants' false and misleading statements, Regions stock traded at inflated levels during the Class Period. However, the Company's share price declined significantly as the truth leaked into the market at the end of the Class Period.

## JURISDICTION AND VENUE

8.     Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

9.     Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

## PARTIES

10.     Plaintiff Local 703, I.B. of T. Grocery and Food Employees Welfare Fund purchased Regions common stock as set forth in the attached certification and was damaged thereby.

11.     Defendant Regions is a Delaware corporation which operates throughout the South, Midwest and Texas.   Regions provides consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services.  Regions provides traditional commercial, retail and mortgage banking services, as well as other financial services in the fields of investment banking, asset management, trust, mutual funds, securities brokerage, insurance and other specialty financing.    Regions' principal executive offices are located at 1900 Fifth Avenue North, Birmingham, Alabama 35203.

12.     Defendant C. Dowd Ritter ("Ritter") served as President, CEO and a director of Regions since the acquisition of AmSouth on November 4, 2006.  Ritter also served as Chairman of Regions' Board of Directors (the "Board") after Jackson W. Moore ("Moore") resigned the chairmanship in January 2008. Prior to the acquisition of AmSouth, Ritter served as President and CEO of AmSouth and AmSouth Bank and Chairman of the board of AmSouth Bank since 1996. Ritter served as chairman of the AmSouth board from September 1996 to October 1999 and from January 2001 through the acquisition.  Ritter signed the false and misleading 2007 annual financial report, the false and misleading 2008 interim financial reports, and the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications that accompanied those financial reports.

13.     Defendant Irene M. Esteves ("Esteves") served as CFO of Regions since April 1, 2008. Esteves signed the false and misleading 2008 interim financial reports, and the Sarbanes-Oxley certifications that accompanied those financial reports.

14.     Defendant Alton E. "Al" Yother ("Yother") served as the CFO of Regions from April 13, 2007 until April 1, 2008. Yother signed the false and misleading 2007 annual financial report, and the Sarbanes-Oxley certification that accompanied that financial report.

15.     Defendants Ritter, Esteves and Yother (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Regions'

- 3 -

quarterly and annual financial reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

16.     In the spring of 2006, Regions agreed to purchase AmSouth, a bank that was heavily invested in the real estate markets in the South, especially Florida and Georgia, through its growing issuance of residential mortgages.

17.     At the urging of management of both companies, the stock-for-stock purchase was completed on November 4, 2006. Regions paid $10 billion for AmSouth, but an astounding 60% of that price, or over $6 billion, was ***not*** based on the assets of the company, and therefore had to be attributed to "goodwill." The only way that amount of goodwill could reasonably be attributed to AmSouth was if the residential real estate markets that AmSouth was so heavily invested in continued their rapid growth for years into the future. Nonetheless, just the opposite was happening. Indeed, by the time the deal had closed the air was already coming out of the real estate bubble in the areas where AmSouth – and now Regions – was so heavily invested.

18.     Many of AmSouth's residential mortgages were adjustable rate mortgages ("ARMs"), including those with initial teaser rates. The combination of a declining real estate market and a large number of ARMs meant that many of these mortgages would later default. This problem was

amplified at AmSouth because, since 2005, AmSouth had kept a large portion of ARMs on its own books rather than selling the loans to other investors.

19.     By late 2006, the real estate markets in the areas where the vast majority of Regions' business was now focused – especially Florida – began a rapid descent from its dizzying heights in 2005.   Real estate sales slowed, mortgage originations stalled, values began declining and foreclosures began accelerating.  As the collapse gained momentum throughout 2007, foreclosures increased, loan originators began going bankrupt, and the financial media publicly described the fallout from the lax mortgage requirements and salacious lending practices of the recent past.

20.     As illustrated in the chart below, by late 2006, and accelerating into 2007, the domestic housing market collapsed.  With substantial exposure to troubled geographic housing markets, high loan-to-value loans and ARMs, this collapse immediately resulted in Regions suffering from rising delinquency rates and impaired loans.



21.     In 2007, the real estate markets in which Regions was now so heavily invested got much worse, and a host of competing mortgage lenders suffered from the enormous surge in loan defaults. For instance, in February 2007, two prominent lenders filed for bankruptcy – ResMae

Mortgage and Mortgage Lenders Network USA Inc. Both companies specialized in originating and servicing non-conforming residential mortgages.

     22.     On April 13, 2007, defendants announced that CFO Bryan Jordan had resigned and that Regions' controller Yother had been named CFO. Yother had been AmSouth's CFO at the time of the acquisition.

     23.     Things were especially bad in Florida. As reported in an April 17, 2007 *Sun-Sentinel* article entitled, "Residents Miss More Mortgage Payments; Foreclosure Rates Expected to Jump in South Florida":

> A deluge of South Floridians are falling behind on their monthly house payments, raising fears that many of the delinquent property owners will lose their homes to foreclosure this year and next.
>
> "Who knows how bad it's going to get," said Richard French, a manager with SunTrust Mortgage and president of the Broward County chapter of the Mortgage Bankers Association. "It's a little scary to think about."
>
> Escalating home values from 2000 to 2005 caused buyers to overextend themselves. Many took out short-term, adjustable-rate mortgages and are seeing their loan payments spike as interest rates rise. Higher property taxes and insurance premiums also are putting homeowners in peril.
>
> Broward had 1,168 property owners with late payments in March, a 331 percent increase over the 271 a year ago, according to Realestat.com, a Plantation-based firm that compiles local housing statistics. Palm Beach County's late payments climbed 288 percent, to 888, from 229 last March.
>
> Late home loan payments in both counties increased in each of the first three months of 2007. The rise 'bodes ill for actual foreclosures down the road,' said Mike Larson, an analyst with Weiss Research in Jupiter.
>
> Marc Thomashaw, a vice president for Realestat.com, was more blunt.
>
> "*We're set for an explosion [of foreclosures] to happen between now and the next six months*," he said Monday.
>
>         \*      \*      \*
>
> What's more, South Florida's slumping real estate market is holding down prices and preventing recent buyers from selling quickly to get out of financial trouble.

"A lot of these escape valves are now shut," Weiss' Larson said. "It's not a pretty sight."

*       *       *

Mark Zandi, chief economist with Moody's Economy.com, a West Chester, Pa., research firm, agrees that short-term investors and others who bought within the past few years are most at risk of losing their homes. ***Still, he said more mortgage delinquencies and foreclosures are inevitable due to a "noxious mix" of aggressive lending, falling home prices and borrowers facing large increases in their monthly payments.***

24.     Despite the declines in the U.S. real estate and mortgage-backed securities markets, Regions continued reporting record financial growth for each of the interim quarters during fiscal 2007 and continued reporting that the goodwill attributable to the AmSouth acquisition was not impaired.

25.     On November 6, 2007, almost one year to the day after the AmSouth acquisition, Regions announced Moore would be retiring effective December 31, 2007, with Ritter replacing him as Chairman of the Board. The Company's release that day stated that "[u]pon retirement from the company, Moore will be paid the remaining benefits under his employment agreement." Then on November 15, 2007, Regions announced that Allen B. Morgan, Jr., Chairman of Morgan Keegan and a director and the Vice Chairman of the Regions Board, was also retiring from all three positions, effective December 31, 2007.

26.     On January 3, 2008, the Company announced plans to moderately increase its loan loss provision, but used the announcement as an opportunity to downplay the effects of the collapsing credit markets on Regions. The release issued that day stated in relevant part:

> Regions Financial Corporation today announced it plans to increase its loan loss provision to approximately $360 million in the fourth quarter of 2007, an increase of approximately $270 million from the third quarter of 2007. Regions' decision was prompted by weakening credit quality, primarily in its residential builder loan portfolio. Fourth quarter 2007 net loan charge-offs and non-performing assets are expected to rise to approximately an annualized 46 basis points of average loans and 91 basis points of period-end loans and foreclosed properties, respectively. The total allowance for credit losses is expected to be strengthened to about 1.45 percent of net loans at December 31, 2007, from the prior period's 1.19 percent.

- 7 -

*       *       *

*Despite more challenging residential real estate market conditions, loans within Regions' residential first mortgage and home equity portfolios generally continue to perform well.*

*Regions believes its strong capital position and core earnings power will position the company for continued long-term success despite the current credit cycle.*

27.     While conceding that several of Regions' residential developments had "zero activity today," during a conference call later on the evening of January 3rd, the Company attempted to soothe investors by stating that loans to home builders only made up approximately 8%, or $7.5 billion, of Regions' loan portfolio of $95 billion, with Regions' Chief Risk Officer William Wells stating that the rest of Regions' loan portfolio was performing "relatively well." And as the real estate and credit markets continued to decline in the first half of 2008, Regions repeatedly reassured the investment community that the Company had taken the appropriate steps to decrease its exposure to troubled mortgages.

28.     On January 22, 2008, Regions issued a release announcing its fourth quarter and fiscal year 2007 financial results, stating:

**Fourth quarter EPS of 24 cents, excluding merger-related charges**

*       *       *

"*Despite an increasingly challenging operating environment, Regions is well positioned for 2008 and beyond," said Dowd Ritter, chairman, president and chief executive officer.*

*       *       *

*Annualized net charge-offs of 45 basis points of average loans, non-performing assets at 90 basis points of loans and other real estate.*

Net loan charge-offs increased to $107.5 million, or an annualized 0.45 percent of average net loans, in the fourth quarter of 2007 compared to $63.1 million, or an annualized 0.27 percent of average net loans in the prior quarter. The linked-quarter increase was partially related to deterioration in the residential homebuilder loan portfolio, a result of the housing down cycle in some of the Company's markets.

including Florida and Atlanta. ***Loans within Regions' residential first mortgage and home equity portfolios continue to perform relatively well***.

As previously reported, residential homebuilder loans represent approximately 8 percent, or $7.2 billion, of Regions' total portfolio of $95.4 billion. ***In addition to increasing the loan loss provision, the Company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers***. Approximately $850 million of loans have been identified to be managed by Regions' special assets department.

Indicative of the more challenging credit environment, the fourth quarter's loan loss provision totaled $358.0 million, or $250.5 million above actual fourth quarter net loan charge-offs. The total reserve for credit losses was 1.45 percent of net loans at December 31, 2007, a significant increase over the prior quarter's 1.19 percent.

Total non-performing assets at December 31, 2007, were $864.1 million, or 0.90 percent of loans and other real estate, compared to $588.3 million, or 0.62 percent at September 30, 2007. Stress on the residential builder portfolio largely drove the quarterly increase. Non-performing assets and net charge-off levels are expected to continue upward in 2008 as the depressed housing market further evolves.

*      *      *

***Capital position remains strong***

***At December 31, 2007, Regions' capital position, as measured by the tangible stockholders' equity-to-tangible assets ratio, was a strong 5.88 percent. This compared to 6.02 percent at September 30, 2007***.

29.     On February 13, 2008, Regions announced CFO Yother was stepping down and would be replaced by defendant Esteves effective April 1, 2008.

**THE FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD**

30.     All of the above statements by defendants were in the market, active and uncorrected, at the beginning of the Class Period. All of the above statements were maintained and available on Regions' website throughout the Class Period, and the documents filed with the U.S. Securities and Exchange Commission ("SEC") were available at the SEC's website.

31.     On February 27, 2008, Regions filed false and misleading annual financial report for

2007 with the SEC (the "2007 Form 10-K"). ***The 2007 Form 10-K reflected Regions' goodwill***

***balance for the fiscal year ending December 31, 2007 as $11.5 billion, essentially reporting that its***

***goodwill was not impaired.*** In fact, the 2007 Form 10-K stated that "[e]xcess purchase price at

December 31, 2007 totaled $11.5 billion as compared to $11.2 billion at December 31, 2006, with

the increase driven by finalizing the purchase price adjustments related to the AmSouth merger."

Regions' "Critical Accounting Policies," the 2007 Form 10-K expressly stated that:

> ***Regions' excess purchase price is tested for impairment annually, or more often if***
> ***events or circumstances indicate impairment may exist.*** Adverse changes in the
> economic environment, declining operations of the business unit, or other factors
> could result in a decline in implied fair value of excess purchase price. ***If the implied***
> ***fair value is less than the carrying amount, a loss would be recognized to reduce***
> ***the carrying amount to implied fair value.***

32.     The 2007 Form 10-K also contained the following false and misleading

Sarbanes-Oxley certifications, signed by defendants Ritter and Yother:

> 1.     I have reviewed this annual report on Form 10-K of Regions Financial
> Corporation;
>
> 2.     Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary to make the
> statements made, in light of the circumstances under which such statements were
> made, not misleading with respect to the period covered by this report;
>
> 3.     Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the financial
> condition, results of operations and cash flows of the registrant as of, and for, the
> periods presented in this report;
>
> 4.     The registrant's other certifying officer(s) and I are responsible for
> establishing and maintaining disclosure controls and procedures (as defined in
> Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
> reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the
> registrant and have:
>
> > (a)     Designed such disclosure controls and procedures, or caused
> > such disclosure controls and procedures to be designed under our
> > supervision, to ensure that material information relating to the registrant,
> > including its consolidated subsidiaries, is made known to us by others within

those entities, particularly during the period in which this report is being prepared;

        (b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        (c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        (d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

    5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

        (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

        (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

    33.    The Company's massive goodwill being carried on the balance sheet and reported in the 2007 Form 10-K had not been written down since the AmSouth acquisition despite the fact that the housing markets relied upon so heavily by AmSouth and Regions had collapsed.   The Company's 2007 Form 10-K had overstated goodwill *by more than $6 billion*.

    34.    By early 2008, the mortgage meltdown was in full swing.  In early March 2008, the credit markets seized up, causing the near bankruptcy of Bear Stearns.  In desperation, Bear Stearns had to be sold overnight to J.P. Morgan for pennies on the dollar, in a deal brokered by the U.S. government in which the government agreed to make good on $30 billion of Bear Stearns' losses –

mostly attributable to mortgage-backed securities. This event represented a change in the business climate for Regions, requiring the Company to test for impairment again. Incredibly, defendants did not.

35.     On May 7, 2008, Regions filed its false and misleading interim financial report for the first quarter of 2008 with the SEC. The Form 10-Q still reflected Regions' goodwill balance for the quarter ending March 31, 2008 as $11.5 billion, incredibly reporting that its goodwill was not impaired.

36.     On June 17, 2008, the SEC sent a comment letter to Regions regarding its 2007 Form 10-K. In the comment letter, the SEC questioned Regions' determination that its goodwill balance was not impaired, *especially in light of the fact that Regions stock had been trading at a market value below the Company's book value by the date of the filing of the 2007 Form 10-K. The SEC further noted Regions' failure to comply with the disclosure requirements of SFAS No. 142 and demanded that the Company begin providing information related to its goodwill on a reportable segment basis*.

37.     On July 22, 2008, Regions issued a release announcing the Company's second quarter 2008 financial results and disclosing *that Regions' quarterly cash dividend would only be cut by approximately 75% from $0.38 to $0.10 per share "to further strengthen capital position*." For the second quarter of 2008, the release disclosed earnings from continuing operations of $0.30 per diluted share, disclosed "[h]igher net loan charge-offs, at an annualized 0.86 percent of average loans, primarily due to home equity and residential homebuilder credit deterioration," announced "[a]llowance for credit losses increases to 1.56 percent of loans" and reported a "[f]urther rise in non-performing assets to 1.65 percent of period end loans and other real estate," but provided for an "[i]ncrease in average loan growth to 6 percent annualized, driven by prudent support of Regions'

best commercial customers through the current cycle." Once again, Regions did not write down its massive goodwill.

38.     Because of the continued deterioration of the mortgage and credit markets in the months and weeks leading up to this disclosure, the market was relieved that the news from Regions was not worse, *and Regions' stock price rallied on the news*.  On July 22, 2008, Regions' stock price closed up $1.00 per share (almost 10%) compared to the day before on heavy volume.

39.     On August 7, 2008, Regions filed with the SEC its false and misleading interim financial report for the second quarter of 2008, which included substantially the same financial results previously reported on July 22, 2008.  The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2008 as $11.5 billion.  Due to the SEC's prompting, Regions performed an impairment test for second quarter 2008 but continued using its unreasonable assumptions in performing the tests, reporting that "*[t]he interim impairment test indicated that the fair value of the respective reporting units is greater than the carrying value (including goodwill); therefore, goodwill was not impaired as of June 30, 2008.*"

40.     On September 7, 2008, the U.S. government rescued Fannie Mae ("Fannie") and Freddie Mac ("Freddie") from bankruptcy, effectively nationalizing them.  At the time, Fannie and Freddie owned or guaranteed about half of the United States' $12 trillion mortgage market.  Fannie and Freddie's insolvency caused extreme distress in the financial markets because almost every home mortgage lender and Wall Street bank relied on them to facilitate the mortgage market.

41.     Shortly thereafter on September 14, 2008, Merrill Lynch was sold overnight to Bank of America in a rapid fire transaction amidst fears of a liquidity crisis.  The next day, Lehman Brothers, one the oldest investment banks on Wall Street, filed for bankruptcy protection.

42.     On September 25, 2008, another large U.S. financial institution, Washington Mutual, was seized by the Federal Deposit Insurance Corporation ("FDIC"), and its banking assets were quickly sold to J.P. Morgan for $1.9 billion.

43.     These events sent a shudder through the credit markets and stock markets around the world. Stock prices at banks and financial institutions – including Regions – declined dramatically. And there was a monumental shift in the way these institutions would operate going forward.

44.     Instead, on September 30, 2008, *The Birmingham News* issued an article reporting that CEO Dowd Ritter had reiterated that at Regions "business is strong," noting:

> Birmingham-based Regions Financial Corp.'s stock plummeted 41 percent on Monday, but CEO Dowd Ritter expressed confidence in the strength of his company's Main Street business amid turmoil on Wall Street.

>                          *       *       *

> **But Ritter noted that while other banks are writing off billions every quarter, Regions has so far made about a half-billion in profit this year.**

> "There's a pretty simple reason," he said. "We always have taken a very conservative approach to our business. At times, we may not be doing what is in vogue, but that plain vanilla banking plays very well in times like this."

> Ritter said Regions is well-capitalized by regulatory standards, as evidenced by its recent takeover of the failed Georgia-based Integrity Bank last month, at the request of the Federal Deposit Insurance Corp.

> "We are a safe harbor, if you will, for deposits," he said.

> He also noted that Regions is not burdened with exotic securities and risky mortgages that have prompted the demise of other institutions. Regions has few subprime mortgages in its entire portfolio, he said.

> *"All that said, it doesn't matter whether we're lucky or smart, we've avoided the real troubled areas that are plaguing many in this industry," he said.*

45.     On October 21, 2008, Regions issued a release announcing its third quarter 2008 financial results, reporting $0.11 per diluted share for the quarter ended September 30, 2008, disclosing it was "[a]ggressively managing well-defined credit issues, with $430 million in non-performing assets either sold or transferred to held for sale," with "[n]et charge-offs and other real

estate expense related to these dispositions total[ing] approximately $186 million," stating "[n]on-performing assets, excluding assets held for sale, *steadied* at 1.66 percent of period end loans and other real estate," disclosing "[n]et loan charge-offs an annualized 1.68 percent of average loans, driven by accelerated problem asset disposition," such that "[e]xcluding impact of sales and transfers to held for sale, net loan charge-offs an annualized 1.03 percent of average loans," but highlighting its "Tier 1 capital ratio at an estimated 7.47%, $1.7 billion above well-capitalized level."

46.     The October 21, 2008 release also disclosed that Regions had been invited to participate in the U.S. government's TARP bailout program and that defendants intended to cause Regions to accept TARP funds:

> Regions has been notified that it is eligible and *does intend to participate in the capital purchase program announced by the Treasury Department on October 13, 2008*. The capital is in the form of senior perpetual preferred stock (together with warrants to purchase common stock) and qualifies as Tier 1 capital for regulatory purposes. It is being offered at an attractive coupon of 5 percent for the first five years. Qualified institutions can obtain between 1 percent and 3 percent of their total risk-weighted assets as of September 30, 2008, as defined by banking regulations. For Regions, this would approximate between $1.17 billion and $3.51 billion of capital, providing a significant strengthening of our overall capital base.

47.     Regions continued to report a grossly inflated value of the goodwill attributable to the AmSouth acquisition, with its balance sheet materially overstating assets, shareholder equity and, as a result of not taking the impairment charge on the goodwill attributable to the AmSouth acquisition, overstating Regions' reported net income.

48.     On October 24, 2008, Regions announced that it had determined to accept $3.5 billion in TARP funds, with the Company's release stating in relevant part that the cash infusion would "*increase Regions' Tier 1 capital to approximately 10.5 percent*" and "*enable [it] to expand lending and step up acquisitions*."

49.     On October 30, 2008, Regions filed its false and misleading interim financial report for the third quarter of 2008 with the SEC, which included substantially the same financial results

previously reported on October 21, 2008. The Form 10-Q still reflected Regions' goodwill balance

for the quarter ending September 30, 2008 as $11.5 billion. Due to the SEC's prompting, Regions

performed an impairment test for third quarter 2008 but continued using its unreasonable

assumptions in performing the tests, reporting that "*[t]he interim impairment test indicated that the

fair value . . . of the respective reporting units is greater than the carrying value (including

goodwill); therefore, goodwill was not impaired as of September 30, 2008*."

50.     Suddenly, on January 20, 2009, before the market opened, Regions reported *a net loss

of $5.6 billion for the fourth quarter of 2008*, stating the loss "was largely driven by a *$6 billion

non-cash charge for impairment of goodwill*." Regions' January 20th release also disclosed:

> -- *Accelerated disposition of problem assets*, with approximately $1 billion in non-
> performing assets sold or transferred to held for sale, resulting in approximately $479
> million of losses
>
> -- *Net loan charge-offs rose to an annualized 3.19 percent of average loans*
>
> -- *Increased loan loss provision to $1.150 billion*, $354 million above net charge-
> offs; raised allowance for credit losses to 1.95 percent of loans.

51.     If defendants' disclosures were to be believed, the "results of goodwill impairment

testing at the end of the fourth quarter [*suddenly*] indicated that the estimated fair value of Regions'

banking reporting unit was less than its book value, *requiring a $6 billion non-cash charge*." But

$6 billion in impairments do not happen overnight, and Regions had falsely stated quarter after

quarter that its goodwill was not impaired. Likewise, Regions' CEO and CFO falsely certified each

quarter those financial filings were accurate and that Regions' internal controls were solid.

52.     On this disclosure, investors hammered the stock on heavy volume. On January 20,

2009, *Bloomberg.com* issued an article entitled "Regions Plunges to 23-Year Low on $6.24 Billion

Loss," which stated in relevant part:

> Regions fell $1.47 to $4.60 at 4 p.m., the lowest price since March 13, 1985.
> The bank has lost more than three-quarters of its market value in the past 12 months.

53.     Rating agencies began slashing the Company's ratings.  On February 2, 2009,

*Bloomberg* published an article entitled "Regions Declines After Moody's Downgrade on Defaults,"

which stated:

> Regions Financial Corp., Alabama's biggest bank, fell 16 percent in New York
> trading after Moody's Investors Service downgraded the lender on the prospects of
> more borrower defaults in Florida.
>
> "Regions has seen nearly a doubling of nonperforming assets over the past
> year, largely in the residential homebuilder and home-equity portfolios," Moody's
> said in a statement today on the Birmingham-based bank.
>
> The bank dropped 54 cents to $2.92 at 4 p.m. in New York Stock Exchange
> composite trading and has plunged almost 90 percent in the past 12 months.
>
> The debt rating was cut to A3 from A2 and may be dropped further, Moody's
> said.

54.     The Company's annual financial report on Form 10-K filed with the SEC on

February 25, 2009 finally admitted how much damage the residential loan portfolio was causing,

***and that it had been occurring since at least 2007***:

> As of December 31, 2008, residential homebuilder loans, home equity loans
> secured by second liens in Florida and condominium loans represented
> approximately 9.3% of our total loan portfolio. ***These portions of our loan portfolio
> have been under stress for over a year and, due to weakening credit quality, we
> increased our loan loss provision and our total allowance for credit losses***.  In
> addition, we have implemented several measures to support the management of these
> portions of the loan portfolio, including reassignment of experienced, key
> relationship managers to focus on work-out strategies for distressed borrowers.

55.     Finally, on May 19, 2009, the *Memphis Business Journal* reported that the Company

would have to conduct a very dilutive stock offering and sell assets to bring the Company's capital

up to the levels being required by the U.S. government:

> Regions Financial Corp. plans to raise $1.25 billion in a stock offering to help
> meet the U.S. government's demands to raise more capital if the economy worsens.
>
> The Birmingham banking giant plans to pony up $1 billion via a common
> stock offering and another $250 million in new mandatory convertible preferred
> shares.  If raised, the money would account for only half of the $2.5 billion the
> company needs to bolster its capital reserves, a requirement set by the federal

government after results of its "stress tests" predicted the bank could suffer from $9.2 billion in loan losses given the worst-case scenario.

Regions also plans to sell certain businesses, exchange equity for Regions Bank's $4.25 billion of outstanding subordinated debt and $345 million of additional trust preferred securities to come up with the rest of the money, the bank said in a written statement.

56.     On this final disclosure, the Company's stock price again collapsed, falling more than 20% on massive volume over the next two days to close at $4.10 per share.

57.     Throughout the relevant period, the Individual Defendants subjected Regions to improper loan review processes, overvalued its loan portfolio and failed to maintain adequate loan loss reserves which inflated Regions' operating results and goodwill. By failing to report the true facts concerning the Company's grossly inflated goodwill, the financial reports defendants caused and/or permitted Regions to issue and file with the SEC failed to provide investors with the basic information necessary to understand Regions' financial results and omitted material information, rendering them materially false and misleading.

58.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were:

(a)     that the more than the $6 billion in "goodwill" Regions carried on its books since the November 4, 2006 acquisition of AmSouth was grossly impaired and overstated;

(b)     that subsequent to the AmSouth acquisition Regions had failed to properly test for and write down impaired goodwill, causing the Company's balance sheet and reported financial results to be artificially inflated; and

(c)     that Regions was operating with woefully deficient internal controls, resulting in inaccurate and misleading financial disclosures in violation of GAAP, including improperly reporting its goodwill.

## LOSS CAUSATION/ECONOMIC LOSS

59.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Regions common stock and operated as a fraud or deceit on Class Period purchasers of Regions common stock by misrepresenting the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Regions' business was not as healthy as represented, defendants falsely concealed the extent of its credit and goodwill impairment and the threat to its entire business from its failure to properly account for its loan loss reserves. Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Regions common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of Regions common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

60.     As a result of the Company's subsequent corrective disclosures, the price of the stock dropped significantly throughout the latter half of 2008 and early 2009. Although the stock traded above $23 per share early in the Class Period, at the end of the Class Period it closed at below $5 per share.

## CLASS ACTION ALLEGATIONS

61.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Regions common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

62.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Regions has more than one billion shares of stock outstanding, owned by hundreds if not thousands of persons.

63.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

(c)     whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of Regions common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

64.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

65.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

67.     Plaintiff incorporates ¶¶1-66 by reference.

68.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

      (a)     employed devices, schemes and artifices to defraud;

      (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Regions common stock during the Class Period.

70.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Regions common stock. Plaintiff and the Class would not have purchased Regions common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

71.     Plaintiff incorporates ¶¶1-70 by reference.

72.     The Individual Defendants acted as controlling persons of Regions within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of Regions stock, the Individual Defendants had the power and authority to cause Regions to engage in the wrongful conduct complained of herein.  By reason of such conduct, Individual Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages, including interest;

C.     Awarding plaintiff reasonable costs and attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 20, 2010                    WARD & WILSON, LLC
                                            PATRICK C. COOPER (ASB-4959-O77P)
                                            JAMES S. WARD (ASB-7285-R64J)


                                            _____
                                                  JAMES S. WARD


                                            _____
                                            PATRICK C. COOPER

                                            2100 Southbridge Parkway, Suite 580
                                            Birmingham, AL  35209
                                            Telephone:  205/871-5404
                                            205/871-5758 (fax)

ROGER BEDFORD & ASSOCIATES, P.C.
ROGER H. BEDFORD, JR. (ASB-3651-D60R)
P.O. Box 370
303 North Jackson Avenue
Russellville, AL  35653
Telephone:  256/332-6966
256/332-6967 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
PATRICK J. COUGHLIN, Of Counsel
CATHERINE J. KOWALEWSKI
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Regions_AL.doc

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

LOCAL 703, I.B. OF T., GROCERY & FOOD HEALTH & WELFARE
FUND ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the
direction of plaintiff's counsel or in order to participate in this private action or any
other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in
the securities that are the subject of this action:

Security          Transaction          Date          Price Per Share

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a
class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

6. The Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __19__ day of __October__, 2010.

> LOCAL 703, I.B. OF T., GROCERY &
> FOOD HEALTH & WELFARE FUND
>
> By: _____
>
> Its: _Chainman of Boord of Trustees_

- 2 -

REGIONS FINANCIAL

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/15/2008 | 1,900 | $11.62 |
| 09/16/2008 | 1,700 | $11.27 |
| 09/17/2008 | 700 | $11.08 |
| 09/18/2008 | 1,200 | $10.41 |
| 09/24/2008 | 500 | $13.22 |
| 09/29/2008 | 800 | $9.97 |
| 11/17/2008 | 500 | $9.24 |
| 12/10/2008 | 400 | $9.18 |