**FILED**

2011 Feb-28  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ALABAMA

### SOUTHERN DIVISION

| | | |
|---|---|---|
| LOCAL 703, I.B. OF T. GROCERY AND FOOD EMPLOYEES WELFARE FUND, DISTRICT NO. 9, I.A. OF M. & A.W. PENSION TRUST and EMPLOYEES' RETIREMENT SYSTEM OF THE GOVERNMENT OF THE VIRGIN ISLANDS, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) | Civil Action No. 2:10-cv-02847-IPJ <br><br> <u>CLASS ACTION</u> <br><br> (CORRECTED) AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| REGIONS FINANCIAL CORPORATION, C. DOWD RITTER, IRENE M. ESTEVES and ALTON E. YOTHER, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

610459_1

## INTRODUCTION

1.      This is a class action for violation of the federal securities laws brought under §§10(b) and 20(a) of the Securities Exchange Act of 1934 Act (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").  Lead Plaintiffs District No. 9, I.A. of M. & A.W. Pension Trust ("District No. 9") and Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands") bring this action on behalf of a class of all persons and entities who purchased or otherwise acquired the common stock of Regions Financial Corporation ("Regions" or the "Company") between February 27, 2008 and January 19, 2009, inclusive (the "Class Period"), to recover damages caused to the class by defendants' violations of the securities laws; specifically, the failure to promptly reserve for and record losses from troubled loans and a goodwill impairment of nearly $6 billion related to Regions' purchase of AmSouth Bancorporation ("AmSouth") in November 2006.[1]

2.      With the announcement of the "Birmingham Marriage" between Regions and AmSouth in 2006, then-AmSouth CEO Ritter envisioned that the merger would create a "powerhouse in the South."  But the truth was this newly

---

[1]      Defendants are Regions, C. Dowd Ritter ("Ritter"), Regions' Chairman and Chief Executive Officer ("CEO"), Irene M. Esteves ("Esteves"), Regions' Chief Financial Officer ("CFO") since April 1, 2008, and Alton E. "Al" Yother ("Yother"), the Company's former CFO from April 13, 2007 to April 1, 2008.

combined banking behemoth was much less formidable than he had hoped.  Today, shares of Regions are down almost 80% from where they were at the time of the merger, the Company has laid off thousands of employees and closed hundreds of branches, it has lost money on an annual basis since 2008, charged off more than three billion dollars in loans since the beginning of 2009, is on its third CEO and fourth CFO since the merger only four years ago and is currently mired in regulatory and its own internal investigations.  While defendants may try to blame Regions' precipitous fall on a devastating financial crisis no one could have foreseen, the reality is, like a central figure of a Shakespearean tragedy, defendants' hubris was their own undoing.

3.     Like many other financial institutions during the housing boom of 2003, 2004 and 2005, AmSouth saw states like Florida and Georgia as fertile ground to rapidly grow its real estate lending portfolio.  This was especially true when it came to issuing loans to developers of commercial and residential properties.  So while prior to the merger Regions had a diversified real estate lending presence that included Florida, for AmSouth, Florida real estate was their proverbial golden goose.  As former AmSouth CFO Beth Mooney ("Mooney") summed up in a January 2006 conference call with analysts: "[w]hile [loan] production was solid across our entire footprint, *our Florida operations again set the pace for the company*."  But AmSouth was not just profiting from the underwriting of loans to commercial and residential real estate developers during

this pre-merger time.  Capitalizing on, and no doubt fostering, the belief among current and potential homeowners that the seemingly endless rise in home prices would offset any future increase in interest rates, loan products like adjustable rate mortgages ("ARMs") became the "product of choice" for AmSouth's borrowers.

4.     By the beginning of 2006, however, AmSouth (along with much of the financial and investment community) began to see cracks emerging in the real estate bubble that had been so prosperous just a year earlier.  Yet, even in the face of a steadily deteriorating real estate market, AmSouth and its executives refused to publicly admit any signs of weakness in their own lending portfolio. Fortunately for defendant Ritter and AmSouth shareholders, AmSouth found a willing suitor in the Spring of 2006.  On May 25, 2006, after only a few days of due diligence, Regions and AmSouth jointly announced their plans to merge.  The Merger Proxy filed with the SEC and sent to Regions' and AmSouth's shareholders advised that the transaction was an "acquisition" of AmSouth by Regions, but most of the purchase price could not be directly attributed to a tangible asset.  Therefore, *an astounding $6 billion of the approximately $10 billion being paid (or over 60% of the total purchase price)* – would be recorded as "goodwill," or "excess purchase price," on the new Regions' balance sheet following the acquisition.  In October 2006, Regions' shareholders approved the purchase, and the deal officially closed in November.

- 3 -

5.      Soon after the merger, and throughout the Class Period, droves of pre-merger Regions' executives began to leave the newly combined company.  In the Spring of 2007, Bryan Jordan ("Jordan"), Regions' CFO at the time of the merger, resigned and was replaced by Yother, his AmSouth counterpart.  Almost a year into the merger, the same would be true for Jackson W. Moore ("Moore"), who resigned from the Company and handed over his title as CEO, President and Chairman to defendant Ritter, AmSouth's CEO and Chairman prior to the merger.  Thus, although it was Regions which acquired AmSouth, within a year it was the former AmSouth executives assuming leadership of the combined company.

6.      With the knowledge these former AmSouth executives had of AmSouth's high risk loan portfolio – especially in areas like Florida and Georgia – they knew that with a real estate market crumbling around them, the newly combined  Regions desperately needed to deleverage and restructure its balance sheet.  Yet, no one would know this from the public statements made by the Company.  Even with some of the country's top subprime lenders declaring bankruptcy, interest rates steadily rising and the Federal Deposit Insurance Corporation ("FDIC") shutting down banks seemingly one after another, Regions continually, yet falsely, told the public that unlike its peers, it was well-positioned to handle the ongoing crisis.

7.      For instance, on September 30, 2008 – the same month that Fannie Mae and Freddie Mac had been nationalized, AIG was bailed out and Lehman

- 4 -

Brothers declared bankruptcy – *The Birmingham News* issued an article reporting

that CEO Ritter declared that at Regions "*business is strong*," noting:

> Birmingham-based Regions Financial Corp.'s stock plummeted 41 percent on Monday, but CEO Dowd Ritter expressed confidence in the strength of his company's Main Street business amid turmoil on Wall Street.
>
> \*      \*      \*
>
> **But Ritter noted that while other banks are writing off billions every quarter, Regions has so far made about a half billion in profit this year**.
>
> "There's a pretty simple reason," he said.  "**We always have taken a very conservative approach to our business**.  At times, we may not be doing what is in vogue, but that plain vanilla banking plays very well in times like this."
>
> Ritter said Regions is well-capitalized by regulatory standards, as evidenced by its recent takeover of the failed Georgia-based Integrity Bank last month, at the request of the Federal Deposit Insurance Corp.
>
> "We are a safe harbor, if you will, for deposits," he said.
>
> He also noted that Regions is not burdened with exotic securities and risky mortgages that have prompted the demise of other institutions. Regions has few subprime mortgages in its entire portfolio, he said.
>
> "**All that said, it doesn't matter whether we're lucky or smart, we've avoided the real troubled areas that are plaguing many in this industry**," he said.

8.      In order to calm analysts and investors who were becoming

increasingly concerned about Regions' massive real estate portfolios, beginning in

early 2008 and throughout the Class Period, defendants repeatedly told the market

that they had taken substantial steps to aggressively manage their troubled loans.

As an example, on January 22, 2008, defendants promised:

[T]he Company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers.  Approximately $850 million of loans have been identified to be managed by Regions' special assets department.

9.      This was all a lie.  As several former members of Regions' Special Assets department would explain – the very people tasked with the responsibility of analyzing and managing the Company's "problem" loans – this department was being used to manipulate the classification of these loans, and thus hide the actual number of problem loans from public view.  During the Class Period, defendants were thus well aware that the non-performing and non-accrual loan numbers they were publicly reporting on conference calls with analysts and investors, and in filings with the SEC, were false and misleading.  By fraudulently "cooking the books" associated with these impaired loans, and in complete disregard of obvious indications to the contrary, defendants also repeatedly, yet falsely, claimed that the $6 billion in goodwill associated with Regions' purchase of AmSouth remained unimpaired.

10.     By the beginning of 2009, the collapsing real estate market proved more devastating than even defendants fraud could conceal.  So on January 20, 2009, defendants were forced to finally announce a huge increase in loan loss reserves, and a colossal $6 billion writedown of goodwill.  According to the announcement, Regions reported *a net loss of $5.6 billion for the 4Q 08*, stating

- 6 -

the loss "was largely driven by a **$6 billion non-cash charge for impairment of goodwill**."  But as defendants knew, a $6 billion impairment does not happen overnight, and therefore Regions had falsely stated quarter after quarter that its goodwill was improving, and Regions' CEO and CFO falsely certified each quarter those financial filings were accurate and the Company's internal controls were solid.  Moreover, as a result of defendants' manipulations and fraudulent reporting of the loans managed by the Special Assets department, Regions' Audit Committee is not only conducting its own internal inquiry, but the Company is currently the subject of an ongoing investigation by the Federal Reserve.

11.    Although Regions' stock traded as high as $23 at the beginning of the Class Period, as the financial effects of defendants fraudulent scheme were revealed, it collapsed to $4 per share.  The chart on the next page tells the story.



### Regions Financial
#### January 2, 2008 - June 30, 2009

## JURISDICTION AND VENUE

12.    Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C.

§78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange

Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

13.    Venue is proper in this District pursuant to §27 of the Exchange Act.

Many of the false and misleading statements were made in or issued from this

District.

## PARTIES

14.     Plaintiff Local 703, I.B. of T. Grocery and Food Employees Welfare Fund ("Local 703") filed, in this Court, the initial complaint in this action on October 20, 2010 (Dkt. No. 1).  Subsequently, on January 20, 2011, this Court appointed District 9 and Virgin Islands to serve as Lead Plaintiffs (Dkt. No. 24). Local 703 is a member of the plaintiff class.

15.     Lead Plaintiff District No. 9 purchased Regions common stock as set forth in the certification filed with this Court on December 20, 2010 and was damaged thereby.  Lead Plaintiff Virgin Islands purchased Regions common stock as set forth in the certification filed with this Court on December 20, 2010 and was damaged thereby.

16.     Defendant Regions is a Delaware corporation which operates throughout the South, Midwest and Texas.  According to its public filings, Regions provides consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services.  Regions provides traditional commercial, retail and mortgage banking services, as well as other financial services in the fields of investment banking, asset management, trust, mutual funds, securities brokerage, insurance and other specialty financing.  Regions' principal executive offices are located at 1900 Fifth Avenue North, Birmingham, Alabama 35203.

17.     Defendant Ritter served as President, CEO and a director of Regions since the acquisition of AmSouth on November 4, 2006.  Ritter also served as

Chairman of Regions' Board of Directors (the "Board") after Moore resigned the chairmanship in January 2008.  Prior to the acquisition of AmSouth, Ritter served as President and CEO of AmSouth and AmSouth Bank and Chairman of the board of AmSouth Bank since 1996.  Ritter served as chairman of the AmSouth board from September 1996 to October 1999 and from January 2001 through the acquisition.  ***Ritter signed the false and misleading 2007 annual financial report on SEC Form 10-K, the false and misleading 2008 interim financial reports and the Sarbanes-Oxley Act of 2002 ("SOX") certifications that accompanied those financial reports.  On December 18, 2009, three days after Regions announced that it was not going to pay executive bonuses in 2009 in order to comply with the government's Troubled Asset Relief Program, the Company announced that Ritter would resign as of March 31, 2010, which he did.***

18.     Defendant Esteves served as CFO of Regions since April 1, 2008. Esteves signed the false and misleading 2008 interim financial reports, and the SOX certifications that accompanied those financial reports.  On February 22, 2010, Regions announced that Esteves had also resigned from the Company.

19.     Defendant Yother served as the CFO of Regions from April 13, 2007 until April 1, 2008.  Yother signed the false and misleading 2007 annual financial report, and the SOX certification that accompanied that financial report.  Prior to the merger, Yother had served as AmSouth's CFO.  On February 13, 2008,

- 10 -

Regions announced Yother had resigned from the Company, effective April 1, 2008.

20.     Defendants Ritter, Esteves and Yother (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Regions' quarterly and annual financial reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## BACKGROUND TO DEFENDANTS' FRAUDULENT SCHEME

21.     In the Spring of 2006, Regions announced that it agreed to purchase AmSouth, a bank heavily invested in the real estate markets in the South, especially Florida and Georgia, through its growing issuance of commercial real estate, construction and residential loans.  Regions saw the acquisition of its in-

- 11 -

state rival AmSouth as an opportunity to solidify itself as a Southern banking powerhouse and one of the top-10 bank holding companies in the United States. While Regions had the brand recognition, along with being the parent company of Morgan Keegan & Company Inc. ("Morgan Keegan"), one of the largest full-service regional brokerage and investment banking firms in the South, what it sought in its merger with AmSouth was a significant banking and lending footprint in the hot real estate markets of Florida and Georgia. Regions paid $10 billion for AmSouth, but an astounding 60% of that price, or over $6 billion, was not based on the fair value of assets of the company and, therefore, had to be attributed to "goodwill." But the only way that amount of goodwill could reasonably be attributed to AmSouth was if the real estate markets that AmSouth (and Regions) was so heavily invested in, continued their rapid growth for years into the future. But AmSouth's real estate lending portfolio, especially in states like Florida and Georgia, was running on borrowed time.

22.     By 2005, AmSouth had been on a residential real estate lending binge in the white-hot areas of Florida and Georgia. And AmSouth was not shy about the fact that it had built its real estate lending portfolio in Florida around two of the main stars of the real estate bubble: (i) commercial real estate and construction loans ("commercial loans") to developers of condominiums, retail stores and beachfront hotels; and (ii) ARMs to residential borrowers.

- 12 -

23.     AmSouth's commercial lending portfolio, especially in Florida, expanded rapidly.  Reporting its results for the fourth quarter of 2004, AmSouth announced that its commercial real estate loan portfolio hit a record high of $5.6 billion, a dramatic 34% increase over the prior year's level; while by the end of 2005, this number skyrocketed another 31%, topping more than $7 billion. Additionally throughout 2005 and 2006, AmSouth executives reiterated that their "Florida operations again set the pace for the Company."  This was hardly a surprise considering that of AmSouth's approximately $7 billion commercial lending portfolio in 2005, nearly 43% (or about $3 billion) of that was made up of commercial loans in the state of Florida; and of that amount, approximately $600 million (or 20%) was tied up in loans to Florida condominium developers.

24.     While some analysts voiced possible concerns over AmSouth's rapid growth in commercial lending, AmSouth executives effectively calmed the market. For example, as an AG Edwards analyst wrote in December 1, 2005:

> Like most Southeastern banks, AmSouth has significant exposure to commercial real estate and construction lending, particularly in residential development.  The exposure includes condo projects, which are an area of increased concern.  ***Management indicated that they are not financing condo conversions, have very little exposure to South Florida (Miami), are concentrating on beachfront properties, and are requiring that a significant amount of the units be pre-sold with high non-refundable deposits***.

25.     In regard to the use of ARMs by its residential borrowers, AmSouth executives repeated on conference calls throughout 2004 and 2005 that adjustable

- 13 -

rate mortgages "*continu[e] to be the product of choice by our customers*." These ARMs were loans with an interest rate linked to an economic index, and that interest rate, along with a mortgagor's monthly payments, would be adjusted up or down as the index fluctuations. Often these loans would include low initial interest rates – otherwise known as "teaser" rates – wherein the rate would remain fixed for a short period of time and then spike up after this initial time period (usually between three and ten years) elapsed.[2] According to AmSouth, not only were these loans relatively safe, they also represented the future growth for its residential mortgage lending business. As Mooney explained in an October 18, 2005 conference call:

> *As we ramp up and continue to expand our mortgage operations, and with the shift in customer preference to adjustable rate mortgages, we view it as an important outlet for us to be able to grow our business and meet our customers' needs*. And then, obviously, given the nature of those being three to five-year [ARMs], they do perform in that period of time more like a fixed rate loan, so we want to make sure we have a good balance of putting the highest quality loans on our balance sheet and the ability to have the capacity to sell in order to support our growth plan.

26. Moreover, AmSouth decided in 2005 not to sell these residential loans in the secondary market but instead to keep them on AmSouth's balance sheet. According to its 2005 Annual Report, AmSouth decided "to retain a greater

---

[2]    As former AmSouth CFO Mooney stated on conference calls during 2004, for most of its ARM customers, the rate reset would occur during the fifth year of the loan.

proportion of adjustable-rate residential mortgages on the balance sheet." As evidence of AmSouth's commitment to keep these loans on its balance sheet, in 2006, according to Home Mortgage Disclosure Act Disclosure Reports, AmSouth's sales of Florida real estate loans to third parties such as the Federal Home Loan Mortgage Corporation ("Freddie Mac"), Federal National Mortgage Association ("Fannie Mae"), Government National Mortgage Association ("Ginnie Mae") and other financial institutions dropped to 1,288 – a decline of more than 50% from 2005.

27.   By 2006, AmSouth was knee-deep in the oversaturated Florida real estate market that it helped create. Yet, analysts' questions were repeatedly met by AmSouth with reassuring statements that its commercial lending portfolio in this area was well managed and of the highest quality. As noted in a March 1, 2006 Morgan Stanley report:

> A key question we delved into with Mike Willoughby, Chief Credit Officer, was the risks raised by [AmSouth's] commercial real estate portfolio. ***Willoughby defended [AmSouth's] construction lending strategy as less risky than permanent financing due to these loans' shorter lives and the strength of the parties they do business with***. This runs counter to the view held by regulators who recently released guidance on capital held against commercial real estate loans, and singled out construction as higher risk.
>
> *        *        *
>
> Florida condominiums remain a large chunk of AmSouth's portfolio and the most controversial in our view. AmSouth emphasized its lending standards here, which seem disciplined. AmSouth focuses on

projects which are on the beach, and are pre-sold with 20% downpayments.

28.     An April 19, 2006 Morgan Keegan report echoed these same sentiments, publishing that, "[AmSouth] seems to be helping itself to one of the state['s] hottest asset classes with 73% LQA residential real estate construction growth."  Even as late as October 2006, AmSouth convincingly maintained that fears regarding its commercial lending portfolio in Florida were groundless.  As a Punk Ziegel & Co. analyst noted in an October 6, 2006 report:

- A number of clients, and others, have suggested to us that AmSouth is a major condominium lender in south Florida.  The fear, of course, is that as this market becomes more troubled AmSouth will absorb meaningful losses.  ***After a conversation with the company, I believe that these fears are misplaced***.

                              *       *       *

- ***In sum, the rumors and fears related to AmSouth's risks in this market do not appear to be well-founded***.

29.     However, as AmSouth's commercial lending portfolio both within and outside Florida was booming – with 60% of their total commercial loans for projects still under construction – the same could not be said for its residential mortgage portfolio.  As interest rates began rising in 2005 and throughout 2006, homeowners who purchased their homes with ARMs (AmSouth's "product of choice") in 2003, 2004 or 2005, found themselves unable to re-finance with a lower rate.  Rising interest rates combined with the oversaturation of AmSouth's primary markets caused AmSouth to announce in a January 17, 2006 quarterly

- 16 -

earnings conference call that it expected "the rate of balance sheet growth of residential mortgage loans to moderate from 2005 levels."  As AmSouth began to experience a drop in production of residential mortgages during 2006, the company was desperate to find a way to drive more revenue through its lending portfolio; this meant sacrificing the quality of its underwriting criteria.

30.     As the financial community began to see cracks emerging in the real estate bubble in early 2006, AmSouth skillfully convinced analysts that it was not at risk.  But AmSouth's executives also knew that simply telling the marketplace that its real estate lending portfolio was strong did not make it so.  In order to mask the true vulnerabilities of this portfolio and at the same time maintain its place as an elite Southern banking institution before the real estate bubble burst, AmSouth needed to find a buyer.

31.     In February 2006, Moore and defendant Ritter – Regions' and AmSouth's Chairmen and CEOs, respectively – began seriously discussing a strategic merger of their two companies. In May 2006, after consulting with Regions' Board, Moore retained Merrill Lynch as Regions' outside financial advisor concerning a proposed combination with AmSouth.  On May 17, 2006, Regions and AmSouth entered into a confidentiality agreement and commenced mutual "due diligence."  Within five days, Moore and defendant Ritter had agreed in principle to an all-stock transaction in which AmSouth would merge into Regions, with Regions being the surviving corporation, and having a fixed

- 17 -

610459_1

exchange ratio of 0.7974 shares of Regions common stock for each share of AmSouth common stock.

32.     AmSouth and Regions announced their plan to "merge" on May 25, 2006.  In reality, Regions, a valuable and well-established Birmingham bank charted in 1970 as Alabama's first multi-bank company, would be acquiring the grossly inflated assets of AmSouth.  Under the agreement announced, each share of AmSouth would be exchanged for 0.7974 share of Regions common stock.  Based on the closing prices of Regions' and AmSouth's stock, the companies estimated the market capitalization of the combined entity would be approximately $26 billion.  The deal valued AmSouth shares at $28.33 each, putting the overall price of the deal at approximately $10 billion.

33.     The Merger Proxy filed with the SEC and sent to Regions' and AmSouth's shareholders advised that the transaction was an "acquisition" of AmSouth by Regions and that most of the purchase price could not be directly attributed to a tangible asset – *__an astounding $6 billion of the approximately $10 billion being paid (or over 60% of the total purchase price)__* – would be recorded as "goodwill," or "excess purchase price," as an asset on the new Regions' balance sheet following the acquisition.

34.     Without knowledge of the impending financial catastrophe related to AmSouth's deceptively fragile real estate lending portfolio, Regions' shareholders overwhelmingly approved the acquisition on October 3, 2006.  On November 4,

- 18 -

2006, Regions announced that the transaction had been completed, causing a mass exodus of Regions' senior executives who moved onto other endeavors and left the operations of Regions' franchise in the hands of Ritter and his AmSouth executives.

35.    In the Merger Proxy, Regions' investors were told that in connection with the acquisition, Moore would continue on as the combined entity's Chairman and that he had entered into a lucrative four-year employment agreement commencing upon completion of the acquisition; an agreement that gave Moore entitlement to millions of dollars in the event he was either terminated "without cause" or left for "good reason."  According to the Merger Agreement:

> On completion of the merger, all equity-based compensation awards will vest and options will remain exercisable in accordance with their terms. Following completion of the merger, Mr. Moore will be paid his accrued SERP benefit, the balance of his deferred stock account and the change-in-control benefits under his existing employment agreement.  In addition, Regions will honor the existing terms of the trust agreement pertaining to the payment of premiums on Mr. Moore's life insurance policy.  In the event that, during the term, Mr. Moore's employment is terminated by Regions without "cause" or by Mr. Moore for "good reason," Mr. Moore will be paid a lump sum cash payment equal to the sum of (1) a pro rata bonus for the year of termination and (2) Mr. Moore's annual base salary and average annual bonus as Chairman (or if no such bonus has been paid, his last bonus as chief executive officer) for the remainder of the term.  In addition, upon such a termination all equity compensation awards will vest and remain exercisable for their full term.

36.    In reality, Moore would leave and cash out within a year, leaving defendant Ritter to assume the reigns as the combined entity's Chairman and CEO.

- 19 -

37.     By the time Regions had consummated its purchase of AmSouth in late 2006, the real estate markets in the areas where the vast majority of Regions' current business was now focused – especially Florida – was in a rapid descent from its dizzying heights in 2005.  Real estate sales slowed, mortgage originations stalled, values began declining and foreclosures began accelerating.  As the collapse gained momentum in 2007, foreclosures increased, loan originators began declaring bankruptcy and the financial media publicly detailed the fallout from the lax mortgage requirements and salacious lending practices of the recent past.  However, even with clear signs of the deteriorating real estate market in the areas that Regions was now a significant player, a result of its acquisition of AmSouth, the Company nonetheless refused to publicly acknowledge any foreseeable credit vulnerability in 2007.

38.     During a Citigroup 2007 Financial Services Conference held on January 30, 2007, defendant Ritter emphasized that both Regions and the company he formally headed, AmSouth, "had a very strong business in [Florida] construction real estate" at the time of the merger.  Moreover, in order to put a more appealing veneer on the weakening real estate market in Florida, defendant Ritter stated that any issues at Regions concerning commercial developments in Florida were not related to a bursting housing bubble, but rather due to "labor shortages, interest costs [and] insurance costs."  Thus, defendant Ritter proudly

- 20 -

declared, "*[i]n terms of quality, in our portfolios, delinquencies, foreclosures they just aren't there; it is still a very, very solid portfolio*."

39.     So while defendants spent the first half of 2007 trying to quell investor and analyst fears that the Florida real estate portfolio Regions' inherited from AmSouth might suffer like many of its peer institutions, it was plainly obvious that the real estate markets in which Regions was now so heavily invested were rapidly degenerating.  For example, between February and April of 2007, more than 25 subprime lending firms declared bankruptcy, most notably, New Century Financial Corporation, the nation's largest of these lenders.

40.     Additionally, where once residential mortgages were so valuable to AmSouth that it announced in 2005 that it would keep these loans on their balance sheet, by 2007 this seemed to no longer be the case.  Increasingly desperate for capital, the new Regions began shedding its largest residential portfolio in Florida. In 2007, Regions sold approximately 2,500 Florida residential loans to third parties; sales totaling approximately $558 million.  This fire sale of residential loans was nearly double the amount of loans sold by AmSouth in 2006, but for only 150% of the value.

41.     On April 13, 2007, defendants announced that CFO Jordan had resigned and that Regions' controller Yother had been named CFO.  Defendant Yother had been AmSouth's CFO at the time of the acquisition.

42.     While the entire real estate market was collapsing in 2007, things were especially bad in Florida.  As reported in an April 17, 2007 *Sun-Sentinel* article entitled, "Residents Miss More Mortgage Payments; Foreclosure Rates Expected to Jump in South Florida":

> A deluge of South Floridians are falling behind on their monthly house payments, raising fears that many of the delinquent property owners will lose their homes to foreclosure this year and next.
>
> "Who knows how bad it's going to get," said Richard French, a manager with SunTrust Mortgage and president of the Broward County chapter of the Mortgage Bankers Association.  "It's a little scary to think about."
>
> Escalating home values from 2000 to 2005 caused buyers to overextend themselves.  Many took out short-term, adjustable-rate mortgages and are seeing their loan payments spike as interest rates rise.  Higher property taxes and insurance premiums also are putting homeowners in peril.
>
> Broward had 1,168 property owners with late payments in March, a 331 percent increase over the 271 a year ago, according to Realestat.com, a Plantation-based firm that compiles local housing statistics.  Palm Beach County's late payments climbed 288 percent, to 888, from 229 last March.
>
> Late home loan payments in both counties increased in each of the first three months of 2007.  The rise "bodes ill for actual foreclosures down the road," said Mike Larson, an analyst with Weiss Research in Jupiter.
>
> Marc Thomashaw, a vice president for Realestat.com, was more blunt.
>
> "***We're set for an explosion [of foreclosures] to happen between now and the next six months***," he said Monday.

*                *                *

- 22 -

610459_1

What's more, South Florida's slumping real estate market is holding down prices and preventing recent buyers from selling quickly to get out of financial trouble.

"A lot of these escape valves are now shut," Weiss' Larson said. "It's not a pretty sight."

\*      \*      \*

Mark Zandi, chief economist with Moody's Economy.com, a West Chester, Pa., research firm, agrees that short-term investors and others who bought within the past few years are most at risk of losing their homes. ***Still, he said more mortgage delinquencies and foreclosures are inevitable due to a "noxious mix" of aggressive lending, falling home prices and borrowers facing large increases in their monthly payments***.

43.      However, despite the major headwinds facing both borrowers and lenders in the real estate market nationwide – and especially Florida – defendants remained steadfast that they were well positioned to weather the downturn plaguing many of Regions' peers.  As defendant Yother reaffirmed in a April 17, 2007 conference call announcing the Company's 1Q 07 results:

> ***On a broader scale, our commercial real estate portfolio is performing well and we do not foresee any large problem areas at this time.  Our total exposure to construction, land and land development loans is very manageable, and to date we are not seeing significant deterioration in this portfolio's non-accrual, past due or foreclosure trends***.  As we indicated last quarter, we still expect total 2007 net loan charge-offs in the mid 20 basis point range.

44.      Yet, tellingly, defendant Yother devoted only one sentence to how Regions' residential mortgages were performing: "Regions' mortgages results were weaker than anticipated, reflecting both seasonal and industry challenges." And when specifically asked about past-due loans, defendant Yother responded,

- 23 -

"*the majority of that is residential mortgage, it is well collateralized; there is virtually no loss in that*."

45.     As for any signs that the Company's commercial lending portfolio was suffering any significant setbacks, defendant Yother during the Sanford Bernstein 23rd Annual Strategic Decisions Conference on May 30, 2007, confidently stated:

> *Commercial real estate credit quality, we still are very, very comfortable with where we are on our commercial real estate. A large part of our commercial real estate is in the state of Florida. The economy in the state of Florida, even though it is not as strong as it has been the last couple of years, it is still extremely strong*. When you look at the unemployment rate and migration, the job creation, everything is still going extremely well in the state of Florida. And the other areas where we have large commercial real estate concentrations, the portfolio is very granular. It is very well dispersed by product type, by size, by customer, by geography. So we don't have any areas there where we think we have major issues at all.

Defendant Yother further downplayed any potential problems regarding loans to condominium developers, noting that:

> We have I think about $2.7 billion in condominiums – $2.3 billion in condominiums, which is still less than 9% of our total commercial real estate portfolio. *So yes, we don't see any – as I said, we don't see any significant credit issues on the horizon right now*.

46.     And while defendant Ritter in an April 2007 earnings call attributed the halt in construction projects not to a faltering real estate market, but to "building material costs," "insurance costs" and an overall "worrying that the square footage charges wouldn't make the project viable as it was originally

- 24 -

planned," it certainly was not the whole story.  As a May 26, 2007 *New York Times*

article entitled "As Condos Rise in South Florida, Nervous Investors Try to Flee"

illustrated:

> As dozens of condominium towers conceived during Florida's real estate boom near completion, ***investors who snatched up units in the preconstruction phase in hopes of turning a quick profit are increasingly trying to break contracts, even walking away from fat deposits***.

> "***Motivated***" ***sellers are flooding online forums like Craigslist with advertisements for condo units still months or years from being finished***.  And lawyers have been inundated with calls from people hoping to avoid closing on units they bought during the speculative craze of 2004 and 2005.

> "I get two or three of these calls a day," said James Ryan, a lawyer in Boca Raton who said he had 40 clients looking to get out of condo contracts.  ***One, Mr. Ryan said, abandoned a $340,000 deposit rather than close on a $1.6 million unit that lost its appeal as the market faltered***.

> ***The numbers suggest that it will only get worse***.  In Miami-Dade County alone, 8,000 new condo units will be completed this year and nearly 12,000 more in 2008.

> ***But demand has dropped markedly, and people who thought they could "flip" condos – buying, then selling for a steep profit before construction is done – are parting with that fantasy***.  After years of stunning price increases – 25 percent in the West Palm Beach-Boca Raton area, for example, from March 2005 to March 2006 – condo prices have started dropping.

> Condominiums in West Palm Beach and Boca Raton sold for a median price of $211,800 in March, down from $224,600 a year earlier, according to the Florida Association of Realtors.  And in Fort Lauderdale, the median price in March was $195,500, down from $202,600 the previous year.

*     *     *

"*I see buyers unleashing all possible means to try to get out of contracts*," said Gary Saul, a lawyer in Miami for developers, adding that in some projects, *20 percent of buyers want their money back*.

47.     On an October 16, 2007 conference call with analysts announcing the Company's 3Q 07 third quarter 2007 results, defendants continued their familiar drumbeat that their lending portfolio was not made up of those "risky" loans steadily infecting the balance sheets of their competitors and grabbing news headlines nationwide.  As defendant Ritter stated:

Besides the merger advantages, there are other reasons why we feel Regions is well positioned.  *First and foremost, particularly in this environment, is Regions' conservative risk culture.  This is perhaps best exemplified by what we do not have on our balance sheet.  We have no negative amortizing mortgages, no option ARMs, very little in the way of subprime backed or high-risk investment securities*, only about $100 million of subprime loans or less than 1/10th of 1% of the total loan portfolio, and our alt A portfolio represents just 3.6% of the overall loan portfolio.  *As to credit quality, our loan portfolio's products, geographic, and size diversification provides considerable protection from credit cycle downturns.  And we follow strict conservative underwriting standards.  There's no doubt that our loan tolerance for risk has caused us to give up on some potential loan growth in the past, but it serves us very well in the current market*.

*As an example, where home equity loans have been a troublesome area for many banks lately, Regions is faring well*.  In the second quarter, our annualized home equity charge-off rate compared very positively to our peers and I would certainly think that our 31 basis points of average home equity outstanding losses in the third quarter will again, on a relative basis, be very favorable.

48.     And while defendants were unwavering in their message that Regions' loan portfolio in Florida remained strong, a bank of a similar size and with a similar exposure to this particular real estate market reported something

- 26 -

quite different.  On October 16, 2007, KeyCorp, one of the nation's largest bank-based financial services companies, with approximately $97 billion assets at the time and nearly 20% of its $3.7 billion commercial real estate loan portfolio (residential properties) emanating from Florida, announced in a conference call that:

> As you saw in our earnings release, we experienced an increase in our non-performing assets during the [third] quarter resulting from several projects in the residential property segment of our Real Estate capital line of business moving to non-accrual.  ***The two geographic areas of the country that we have been watching for some time and have taken action to reduce our exposure in are Florida and Southern California. These are the two parts of the country where we experienced an increase in non-performing assets.  As you may recall, we started reducing our condo exposure in Florida over two years ago, by not making any new commitments***.  There are a number of projects we financed in Florida that are coming to completion in the next two quarters which will further reduce our exposure to this market.[3]

49.    On November 6, 2007, almost one year to the day after the AmSouth acquisition, Regions announced former CEO, President and Chairman Moore would be retiring effective December 31, 2007, with defendant Ritter replacing him as CEO and Chairman of the Board.  Then on November 15, 2007, Regions announced that Allen B. Morgan, Jr., Chairman of Morgan Keegan and a director

---

[3]    Of KeyCorp's $3.7 billion nationwide commercial real estate portfolio (residential/condominium development), 19% (or $700 million) was based in Florida.  By way of comparison, nearly 21% (or $600 million) of AmSouth's nationwide $2.9 billion commercial real estate (residential/condominium development) lending portfolio was located in Florida.

and the Vice Chairman of the Regions' Board, was also retiring from all three positions, effective December 31, 2007.

50.    On January 3, 2008, the Company finally announced plans to incrementally increase its loan loss provision, but used the announcement as an opportunity to downplay the effects of the collapsing credit markets on Regions. The release issued that day stated in relevant part:

> Regions Financial Corporation today announced it plans to increase its loan loss provision to approximately $360 million in the fourth quarter of 2007, an increase of approximately $270 million from the third quarter of 2007. Regions' decision was prompted by weakening credit quality, primarily in its residential builder loan portfolio. Fourth quarter 2007 net loan charge-offs and non-performing assets are expected to rise to approximately an annualized 46 basis points of average loans and 91 basis points of period-end loans and foreclosed properties, respectively. The total allowance for credit losses is expected to be strengthened to about 1.45 percent of net loans at December 31, 2007, from the prior period's 1.19 percent.
>
> \*     \*     \*
>
> **Despite more challenging residential real estate market conditions, loans within Regions' residential first mortgage and home equity portfolios generally continue to perform well**.
>
> **Regions believes its strong capital position and core earnings power will position the company for continued long-term success despite the current credit cycle**.

51.    While conceding that several of Regions' residential developments had "zero activity today," during a conference call later on the evening of January 3rd, the Company attempted to soothe investors nerves. Chief Risk Officer Bill Wells ("Wells") stated that Regions' loan portfolio was performing "relatively

well."  However, for those areas of its lending portfolio that were seeing signs of

weakness, Regions created a Special Assets group to specifically focus on those

loans showing signs of "stress."  As List Underwood ("Underwood"), Regions'

Director of Investor Relations explained on the call:

> [A]s we started to see the downturn in the market, we, as part of our risk function, which is part of our credit process, went through the portfolio and identified customers that had some stress on them, and that might be from a different point.  It might be from the market they were in, it might be from their ability to weather a downturn.  ***What we decided to do is take action and move these assets, which is the strength of our risk process, on early problem loan identification.  And we thought it's always best as a company to move these assets into a special workout group, and that's what we've done***.  And we have identified these credits and moved them over into a group that we feel can work us through the cycle.

52.     Analysts took the bait, and repeated what defendants had told them.

As a SunTrust Robinson Humphrey analyst noted in her January 4, 2008 report:

> RF is aggressively dealing with problem loans in the struggling Florida and Atlanta real estate markets and is reassigning lending relationship managers to focus on work-out strategies for distressed borrowers. Management stated RF's residential mortgage and home equity loan portfolios are still performing relatively well.

53.     Then again on January 22, 2008, when Regions issued a release

announcing its fourth quarter and fiscal year 2007 financial results, Regions

repeatedly reassured the investment community that the Company had taken the

appropriate steps to decrease its exposure to troubled mortgages stating:

***Fourth quarter EPS of 24 cents, excluding merger-related charges***

\*       \*       \*

- 29 -

"Despite an increasingly challenging operating environment, Regions is well positioned for 2008 and beyond," said Dowd Ritter, chairman, president and chief executive officer.

\*      \*      \*

Net loan charge-offs increased to $107.5 million, or an annualized 0.45 percent of average net loans, in the fourth quarter of 2007 compared to $63.1 million, or an annualized 0.27 percent of average net loans in the prior quarter.  The linked-quarter increase was partially related to deterioration in the residential homebuilder loan portfolio, a result of the housing down cycle in some of the Company's markets, including Florida and Atlanta. *Loans within Regions' residential first mortgage and home equity portfolios continue to perform relatively well*.

As previously reported, residential homebuilder loans represent approximately 8 percent, or $7.2 billion, of Regions' total portfolio of $95.4 billion.  *In addition to increasing the loan loss provision, the Company is implementing several measures to support the management of this portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers*.  Approximately $850 million of loans have been identified to be managed by Regions' special assets department.

\*      \*      \*

*Capital position remains strong*

*At December 31, 2007, Regions' capital position, as measured by the tangible stockholders' equity-to-tangible assets ratio, was a strong 5.88 percent.  This compared to 6.02 percent at September 30, 2007*.

54.    On a conference call following the announcement of their 4Q 07 results, defendant Ritter reemphasized how aggressively the Company was scrutinizing and managing the "credit quality issues" popping up in its real estate lending portfolio, stating:

- 30 -

> As we disclosed earlier this month, ***Regions took aggressive steps in the fourth quarter to address the effects of the weakening housing demand on our residential home builder loan portfolio***.
>
> *       *       *
>
> Overall, we agree that 2008 is going to be an extremely difficult year for our industry but we feel convinced that Regions has the tools and the ability to manage through these tougher times. ***We have been and will continue to be proactive in recognizing credit quality issues and taking actions to mitigate earnings and balance sheet impacts***.

55.   Defendant Ritter continued, saying that even though its home mortgage products were not the "loan types that are a current source of much industry stress," the Company nonetheless "actively sought out our customers who might need our help as their mortgage is repriced. ***For instance since early 2007, we've been contacting those customers with adjustable-rate mortgages six months in advance of their rate reset to discuss their ability to make the increased payments***." Ritter also discussed the Special Assets group that was brought up during the January 3rd call. He reiterated that:

> In our review of the residential homebuilder portfolio, we've identified about $850 million that we would term relationships that we wish to exit. And we've increased the related allowances for inherent losses. ***We've also shifted experienced real estate lenders to oversee and actively manage the portfolio as well as establishing a detailed proactive workout program***. Our specifically tailored workout program calls for frequent borrower contact, continuous local market review, and comprehensive internal analysis in terms of resolution and exit options.

56.   Less than a week later, on February 13, 2008, Regions announced that defendant Yother was stepping down and would be replaced as CFO by defendant Esteves effective April 1, 2008.

- 31 -

## SUBSTANTIVE ALLEGATIONS

### Defendants' Fraudulent Scheme at the Beginning of 2008

57.     Defendants' statements that they were "implementing several measures to support the management of this [troubled] portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers" was a reference to the Company's Special Assets department.  This group existed at Regions pre-merger, but in late 2007 was restructured by defendant Ritter in a way to more actively manage and manipulate the accounting for Regions non-performing loans.

58.     The Special Asset Officers or "SAOs" working in this group were assigned, by geographic region, large pools of loans that had been identified as "substandard" or worse according to Regions' internal risk-rating.  Special Assets Officers were then tasked with either trying to work with the borrower in order to arrange a mutually acceptable means to repay the loan, or determine that the loan was simply not recoverable.  In these instances where it became likely that Regions would never recover anything on the loan, it was classified as "non-accrual," and Regions was required to allocate an appropriate reserve for it and/or write it down under the applicable accounting rules.

59.     According to Regions' 2007 Form 10-K, loans are placed on non-accrual status when management has determined that full payment of all contractual principal and interest is in doubt, or the loan is past due 90 days or

more as to principal and/or interest unless the loan is well-secured and in the process of collection.  When a loan is placed on non-accrual status, uncollected interest accrued in the current year is reversed and charged to interest income.

60.    The Head of Special Assets at Regions during this time was Jeff Kuehr ("Kuehr").  But as part of Regions' "reassignment of highly experienced, key relationship managers," defendants now required the Special Assets Officers to justify their decisions – especially the decision that a loan had become a "non-accrual" loan – also to be discussed with Tom Neely ("Neely") (former Head of Problem Asset Management), Michael Willoughby ("Willoughby") (former Chief Credit Officer), and Wells (former Chief Risk Officer).  With the understanding of defendants, and under the guise of their new authority, Neely, Willoughby and Wells did everything they could to keep loans from becoming "non-accrual" – even though it violated Regions' policies and internal controls.

61.    For instance, Confidential Witness ("CW")1 was a Special Assets Officer at Regions from 2005 through March 2010, who managed a portfolio of "sub-standard" risk rated loans (*i.e.*, loans that were rated a seven or worse – on a scale of one to nine – on the Regions' internal risk rating scale).  The portfolio of special asset loans that this witness managed was comprised of loans from Georgia and South Carolina, and included commercial real estate loans.  The portfolio increased in size from $400 million in 2007 to $1.6 billion in 2009.

- 33 -

62.     According to CW1, he/she managed problem loans for builders George Lane and Daniel Miles ("Miles"), among others.  Miles was an apartment developer that "bankrupted" his developments and then filed for personal bankruptcy.  Miles had an estimated $250 million obligation to Regions.

63.     As a Special Assets Officer, CW1 states that he/she was responsible for making risk recommendations on loans he/she managed, including identifying loans that should be classified as non-accrual.  Non-accruing assets were those for which it was obvious and unlikely that Regions would be able to collect any money due on the loan.  Once per month, the Special Assets Officers, including CW1, manually completed forms, which CW1 referred to as the "non-accrual forms."  These forms were two to three pages in length, and included details about the loan balances, a narrative about why collection was unlikely and an estimated amount of the loss.  These forms were routed to the Credit Managers.  Then, a meeting was held each month to discuss the "recommendations for non-accruals."  Attendees at the monthly meetings usually  included all of the Special Assets Officers, Neely, Willoughby and Wells, among others.  "The Special Assets Officers always tried to assign the correct risk ratings" to reflect the actual status of the loan, including timely classifying loans as non-accruals.  However, at the monthly meetings, Neely would "challenge" the recommendations from the Special Assets Officers regarding non-accruals.  Neely's mandate was clearly to try to keep loans from being designated non-accrual, making comments like "can't

- 34 -

they borrow money from their mom" or "isn't there any glimmer of hope that we will get some sort of payment."

64.   The monthly special asset meetings were preceded by a process in which the SAOs and their support staff completed non-accrual forms that were sent to the regional Credit Managers.  The Credit Managers "signed off" on the non-accrual forms and the non-accruing loans were designated as such in a spreadsheet that Milton Tate ("Tate") maintained out of Gainesville, Florida.  The spreadsheets that Tate maintained tracked the risk ratings on special assets, including risk ratings of "eight" or "nine."  A risk rating of "eight" meant that the loan was non-accruing and a risk rating of "nine" meant that the loan was reported as a loss.  The data in the spreadsheets were then discussed at the monthly special asset meetings.

65.   On a quarterly basis, the Special Assets Officers also completed Statement of Financial Accounting Standards ("SFAS") No. 114 forms.  According to Regions' policy, loans evaluated for inclusion on a SFAS No. 114 form had to be in non-accrual status and over $2.5 million.  The SFAS No. 114 form was used as part of the process through which Regions forecasted losses on non-performing assets ("NPAs").   The  SFAS  No. 114  forms  were  submitted  to  the  Credit

Managers, who signed off on the forms.   They were then made available to accounting.[4]

66.    According to CW1, after the monthly meetings, Neely worked with the Credit Managers – without the Special Assets Officers present – to get the risk ratings reduced from non-accrual back to sub-standard, so that the non-accruing assets did not have to be reported to the investment community.   Non-accruals were not "put on the list" because "numbers had to be made" each quarter at Regions.   But there was another form that was completed by the Credit Managers to get the risk ratings reduced and so that the non-accruals did not have to be reported.

67.    CW1 states that the loans that were not properly classified as non-accruals were usually classified as such the following month or quarter, so that the non-accrual classification was just delayed to "make numbers."   The loans that were not properly classified as non-accrual were typically larger loans, varying from $10 to $40 million in size, because those were the ones that "would tip the needle."

68.    This process continued throughout 2008, and at least through the first quarter of 2009.   It is corroborated by a number of other former Special Assets Officers of Regions.   For example, CW2 is a former Special Assets Officers in the

_____

[4]    SFAS No. 114 is the accounting rule applicable to impaired loans.   *See* ¶¶196-197.

Birmingham, Alabama office who was employed from 2000 through May 2009. CW2 relates the same process was followed for his/her portfolio of loans, which were "business loans" issued to businesses in Alabama and Atlanta, Georgia. Similarly, CW3, the former Head of Special Assets for Florida during the Class Period, confirmed that *the notion that Regions did not properly classify non-performing loans as non-accruing assets in a timely manner was "good information*." CW3 began at AmSouth in July 2000, and joined Regions after the merger. CW3 left the Company in June 2009 as a result of his/her concern about how special assets and recommendations regarding non-accrual loans were handled at the Company.

69. As set forth above in ¶¶51-68, this was a Company-wide practice instituted and relied upon by defendants Ritter, Yother, and later, Esteves throughout the Class Period. These defendants were kept aware of the practice and its effects through both a reporting structure and through periodic reports. For instance, former Chief Credit Officer Willoughby and former Chief Risk Officer Wells frequently attended the monthly and quarterly meetings with the Special Assets Officers. Willoughby also reported to Wells, who in turn met frequently

with defendants throughout the Class Period, and even participated in conference calls and analyst events with defendants on behalf of Regions.[5]

70.    In addition to this direct reporting structure, defendants were also able to monitor the results of the Special Assets department via risk-adjusted return on capital ("RAROC") reporting. CW4 is a former Vice President of Finance (employed with the "management accounting side of the bank"), who was employed at Regions from 2006 through the Spring of 2008. CW4's job duties specifically included supporting internal management and providing reports that detailed performance metrics and RAROC data.

71.    According to CW4, RAROC reporting was an internal management reporting function at Regions. The RAROC reporting provided "different cuts" of data, so that the data was presented by customer type and products or services. The RAROC reports were produced on a monthly and quarterly basis, and at the consolidated financial results of operations level.

72.    Managers, such as the Branch Managers, all the way up to executives received hard copies of the RAROC reports. Branch Managers received a condensed version of the reports that were "very detailed," but only three to four

---

[5]    Wells is also named as a defendant in the shareholder derivative action. *Louisiana Municipal Police Employees Retirement System v. C. Dowd Ritter, et al.*, No. CV-2009-1588 (Ala. Cir. Ct., Jefferson Cnty.), Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Corporate Waste, Abuse of Control, Aiding and Abetting and Breach of Professional Duties, ¶73, filed May 22, 2009.

pages in length and specific to their respective markets.  By contrast, Ritter and the other executives received "white books."  The "white books" were hard copies of the RAROC reports that were "hundreds of pages" in length and contained risk-adjusted performance data broken down by market, region and line of business. There were "tons and tons" of data in the "white books," which were "at least an inch thick."

73.     CW4 states that there was a "reasonably decent review process" of the data in the "white books" by defendant Ritter and other members of the executive team.  The executives, including defendants Ritter, Yother, and later Esteves, met at least monthly in Management Committee meetings, during which the data in the "white books" were reviewed.

74.     According to CW4, the RAROC reports provided performance metrics that management, including the defendants, used to evaluate the financial condition of Regions from a risk-adjusted perspective.  For example, the income statement showed the "bottom line" of the Company.  The RAROC internal reports showed the "bottom-line" from a risk-adjusted perspective.  The RAROC reports included various ratios, such as efficiency ratios, return on equity ratios and return on asset ratios.

75.     In preparing the RAROC reports, CW4 "looked at each asset category" and conducted "studies" about the performance of assets, as well as evaluated "historical loss rates" by loan category.  The assets and liabilities of each

"unit" within the Company were evaluated to arrive at a "judgment" on how each unit was performing in comparison to the other units within the Company and in comparison to similar units of the peer group against which Regions competed. The "units" included the retail, commercial and wealth management business units.

76.     The RAROC reports were broken down by region.  The state of Florida had several reporting regions, which were "rolled up" into the state level. Data in the RAROC reports showed that commercial real estate loans for all of the regions in Florida presented considerable risks for Regions.  The RAROC reports also showed that there were risks associated with the commercial loans Regions issued in Georgia.  According to CW4, "[t]he loans we [Regions] had in Georgia and Florida were the biggest holes."

77.     Highlighting the "riskiest parts of the portfolio" was supposed to be aimed at providing management, including the Individual Defendants, data on the financial results of operations that could be used to make decisions regarding the best way to reduce the exposure to losses.  However, even though Ritter had access to the RAROC data that indicated the commercial loans in Florida were more risky than other loans carried by Regions, he ignored this data – and ultimately misled the investment community regarding the risks of which he was aware.

78.     CW4 also listened to the quarterly analyst calls during his/her employment with Regions and during the Class Period.  According to CW4, during "every single quarterly conversation with the analysts, someone from the financial

- 40 -

world asked Dowd [Ritter] about loans in Florida and bad commercial real estate."
Ritter responded to the inquiries from analysts about the loans in Florida, saying,
"[n]o, no, we are just fine.  We are doing just great."  The loans in Florida are "not
a problem."

79.    According to CW4, Ritter was misleading the investment community
regarding the risks associated with the commercial real estate loans in Florida.
Through the RAROC "reporting mechanism" within Regions, defendant Ritter was
informed that the loans in Florida were "very risky."  However, Ritter failed to
communicate the risks of which he was aware to the investment community and
specifically when he responded to analysts' questions about the commercial loan
portfolio in Florida.

80.    According to CW4, during 2007 defendant Ritter was able to "hide
behind the fact" that the market had not "turned on Regions yet."  The "bottom
line" was positive.  However, the RAROC reports presented the risk-adjusted
"bottom line," which was indicative of what was to come when the market turned
and which demonstrated that the "bottom line" was negative when the risks were
considered.  To the dismay of the Regions' investment community, Ritter ignored
the data in the RAROC reports.

81.    While defendants continued to improperly remove loans from "non-
accrual" status to "make the numbers" throughout 2008, when the market swooned
in September 2008, Regions became increasingly desperate in its manipulation of

- 41 -

its non-performing loans.  According to CW1, in late 2008, Willoughby instructed Neely and the Special Assets Officers that there should be "no more emails or memos" about the removal of non-accrual loans from the non-accrual list.  In direct violation of the Company's policies, banking regulations and Generally Accepted Accounting Principles ("GAAP"), "[t]here was to be no more paper trail of this practice."

82.    Defendants' audacious fraud came to a crescendo in March 2009, and has brought upon Regions *a formal investigation by the Federal Reserve*. According to CW1, at the end of 2009's first quarter and consistent with earlier practices, Neely personally removed $150 million of non-accrual loans on March 31, 2009, only to replace them after the close of the quarter.  CW1 knows of the event because he/she spoke with Tate about it just after it happened.

83.    According to CW1, on or about March 31, 2009, Neely contacted Tate and told Tate to remove $150 million of non-accrual loans "from the list." Tate did as he was instructed.  Tate contacted CW1 the next day and told him/her what had happened.  The $150 million of non-accrual loans was reinstated in early April, after the end of the quarter.

84.    This is corroborated by another former Special Assets Officer.  CW5 was employed at Regions as a Senior Vice President of Special Assets from July 31, 2008 to July 1, 2009.  CW5 managed a portfolio of special assets comprised

mainly of commercial real estate loans for the Eastern Florida region, with a "legal balance" of approximately $500 million.

85.     According to CW5, in March 2009, a $20 million loan he/she recommended as non-accrual was not classified as such until the beginning of the next quarter in April 2009. According to CW5, in March he/she had determined that the loan was non-accrual. CW5's determination was reviewed and approved by Kuehr. The loan had been classified as non-accrual in Regions automated "AFS" system, following the quarterly meeting in early to mid March 2009. However, toward the end of March 2009, CW5 noticed that *the risk rating on the loan had been improved in the AFS system* and changed to "sub-standard" prior to the end of the quarter. CW5 was "surprised" by the change. CW5 was not certain how the change came about, including who made or directed the change.

86.     CW5 immediately contacted someone on the accounting team, and informed them that there was an "error" on the classification of the $20 million loan. The accounting team member responded, noting that the change was *intentional* and it was not an error.

87.     Since then *the Federal Reserve has opened an investigation into Regions' classification of loans as "non-accrual," and the manipulations described herein by various former employees*. CW5 was interviewed by Robert Ward ("Ward"), Senior Investigator with the Division of Banking Supervision and Regulation, Board of Governors Federal Reserve out of Washington D.C. in

- 43 -

approximately August 2009.  CW5 was uncertain who else Ward interviewed. Ward asked CW5 specifically about the March 2009 incident.

88.     In addition, the Company's Audit Committee of the Board is now in the process of conducting its own investigation.  According to CW1, the New York-based law firm Sullivan & Cromwell was hired by the Audit Committee for this purpose, and has a list of the $150 million of assets that were removed from the non-accrual list in March 2009.

89.     CW5 explained how Regions benefitted from failing to recognize loans as "non-accrual."  According to CW5, there were two ways Regions benefitted from not timely reporting non-accruals, as was his/her experience in at least March 2009.  First, when loans were placed on non-accrual status, Regions was forced to "report to the world" that the number of non-accruing assets was continuing to build.  "The bank was trying to show that non-accruals" were properly "being managed" and were beginning to "flatten out or decline."  Regions did "not want to report" that non-accruals were, in fact, increasing.  CW5 believed that the first calendar quarter of 2009 would have represented "something like the fifth consecutive quarter that non-accruals were increasing for Regions."  The second way that Regions benefited from not timely reporting non-accruals was an "economic benefit."  Increases in non-accruals meant that reserves had to be increased.  And, an increase in reserve meant "less income."  So, income was "negatively effected" by an increase in non-accruals.

90.    Since the investigation by the Federal Reserve began, Neely, Willoughby and Wells were all dismissed by Regions *at the same time*.  According to a November 16, 2010 article by the *Birmingham Business Journal*:

> Regions Financial Corp. has announced three departures from its risk management group.
>
> The Birmingham-based financial institution said Chief Risk Officer Bill Wells has resigned from the company.  Also, Michael Willoughby, director of credit risk, has retired from Regions, and Tom Neely, head of problem asset management, has left the company, according to a press release from Regions.
>
> "It is important to note that these departures are not the result of any determination with regard to additional problem loan migration, loan loss reserves or charge-offs.  We are committed to having a strong leadership team in Risk Management and to continuing to de-risk our balance sheet," said President and CEO Grayson Hall.

**Additional Evidence Supporting a Strong Inference of Scienter**

91.    In addition to the facts enumerated above indicating that defendants knew or were reckless in not knowing that their public statements were materially false and misleading at the time they were made during the Class Period, a strong inference of defendants' scienter is also supported by ¶¶92-96 below.

92.    Defendant Ritter is also a defendant in a shareholder derivative action, brought on behalf of the Company against its directors, based on many similar allegations as here.  *Louisiana Municipal Police Employees Retirement System v. C. Dowd Ritter, et al*., CV-2009-1588 (Ala. Cir. Ct., Jefferson Cnty.).  However, notably absent from the allegations in that action are the details of the fraudulent scheme set forth above in ¶¶57-89.  That shareholder derivative action is currently

- 45 -

pending in the Circuit Court of Jefferson County, before the Honorable Robert S. Vance, Jr., Circuit Judge.

93.     In that case, defendants moved to dismiss the action, arguing that plaintiffs failed comply with Delaware and Alabama state law by failing first to make a demand on the Board  or to allege particularized facts demonstrating why such demand would have been futile.  Judge Vance denied that motion on May 6, 2010, holding that plaintiffs' allegations sufficiently demonstrated "*with particularity*" that demand was futile because the allegations showed "*a substantial likelihood of liability*" on behalf of a majority of the defendants, *including defendant Ritter*.

94.     More specifically, Judge Vance held:

> The plaintiffs effectively paint a picture describing the collapsing real estate and credit markets beginning in 2006.  Such turmoil in the industry, by itself, does not take the plaintiffs where they need to be, however.  Their Complaint must also focus on specific problems with Regions and a knowing disregard of obligations owed to the shareholders.

> Between October 2007 and January 2009, Regions issued a number of press releases that suggested no significant problem with its financial situation.  Filings with the S.E.C. also failed to describe any problem.  There was no suggestion that the company's goodwill was impaired in any way.  The merger with AmSouth was touted as a success, even though it led to Regions' acquisition of AmSouth's investment in the Florida real estate market, which was collapsing.  The S.E.C., apparently concerned by the situation, sent a comment letter to Regions in June 2008, questioning the determination in the 2007 10-K filing that its goodwill balance was not impaired.  By October 2008, outside commentators were point out obvious problems in Regions' financial statements.  It was months, however, before Regions wrote

- 46 -

down its goodwill and admitted that the value of its loan portfolio was billions less that what had been reported.

Such facts still do not necessarily suffice – even had the directors been merely negligent or incompetent, no liability would result.  The plaintiffs must instead allege facts showing the directors' reckless disregard of their duties of good faith and loyalty in failing to candidly address this situation.  This cannot be done simply by arguing that board members signed off on allegedly deceptive regulatory filings.  *See In re Citigroup*, 964 A.2d at 133 n.88 (explaining that simply "pleading that director defendants 'caused' or 'caused or allowed' the Company to issue certain statements is not sufficient particularized pleading to excuse demand under Rule 23.1").

The Court concludes that the plaintiffs have met their burden, at least to the extent needed to establish demand futility on this point.  Regions' form 10-K for 2008 acknowledged that its loan portfolio had been under pressure for over a year, resulting primarily from the Florida real estate market, which collapsed beginning in 2007.   In their Complaint, moreover, the plaintiffs allege that the defendants knew of the true financial situation and misrepresented or concealed those facts.

At that time, five of the current directors – Charles McCrary, Donald DeFosset, James Malone, John Roberts, and Lee Styslinger – were on Regions' audit committee.  As the plaintiffs allege, the members of this committee have particular responsibilities and must possess specific qualifications, including a specialized understanding of generally accepted accounting principles ("GAAP").   Under such accounting principles, an analysis of goodwill impairment must be performed at least annually and also in the interim if changing circumstances would likely reduce the fair value below its carrying amount.  The audit committee members are charged with the duty of reviewing quarterly reports with the independent auditors, reviewing with management any press releases pertaining to Regions' earnings, and scrutinizing major financial risk exposures.

Given these duties, along with the well-known and heavily publicized deterioration of the real estate market (especially in Florida) and the corresponding collapse in the credit market, and the letter received from the S.E.C. in June 2008, the members of the audit committee can fairly be said to confront a substantial likelihood of

- 47 -

liability as a result of Regions' failure to advise its shareholders prior to January 2009 that its financial situation was threatened.

These five members, plus board members Dowd Ritter and O. B. Grayson Hall – who are executives of Regions and whose compensation in the wake of the events since 2006 has also been challenged by the plaintiffs – total seven, which is the minimum needed to overcome the demand futility hurdle.

95.     In addition, during the Class Period, the Individual Defendants were incentivized by the Regions' Compensation Program to push the Company to meet and exceed its expected goals of financial performance. According to the Company's 2008 shareholder proxy statement:

One of the central beliefs on which our compensation philosophy is based is that a greater percentage of compensation should be at risk for executives who bear higher levels of responsibility for our performance. To support this belief, we provide our executives with the opportunity to earn performance-based annual cash incentives each year. We intend that these incentives will be much more significant than base pay in determining the total compensation received by an executive if he or she performs at expected levels of achievement. ***Because annual cash incentive payments require the achievement of measurable results based on goals and objectives set at the beginning of the year, payouts are strongly performance-based and may be highly variable – ranging from nothing to more than two times an executive's base pay. The goals and objectives set at the beginning of the year for the CEO will relate primarily to the achievement of expected financial performance of the Company for the year***. Goals and objectives for other officers will include the same Company financial objectives; however, up to 50% of their incentive opportunity may also be based on more subjective goals and the CEO's evaluation of individual contributions to the achievement of these goals in each of their areas of influence and control.

96.     During a time when Regions' real estate and home equity lending portfolios were rapidly deteriorating because of mounting delinquencies,

- 48 -

foreclosures, unfinished multi-million dollar condominium developments in states like Florida and Georgia in addition to rising unemployment, the task of achieving these financial goals legitimately was not very likely. Thus, in order to earn their multi-million dollar annual bonuses and stock option grants, the Individual Defendants relied on their fraudulent scheme to provide the illusion that Regions had and would continue to weather the real estate meltdown that began in 2006 and continued throughout the Class Period. Thus, and as a result of their fraudulent scheme, in 2008, defendants Ritter and Yother, and defendant Esteves, who took over for Yother in April 2008, reaped approximately $9.3 million, $5.6 million and $2.4 million in total compensation respectively according to the Company's Proxy Statement for that year.[6] According to Regions' Proxy Statement for 2009, defendants Ritter and Esteves each took home approximately $9.7 million and $2.4 million in total compensation respectively.

**Defendants' False and Misleading Statements During the Class Period**

97.    On February 27, 2008, Regions filed a false and misleading annual financial report for 2007 with the SEC. The 2007 Form 10-K reflected Regions' goodwill balance for the fiscal year ending December 31, 2007 as $11.5 billion, essentially reporting that its goodwill was not impaired. In fact, the 2007 Form 10-

---

[6]    Although in 2008, defendant Ritter "volunteered" not to receive a cash payment under the annual incentive plan, the Compensation Committee was so moved by this gesture that it awarded him 323,676 shares of restricted stock.

K stated that "[e]xcess purchase price at December 31, 2007 totaled $11.5 billion as compared to $11.2 billion at December 31, 2006, with the increase driven by finalizing the purchase price adjustments related to the AmSouth merger." Regions' "Critical Accounting Policies," the 2007 Form 10-K expressly stated:

> *Regions' excess purchase price is tested for impairment annually, or more often if events or circumstances indicate impairment may exist.* Adverse changes in the economic environment, declining operations of the business unit, or other factors could result in a decline in implied fair value of excess purchase price. *If the implied fair value is less than the carrying amount, a loss would be recognized to reduce the carrying amount to implied fair value.*

98.    Concerning the Company's accounting for loan losses and non-accruals, the Form 10-K also stated:

**Allowance for Credit Losses**

*        *        *

> *Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for credit losses.* This process results in what are internally called FAS 114 Specific Reserves. In the Specific Reserve process, loans are valued based on the most suitable valuation technique as defined in FAS 114 (see Note 1 "Summary of Significant Accounting Policies" to the consolidated financial statements). If current valuations are lower than the current book balance of the credit, the negative differences are reviewed for possible charge-off. In instances where management determines that a charge-off is not appropriate, a FAS 114 Specific Reserve is established for the individual loan in question. That Specific Reserve is incorporated as a part of the overall allowance for credit losses. At December 31, 2007, loans qualifying for FAS 114 consideration totaled $660.4 million with Specific Reserves of $58.7

million.  This compares to total loans qualifying for FAS 114 of $237.5 million with Specific Reserves of $17.6 million at December 31, 2006.

*Management considers the current level of allowance for credit losses adequate to absorb losses inherent in the loan portfolio and unfunded commitments.*

\*       \*       \*

## NON-PERFORMING ASSETS

*Non-performing assets consists of loans on non-accrual status and foreclosed properties.  Loans are placed on non-accrual status when management has determined that payment of all contractual principal and interest is in doubt, or the loan is past due 90 days or more as to principal and interest unless well-secured and in the process of collection.*  Uncollected interest income accrued on non-accrual loans in the current year is reversed and charged to interest income. Uncollected interest accrued from prior years on loans placed on non-accrual status in the current year is charged against the allowance for loan losses.

*At December 31, 2007, non-performing assets totaled $864.1 million, or 0.90 percent of ending loans, compared to $379.1 million, or 0.40 percent of loans, at December 31, 2006.  The increase in non-performing assets at December 31, 2007, was largely influenced by growth in non-performing loans in the fourth quarter of 2007 due to the residential homebuilder portfolio as previously discussed.*  Sales of non-accrual loans during the second half of 2007 totaling $74.2 million partially offset the otherwise higher level of non-performing assets. Associated with the non-performing loans sale, Regions recorded an additional $11 million of loan loss provision, which coupled with $7 million of existing reserves on these loans resulted in an $18 million reduction in the allowance for loan losses in the third quarter of 2007. Changes in economic conditions and real estate demand in Regions' markets are likely to further increase the level of non-performing assets during 2008.

\*       \*       \*

## LOANS

\*       \*       \*

- 51 -

*Loans are placed on non-accrual status when management has determined that full payment of all contractual principal and interest is in doubt, or the loan is past due 90 days or more as to principal and/or interest unless the loan is well-secured and in the process of collection. When a loan is placed on non-accrual status, uncollected interest accrued in the current year is reversed and charged to interest income*. Uncollected interest accrued from prior years on loans placed on non-accrual status in the current year is charged against the allowance for loan losses. Charge-offs on commercial loans occur when available information confirms the loan is not fully collectible and the loss is reasonably quantifiable. Consumer loans are subject to mandatory charge-off at a specified delinquency date consistent with regulatory guidelines. Interest collections on non-accrual loans for which the ultimate collectibility of principal is uncertain are applied as principal reductions. Regions determines past due or delinquency status of a loan based on contractual payment terms.

99.    The 2007 Form 10-K also contained the following false and misleading SOX certifications, signed by defendants Ritter and Yother:

1.    I have reviewed this annual report on Form 10-K of Regions Financial Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

- 53 -

100.   The Company's massive goodwill being carried on the balance sheet and reported in the 2007 Form 10-K had not been written down since the AmSouth acquisition despite the fact that the real estate and credit markets relied upon so heavily by AmSouth and Regions were collapsing.  The Company's 2007 Form 10-K overstated goodwill by more than $6 billion.

101.   In early March 2008, the credit markets seized up, causing the near bankruptcy of Bear Stearns.  In desperation, Bear Stearns had to be sold overnight to J.P. Morgan for pennies on the dollar, in a deal brokered by the U.S. government in which the government agreed to make good on $30 billion of Bear Stearns' losses – mostly attributable to mortgage-backed securities.  This event represented a change in the business climate for Regions, requiring the Company to test for impairment again according to Regions' stated accounting policy.  Incredibly, defendants did not.

102.   On April 15, 2008, Regions issued a press release announcing its 1Q 08 financial results, reporting a profit of $0.48 per diluted share for the quarter ended March 31, 2008, wherein defendant Ritter falsely and misleadingly stated, "'[g]iven the turmoil throughout the financial industry, Regions is successfully managing through the challenges, and remains well-positioned for the balance of 2008 and beyond,'" and that "'[d]uring the first quarter, ***we continued to take steps to proactively deal with credit risks and enhance Regions' already strong balance sheet***. We also continued to gain greater operating leverage, while

- 54 -

implementation of our three-year strategic plan is establishing a solid foundation

for future growth and performance improvement.'" The release further noted that:

> Although the home equity portfolio weakened due to declining residential property values, *losses remain manageable* at an annualized 0.57 percent of related average outstandings and *compare favorably relative to Regions' peer group*.
>
> *The company is aggressively managing its residential homebuilder portfolio*. Overall exposure to this portfolio now stands at $6.2 billion.
>
> Indicative of the more challenging credit environment, the first quarter's loan loss provision totaled $181.0 million, or $55 million above first quarter net loan charge-offs. The total allowance for credit losses was 1.49 percent of net loans at March 31, 2008, an increase over the prior quarter's 1.45 percent.

103.   On the same day, Regions hosted a conference call with analysts,

where defendants re-emphasized the strength of the Company's financial health,

even at a time where the rest of its peers were suffering through the continuation of

the collapse of the housing and credit markets. Defendants Ritter, Esteves and

others participated in the call. Defendant Ritter stated:

> *Despite a very difficult operating environment*, Regions achieved first quarter earnings from our continuing operations of $0.55 per diluted share excluding the merger charges. At the same time, *we continued to proactively address the ongoing challenges of the slowing economic growth and a worsening credit cycle*. . . .
>
> *Our first quarter earnings were solid given this current operating environment. . . . We remain comfortable with our overall loan portfolio*, however, with the exception of that residential homebuilder portfolio which we are managing as we outlined to you last quarter.

104.   On the same call Underwood, Regions' Director of Investor Relations

echoed defendant Ritter's sentiments, stating:

> Losses within our home equity portfolio increased to an annualized 57
> basis points during the first quarter.  As Dowd mentioned, this was
> primarily driven by lower residential property values.  Despite the
> increase, we still believe our home equity portfolio will fair better than
> most.  And although it is not immune to broad economic and market
> pressures, we like this portfolio for several reasons. . . .  We continue to
> make progress in effectively managing the risk in this portfolio. As
> discussed last quarter, we have fully implemented and executed our
> proactive strategy for this quarter. . . .  Our focus for this portfolio
> remains centered on identifying the most sensible exit strategy, one that
> best serves our shareholders in the long run.

105.   Discussing the Company's loan loss provision for the quarter and how

it related to the NPAs within the loan portfolio, Wells, Regions' former Chief Risk

Officer, stated:

> We go through several different scenarios trying to understand what we
> see, the happening of the shifts within the portfolio.  ***That is one of the***
> ***factors that we look at and feel very comfortable with where the reserve***
> ***is today.  We will look at it quarter by quarter as we see what's***
> ***happening within that loan portfolio***.  But I would tell you I don't
> necessarily look at one specific ratio. We look at several of them as we
> do our methodology.

106.   Wells also touched upon the involvement of the Special Assets group

in regards to identifying and managing problem areas within Regions' loan

portfolio:

> [A]lso, we took the step, probably in the latter part of '07, and what we
> tried to do is identify as much as we could, issues around the residential
> portfolio.  We took several steps.  ***One of those, we're moving more***
> ***experienced people into our special asset work-out area, and with that,***
> ***what we tried to do is identify all of the credit that we thought we***

- 56 -

*should be looking at and working with the customers to exit them as best we could*.

107.   The extremely positive, yet false and misleading, spin on the Company's decaying real estate lending portfolio resonated with some analysts. As one SunTrust Robinson Humphrey analyst noted in a April 15, 2008 report:

> [Regions] has seen deterioration in the home equity loan portfolio, but NCOs remained manageable.  All of [Regions'] home equity loans are company originated. ***Therefore, management feels its loss experience from this category will be better than most peers over this credit cycle***.

108.   In an April 16, 2008 report, analyst Richard Xavier Bove, Sr. for Punk Ziegel & Co. was even more upbeat about the Company's prospects, writing:

- Regions Financial reported first quarter earnings of $0.48 per share.  This was $0.01 per share above my estimate and well above depressed fourth quarter results.

*   *   *

- ***This was a pretty good showing, especially since the so-called whisper was that Regions would take a sizable loss on its residential real estate portfolio which would cause the company to show much reduced numbers and a cut in its dividend. Neither event happened***.

109.   On May 7, 2008, Regions filed its false and misleading interim financial report for the first quarter of 2008 with the SEC.  The Form 10-Q still reflected Regions' goodwill balance for the quarter ending March 31, 2008 as $11.5 billion, incredibly reporting that its goodwill was not impaired.

110.   Concerning the Company's accounting for loan losses and non-accruals, the Form 10-Q also stated:

- 57 -

## ALLOWANCE FOR CREDIT LOSSES

\*     \*     \*

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status*. Impaired loans totaled approximately $899.5 million at March 31, 2008, compared to $660.4 million at December 31, 2007. *The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report*. All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for credit losses.  For these loans, Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices.  Specifically reviewed impaired loans totaled $521.3 million, and the allowance allocated to these loans totaled $83.2 million at March 31, 2008.  This compared to $337.2 million of specifically reviewed impaired loans with allowance allocated to these loans of $58.7 million at December 31, 2007.  While impaired loans increased, they are generally well-secured by real estate collateral.

\*     \*     \*

## NON-PERFORMING ASSETS

\*     \*     \*

*Non-accrual loans at March 31, 2008 increased $280.6 million from year-end 2007 levels*.  The increase was primarily driven by commercial and commercial real estate loans, including the residential homebuilder portfolio, due to the widespread decline in residential property values.  Non-performing assets are expected to continue upward throughout the year as the strained economic climate continues.

Loans past due 90 days or more and still accruing increased $110.7 million from year-end 2007 levels, reflecting weaker economic conditions and general market deterioration. The increase was due primarily to increases in home equity and residential first mortgages, as well as commercial loans being managed by the Special Assets Department and in the process of collection.

111. The Form 10-Q also contained false and misleading SOX certifications, signed by defendants Ritter and Esteves. The text of the certifications was nearly identical to that in ¶99 above.

112. The statements above in ¶¶97-106, 109-111 were knowingly or recklessly false and misleading when made because:

(a) The statements issued in the 2007 Form 10-K and the 1Q 08 Form 10-Q above concerning Regions' accounting for loan losses and non-accruals were false and misleading because, as set forth more fully above in ¶¶57-89, defendants had embarked on a Company-wide practice of intentionally and substantially underreporting "non-accrual" and other problem loans in late 2007, during each and every reporting period throughout 2008 and at least through the first quarter of 2009, causing Regions' impaired loans and loan loss reserves to be materially understated in violation of GAAP as set forth in ¶¶191-212;

(b) The statements issued in the 2007 Form 10-K and the 1Q 08 Form 10-Q above concerning Regions' internal practices and procedures for identifying and dealing with problem loans were false and misleading because, as set forth more fully above in ¶¶57-89, and contrary to their assurances, defendants had embarked on a practice of intentionally and substantially underreporting "non-accrual" and other problem loans, in late 2007, during each and every reporting period throughout 2008 and at least through the first quarter of 2009;

- 59 -

(c)     The statements issued in the 2007 Form 10-K and the 1Q 08 Form 10-Q above concerning Regions' accounting for goodwill were false and misleading because, as set forth more fully above in ¶¶21-56, Regions still carried more than $6 billion in goodwill as a result of the AmSouth merger, even though the value of AmSouth and Regions had declined dramatically since the merger, and the entire market value of the combined company was significantly below its book value, demonstrating goodwill impairment under GAAP, as set forth in ¶¶159-190; and

(d)     The 2007 Form 10-K and the 1Q 08 Form 10-Q SOX certifications by the Individual Defendants were false and misleading because, as set forth more fully above in ¶¶57-89, these defendants knew that Regions had embarked on a practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009, in violation of the Company's own internal controls and GAAP.

113.   On June 10, 2008, Morgan Keegan, a subsidiary of Regions, issued a report on a Regions' competitor, Wachovia.  The report noted that based on recent data from the Mortgage Bankers Association, ARMs (the "product of choice" of AmSouth residential borrowers in 2004 and 2005), accounted for 62% of all foreclosures in the United States as of March 31, 2008.  Somewhat ironically – considering Regions' situation at the beginning of the Class Period – *Morgan Keegan also noted that Wachovia was in danger of incurring a significant*

*impairment to its goodwill* based on its October 2006 acquisition of Golden West

Bank.  As the report notes:

> Wachovia had $43.1 billion in goodwill at March 31.  Wachovia stated in its 1Q08 10-Q that its goodwill testing indicated that none of its goodwill was impaired at March 31.  *The company tests for goodwill impairment on an annual basis, or more often if events or circumstances indicate there may be impairment.  However, of particular concern is the $14.9 billion (as of 12/31/07) goodwill related to the October 2006 acquisition of Golden West*.  In light of the recent degradation of the Pick-a-Pay portfolio, *we think it is possible Wachovia might soon have to take a charge to goodwill*.  We would note however that this would be a non-cash charge and would have no impact on regulatory capital ratios.

114.   On June 17, 2008, the SEC sent a comment letter to Regions

regarding its 2007 Form 10-K.   In the comment letter, the SEC questioned

Regions' determination that its goodwill balance was not impaired, *especially in

light of the fact that Regions stock had been trading at a market value below the

Company's book value by the date of the filing of the 2007 Form 10-K.  The SEC

further noted Regions' failure to comply with the disclosure requirements of

SFAS No. 142 and demanded that the Company begin providing information

related to its goodwill on a reportable segment basis*.

115.   Throughout the first half of 2008, the financial and credit markets

continued their precipitous decline, led by the real estate market.  Soon after, large

banks began failing, demonstrating that the Bear Sterns collapse was not an

isolated event.

- 61 -

116.  On July 11, 2008, Indymac Bank, a subsidiary of Independent National Mortgage Corporation ("Indymac"), was placed into the receivership of the FDIC by the Office of Thrift Supervision.  ***Indymac was the fourth-largest bank failure in United States history***, and the second-largest failure of a regulated thrift.  Before its failure, Indymac was the largest savings and loan association in the Los Angeles area and the seventh-largest mortgage originator in the United States.

117.  On July 22, 2008, Regions issued a release announcing the Company's 2Q 08 financial results and disclosing that Regions' quarterly cash dividend would only be cut by approximately 75% from $0.38 to $0.10 per share "to further strengthen its capital position."  For 2Q 08, the release disclosed earnings from continuing operations of $0.30 per diluted share, disclosed "[h]igher net loan charge-offs, at an annualized 0.86 percent of average loans, primarily due to home equity and residential homebuilder credit deterioration," announced a "loan loss provision total[ing] $309.0 million," "[a]llowance for credit losses increases to 1.56 percent of loans" and reported a "[f]urther rise in non-performing assets to 1.65 percent of period end loans and other real estate," but provided for an "[i]ncrease in average loan growth to 6 percent annualized, driven by prudent support of Regions' best commercial customers through the current cycle."  Once again, Regions did not write down its massive goodwill.

118.   On the same day, Regions held a conference call with financial analysts regarding the Company's 2Q 08 financial results.  Defendants Ritter, Esteves and others participated in the call.  In his opening remarks, defendant Ritter stated:

> *We believe that we are prudently managing our credit risk in establishing the necessary reserves* . . . .
>
>        \*      \*      \*
>
> *Credit Management is clearly our top priority*. . . .  *We have been, and will continue to aggressively deal with problem credits*.
>
> *. . . We have and will continue to implement measures to mitigate portfolio risk, particularly in our more problematic portfolios*.
>
>        \*      \*      \*
>
> *We are realistic about the environment, and we are aggressively dealing with the credit issues*.
>
> *We have taken actions to bolster capital and fortify Regions balance sheet*.

Following up defendant Ritter, defendant Esteves added:

> *Now we have been taking steps to proactively address the impact of the real estate market on our overall home equity portfolio.  First of all, you should know we are recognizing losses when they become apparent*.  In many cases, this means we are charging home equity loans and lines down to market value, before they become 180 days past due.  *We review the strength of our equity positions, based on the current appraisal and take appropriate charges, regardless of the payment status with Regions*.
>
>        \*      \*      \*
>
> In summary, we believe the credit environment will continue to pressure the industry, and *we are taking the actions necessary to successfully navigate through this unprecedented environment.  We*

*are directing substantial resources toward working through our credit related issues*, at the same time we remain focused on our customers, increasing branch efficiency, gathering low cost deposits, and enhancing our market share, and driving down overall costs.

119.   In regards to the Company's Special Assets group, defendant Ritter stated:

> *Specific to our residential homebuilder portfolio, we have transferred some of our most experienced bankers to our special assets department, so that they focus on risk mitigation of problem credits*. We have established a loan disposition program, one that evaluates opportunities on multiple levels, through three different independent working groups.  We have intensified our credit servicing function, through more in-depth and frequent builder contact and reporting.  We standardized credit policies and processes across our franchise, and adopted a more rigorous and disciplined underwriting and review process.

120.   In response to a question posed by an analyst asking if the Company was seeing any weakness in its Florida loan portfolio, Wells responded:

> Scott, what we did as you would expect is we have gone [through] our commercial portfolio, in fact we did a review recently and as we did with the residential, *we have increased the amount of credit servicing we have done, and right as of now, we have not seen any significant change or deterioration in the commercial real estate portfolio*.

121.   On August 7, 2008, Regions filed with the SEC its false and misleading interim financial report for 2Q 08, which included substantially the same financial results previously reported on July 22, 2008.  The Form 10-Q still reflected Regions' goodwill balance for the quarter ending June 30, 2008 as $11.5 billion.  Due to the SEC's prompting, Regions performed an impairment test for 2Q 08 but continued using its unreasonable assumptions in performing the tests,

reporting that "*[t]he interim impairment test indicated that the fair value of the respective reporting units is greater than the carrying value (including goodwill); therefore, goodwill was not impaired as of June 30, 2008*."  In fact, the market value (as measured by the stock price) was now *less than half* of what it was at the time of the filing of the 2007 Form 10-K, which concerned the SEC.

122.   Concerning the Company's accounting for loan losses and non-accruals, the Form 10-Q also stated:

**ALLOWANCE FOR CREDIT LOSSES**

\*      \*      \*

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status*.  Impaired loans totaled approximately $1,246.3 million at June 30, 2008, compared to $660.4 million at December 31, 2007.  The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report.  All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for loan losses.  For these loans, Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices.  Specifically reviewed impaired loans totaled $821.5 million, and the allowance allocated to these loans totaled $125.2 million at June 30, 2008.   This compared to $337.2 million of specifically reviewed impaired loans with allowance allocated to these loans of $58.7 million at December 31, 2007.  While impaired loans increased, they are generally secured by real estate collateral.

\*      \*      \*

**NON-PERFORMING ASSETS**

\*      \*      \*

*Non-accrual loans at June 30, 2008 increased $666.9 million from year-end 2007 levels.  The increase was primarily driven by commercial and commercial real estate loans, including the residential homebuilder portfolio, due to the widespread decline in residential property values*.  Of the $5.8 billion residential homebuilder portfolio, non-accruing loans represent approximately $543.7 million, while $7.4 million are 90 days past due.  Non-performing assets are expected to increase throughout the year as the strained economic climate continues.  During the second quarter of 2008, Regions disposed of approximately $147 million of loans and foreclosed properties, of which approximately $132 million were non-performing assets.

Loans past due 90 days or more and still accruing increased $75.3 million from year-end 2007 levels, reflecting weaker economic conditions and general market deterioration.  The increase was due primarily to increases in home equity and residential first mortgages, as well as commercial real estate loans being managed by the Special Assets Department and in the process of collection.

123.   As to the Special Assets group, the Company's quarterly report stated:

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and *Special Assets* are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio.  *This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to aggressively manage the portfolios and mitigate future losses, particularly in the more problematic portfolios*.  Specific to the residential homebuilder portfolio, $1.8 billion of relationships have been identified as problem loans and *are being aggressively managed to mitigate risk*. Significant action in the management of the home equity portfolio has also been taken.  A portfolio evaluation was completed during the quarter, which will provide detailed property level information to assist in workout strategies.

124.   The Form 10-Q also contained false and misleading SOX certifications, signed by defendants Ritter and Esteves, nearly identical to that set forth in ¶99, *supra*.

- 66 -

125.   The statements above in ¶¶117-124 were knowingly or recklessly false and misleading when made because:

(a)   The 2Q 08 statements above concerning Regions' accounting for loan losses and non-accruals were false and misleading because, as set forth more fully above in ¶¶57-89, defendants had embarked on a Company-wide practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009, causing Regions' impaired loans and loan loss reserves to be materially understated in violation of GAAP as set forth in ¶¶191-212;

(b)   The 2Q 08 statements above concerning Regions' internal practices and procedures for identifying and dealing with problem loans were false and misleading because,  as set forth more fully above in ¶¶57-89, and contrary to their assurances, defendants had embarked on a practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009;

(c)   The 2Q 08 statements above concerning Regions' accounting for goodwill were false and misleading because,  as set forth more fully above in ¶¶21-56, Regions still carried more than $6 billion in goodwill as a result of the AmSouth merger, even though the value of AmSouth and Regions had declined dramatically since the merger, and the entire market value of the combined company was

- 67 -

significantly below its book value, demonstrating goodwill impairment under GAAP, as set forth in ¶¶159-190; and

(d)     The 2Q 08 SOX certifications by defendants Ritter and Esteves were false and misleading because, as set forth more fully above in ¶¶57-89, these defendants knew that Regions had embarked on a practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009, in violation of the Company's own internal controls and GAAP.

126.   On August 29, 2008, Integrity Bank ("Integrity"), was closed by Federal and Georgia state banking regulators and sold to Regions.  It was the 10th FDIC insured bank to close in 2008.

127.   In spite of the fact that Regions was suffering from the very same problems as Integrity, some in the investment community mistook this news as a positive sign for Regions. As one JP Morgan analyst wrote in a September 2, 2008 report:

> With the market on high alert for signs of stress at banks, we view the FDIC approval of RF to assume the deposit accounts of Integrity *as an indication that Regions itself is deemed to be a sound institution by regulators*.  Regions' 2Q results were certainly under pressure tied to rising credit costs and margin compression, leading to the company's decision to cut the dividend 74% to preserve capital.  *That said, Regions' ability to take advantage of the recent bank failure is a modest positive and shows us that even in a strained market environment, mid-cap banks are in a position of relative strength*.

- 68 -

128.   On September 4, 2008, Regions participated in the Morgan Keegan

Equity Conference.  In his opening remarks, defendant Ritter stated:

> *Importantly, we remain well capitalized on a regulatory standpoint, strong tangible capital ratios for the second quarter*.

*    *    *

> *Let me quickly talk about some of the actions that we've taken to manage our credit risk, many of which were implemented even before the credit downturn of the past 12 months had started*.  Underlying each of these actions, it was, if you will, a real desire to reduce our concentration in a few areas and focus on things that we do best and we understand best.  *We eliminated certain areas, and all of that done to improve our risk return profile*.

*    *    *

> Even before that 2007 home builder issue started building steam, we were doing some things proactively. Since year-end 2006, as we closed the combination with Regions and AmSouth, we've reduced that land concentration by itself by $1.6 billion, and we've proactively tried reducing and having some good results in that home builder portfolio. *We've placed a lot of management attention on all exit credits in our special assets group*.  *We've taken those and concentrated them in one area*.  We've got a disciplined look at selling these distressed loans into the secondary market, and I think you'll see more of that as opportunities arise over the next few quarters.  *And you'll see that the servicing on these portfolios has been strengthened considerably with a lot more diligence around that particular customer base*.

*    *    *

> *In summary, let me just say that Regions is a company that we're fully aware of the difficult operating environment that we are in today. I would tell you I think we're very well positioned for it*.  I think we're going to come out of it as an even stronger competitor.  *We think the credit risk we have, while they're significantly increased from a year ago, they're very manageable*.

- 69 -

129.   On September 7, 2008, the U.S. government rescued Fannie Mae and Freddie Mac from bankruptcy, effectively nationalizing them.  At the time, Fannie Mae and Freddie Mac owned or guaranteed about half of the U.S.'s $12 trillion mortgage market.  Fannie Mae's and Freddie Mac's insolvency caused extreme distress in the financial markets because almost every home mortgage lender and Wall Street bank relied on them to facilitate the mortgage market, and investors worldwide owned $5.2 trillion of debt securities backed by them.

130.   On September 9, 2008, Regions participated at the Lehman Brothers Global Finance Services Conference.  In his opening remarks, defendant Ritter stated:

> Let me quickly talk about a few actions that we have taken to really manage credit risk, many of which were implemented before the credit downturn began.  Underlying each of these is a premise of our concentrating on what we do best while, at the same time, scaling back and eliminating some areas where we feel the risk/return profile isn't consistent with our own strategic objectives.

*       *       *

> **We've placed management of all those credits that are identified as exit – We've taken those out of the field, and they're being managed in our special assets group with significantly increased staffing and specialists in that lending area, as opposed to generalists**.  We've established an aggressive distressed loan disposition program.  I think you'll see more and more opportunities in that over the next few quarters.  And we've strengthened and instituted a more aggressive servicing of that portfolio.  **With centralizing that portfolio and shifting the experienced residential lenders from the field into special assets, it's had much more frequent borrower contact and much more continuous market review in following the values in those markets.**

- 70 -

***We, like many, have tightened the credit policies in this regard, and we're especially selective to new loan activities in this category***.

131.   On September 14, 2008, the financial crisis worsened as Merrill Lynch was sold overnight to Bank of America amidst fears of a liquidity crisis. The next day, Lehman Brothers, one the oldest investment banks on Wall Street, filed for bankruptcy protection.

132.   Another large U.S. bank, Washington Mutual, was seized by the FDIC on September 25, 2008, and its banking assets were quickly sold to J.P. Morgan for $1.9 billion.

133.   In late September of 2008, Wachovia, the fourth largest bank in the country, also holding $120 billion in ARMs, desperately sought out another more stable  financial giant to hopefully acquire it and provide refuge for its mammoth sized portfolio of troubled assets.  On October 3, 2008 Wells Fargo and Wachovia agreed that the latter would be acquired for approximately $15.1 billion in stock.

134.   These events sent a shudder through the credit markets and stock markets around the world.  Stock prices at banks and financial institutions – including Regions – declined dramatically.  And there was a monumental shift in the way these institutions would operate going forward.

135.   Yet, in spite of a global credit and financial crisis, defendant Ritter pretended all was well at Regions.  On September 30, 2008, *The Birmingham News*

issued an article reporting that CEO Ritter had reiterated that at Regions "***business***

***is strong***," noting:

> Birmingham-based Regions Financial Corp.'s stock plummeted 41 percent on Monday, but CEO Dowd Ritter expressed confidence in the strength of his company's Main Street business amid turmoil on Wall Street.

*      *      *

> ***But Ritter noted that while other banks are writing off billions every quarter, Regions has so far made about a half billion in profit this year***.

> "There's a pretty simple reason," he said. "***We always have taken a very conservative approach to our business***. At times, we may not be doing what is in vogue, but that plain vanilla banking plays very well in times like this."

> Ritter said Regions is well-capitalized by regulatory standards, as evidenced by its recent takeover of the failed Georgia-based Integrity Bank last month, at the request of the Federal Deposit Insurance Corp.

> "We are a safe harbor, if you will, for deposits," he said.

> He also noted that Regions is not burdened with exotic securities and risky mortgages that have prompted the demise of other institutions. Regions has few subprime mortgages in its entire portfolio, he said.

> "***All that said, it doesn't matter whether we're lucky or smart, we've avoided the real troubled areas that are plaguing many in this industry***," he said.

### As the Financial Effects of Defendants' Fraud Leak into the Market, Shareholders Are Damaged

136.   Then on October 21, 2008, Regions issued a release announcing its

3Q 08 financial results, reporting $0.11 per diluted share for the quarter ended

September 30, 2008, disclosing it was "[a]ggressively managing well-defined

- 72 -

credit issues, with $430 million in non-performing assets either sold or transferred to held for sale," with "[n]et charge-offs and other real estate expense related to these dispositions total[ing] approximately $186 million," stating "[n]on-performing assets, excluding assets held for sale, *steadied* at 1.66 percent of period end loans and other real estate," disclosing "[n]et loan charge-offs an annualized 1.68 percent of average loans, driven by accelerated problem asset disposition," such that "[e]xcluding impact of sales and transfers to held for sale, net loan charge-offs an annualized 1.03 percent of average loans," but highlighting its "Tier 1 capital ratio at an estimated 7.47%, $1.7 billion above well-capitalized level."

137. In a financial supplement to the release, the Company also announced a "$417 loan loss provision – $108 million increase from the second quarter, primarily the result of an aggressive stance taken in disposing of non-performing assets."

138. But the October 21, 2008 release also disclosed that Regions had been "invited" to participate in the U.S. government's Troubled Asset Relief Program ("TARP") bailout program and that defendants intended to cause Regions to accept TARP funds:

> Regions has been notified that it is eligible and ***does intend to participate in the capital purchase program announced by the Treasury Department on October 13, 2008***. The capital is in the form of senior perpetual preferred stock (together with warrants to purchase common stock) and qualifies as Tier 1 capital for regulatory purposes. It is being offered at an attractive coupon of 5 percent for the first five years. Qualified institutions can obtain between 1 percent and 3 percent

of their total risk-weighted assets as of September 30, 2008, as defined by banking regulations.  For Regions, this would approximate between $1.17 billion and $3.51 billion of capital, providing a significant strengthening of our overall capital base.

139.  With its announced receipt of TARP funds, the investment community began scrutinizing Regions' financial statements.  On October 23, 2008, *Bloomberg* issued an article entitled "**Regions Financial Must Think We're All Stoned**," which stated in relevant part:

> You have to wonder who the people running Regions Financial Corp. think they're kidding.
>
> So far this year, the Birmingham, Alabama-based regional bank says it has earned $622.5 million, including $79.5 million of net income last quarter. In reality, Regions probably has lost billions.  The bosses just won't admit it.
>
> *It all comes down to that pneumatic, intangible asset known as goodwill, which is about as valuable as the air in a paper sack.  As of Sept. 30, according to Regions, the bank's goodwill was worth $11.5 billion, slightly more than the quarter before.  That's about 59 percent of Regions' book value, and $4.1 billion more than what the stock market says the entire company is worth*.
>
> There is one scenario I can envision in which that goodwill figure would be justified.  That would be if another big bank is offering right now to buy Regions for a huge premium.  There's no reason for us to think that's happening, notwithstanding the Treasury Department's recent jawboning, encouraging U.S. banks to merge their way out of their problems.
>
> Barring an undisclosed deal in the works, Regions executives would have to be nuts to believe that goodwill number.  Maybe they think the rest of us are just stoned.  A Regions spokesman, Tim Deighton, declined to comment.  The bank's chief financial officer, Irene Esteves, didn't respond to my e- mails.

- 74 -

It's become standard fare for banks to insult the public's intelligence by publishing asset values that defy logic. Saying Regions' goodwill is worth $11.5 billion would be like a hen bragging that her unlaid egg weighs more than she does.

Matter of Trust

There's a bigger problem here, though. By sticking to that goodwill valuation, Regions executives might as well be telling us we can't trust a single number on their financial statements.

*     *     *

While goodwill isn't completely unsaleable, it can't be sold by itself. It's just the bookkeeping entry a company records when it pays a premium to buy another. Specifically, it's the difference between the purchase price and the fair value of the acquired company's net assets.

***Most of Regions' goodwill dates to the company's November 2006 acquisition of Birmingham-based AmSouth Bancorp., the month after Wachovia bought Golden West. Regions allocated $6.6 billion of the $9.9 billion purchase price to goodwill. Regions' chief executive, C. Dowd Ritter, joined the company from AmSouth.***

Regions shares closed yesterday at $10.73, down 55 percent this year. It now trades for 38 percent of the company's official book value. Irrational goodwill isn't the only thing weird about Regions' accounting, either.

As of Sept. 30, Regions had a $1.5 billion loan-loss allowance, equivalent to just 83 percent of its nonperforming assets, which were $1.8 billion. A year earlier, Regions' allowance was at 175 percent of nonperforming assets. A year before that, it was at 249 percent.

Keeping Up

***Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets. It's the reserve a lender sets up on its balance sheet in anticipation of bad loans. At Regions, the allowance hasn't kept up.***

- 75 -

140.   As a result of these disclosures, class members were damaged over three days Regions' stock price declined dramatically from a closing price of $11.29 on October 21, 2008 to a closing price of $8.94 on October 24, 2008 – a loss of more than 20%.

141.   Despite *Bloomberg's* and other members of the financial and investment community's criticism, defendants continued their fraudulent scheme reporting a grossly inflated value of the goodwill attributable to the AmSouth acquisition, with its balance sheet materially understating their losses and non-accruals, overstating assets, shareholder equity and, as a result of not taking the impairment charge on the goodwill attributable to the AmSouth acquisition, overstating Regions' income.

142.   On October 30, 2008, Regions filed its false and misleading interim financial report for 3Q 08, which included substantially the same financial results previously reported on October 21, 2008.  The Form 10-Q still reflected Regions' goodwill balance for the quarter ending September 30, 2008 as $11.5 billion, reporting that its goodwill was not impaired.   Concerning the Company's accounting for loan losses and non-accruals, the 3Q 08 Form 10-Q stated:

> ***The allowance for credit losses ("allowance") represents management's estimate of credit losses inherent in the portfolio as of September 30, 2008***.  The allowance consists of two components: the allowance for loan losses and the reserve for unfunded credit commitments. . . .

*At September 30, 2008 and December 31, 2007, the allowance totaled approximately $1.5 billion and $1.4 billion, respectively.* The allowance as a percentage of net loans was 1.57% at September 30, 2008 compared to 1.56% at June 30, 2008 and 1.45% at year-end 2007. Net charge-offs as a percentage of average loans (annualized) were 1.03% and 0.23% in the first nine months of 2008 and 2007, respectively. *The increase in the allowance was primarily driven by deterioration in the residential homebuilder, condominium and home equity portfolios, all of which are tied directly to the housing market slowdown.*

\*     \*     \*

The provision for loan losses is used to maintain the allowance for loan losses at a level that in management's judgment is adequate to cover losses inherent in the portfolio at the balance sheet date. In the third quarter of 2008, the provision for loan losses from continuing operations was $417.0 million and net charge-offs were $416.4 million.

143. The Form 10-Q further stated:

For the third quarter of 2008, net charge-offs on home equity credits were an annualized 1.59% of home equity loans compared to an annualized 0.31% for the third quarter of 2007. However, net charge-offs on home equity credits decreased on a linked-quarter basis from an annualized 1.94% of outstanding loans and lines during the second quarter of 2008. *Losses in Florida-based credits remained at elevated levels, as property valuations in certain markets have continued to experience ongoing deterioration.* These loans and lines represent approximately $5.6 billion of Regions' total home equity portfolio at September 30, 2008. Of that balance, approximately $2.0 billion represent first liens; second liens, which total $3.6 billion, are the main source of losses. *Florida second lien losses were 4.28% annualized during the third quarter of 2008 as compared to 4.74% during the second quarter of 2008. Third quarter home equity losses in Florida amounted to an annualized 3.28% of loans and lines versus 0.69% across the remainder of Regions' footprint. This compares to second quarter 2008 losses of 3.55% and 1.08%, respectively.*

The remainder of the increase in net charge-offs during the third quarter of 2008 relates primarily to the residential homebuilder portfolio, which is discussed earlier in this report, and the disposition of non-accrual loans. During the third quarter of 2008, a total of $327 million in

- 77 -

non-accrual loans were sold or designated as held for sale with associated charge-offs of approximately $163 million.

*Factors considered by management in determining the adequacy of the allowance include, but are not limited to: (1) detailed reviews of individual loans; (2) historical and current trends in gross and net loan charge-offs for the various portfolio segments evaluated; (3) the Company's policies relating to delinquent loans and charge-offs; (4) the level of the allowance in relation to total loans and to historical loss levels; (5) levels and trends in non-performing and past due loans; (6) collateral values of properties securing loans; (7) the composition of the loan portfolio, including unfunded credit commitments; and (8) management's analysis of current economic conditions.*

Various departments, including Credit Review, Commercial and Consumer Credit Risk Management and *Special Assets* are involved in the credit risk management process to assess the accuracy of risk ratings, the quality of the portfolio and the estimation of inherent credit losses in the loan portfolio. *This comprehensive process also assists in the prompt identification of problem credits. The Company has taken a number of measures to aggressively manage the portfolios and mitigate losses, particularly in the more problematic portfolios*. Specific to the residential homebuilder portfolio, $2.2 billion of relationships are being aggressively managed to mitigate risk. *Significant action in the management of the home equity portfolio has also been taken*. A portfolio evaluation was completed during the quarter, which provided detailed property level information to assist in workout strategies. *Also, a strong Customer Assistance Program is in place which educates customers about options and initiates early contact with customers to discuss solutions when a loan first becomes delinquent*.

\*      \*      \*

*Impaired loans are defined as commercial and commercial real estate loans (excluding leases) on non-accrual status. Impaired loans totaled approximately $1,268.7 million at September 30, 2008, compared to $660.4 million at December 31, 2007. The increase in impaired loans is consistent with the increase in non-performing loans, which is discussed in the "Non-Performing Assets" section of this report. All loans that management has identified as impaired, and that are greater than $2.5 million, are evaluated individually for purposes of determining appropriate allowances for loan losses*. For these loans,

Regions measures the level of impairment based on the present value of the estimated cash flows, the estimated value of the collateral or, if available, observable market prices. Specifically reviewed impaired loans totaled $768.8 million, and the allowance allocated to these loans totaled $132.6 million at September 30, 2008. This compared to $337.2 million of specifically reviewed impaired loans with allowance allocated to these loans of $58.7 million at December 31, 2007.

144. Regions also claimed to have performed an impairment test for 3Q 08 but continued using its unreasonable assumptions in performing the tests, reporting that "*[t]he interim impairment test indicated that the fair value . . . of the respective reporting units is greater than the carrying value (including goodwill); therefore, goodwill was not impaired as of September 30, 2008*."

145. The Form 10-Q also contained false and misleading SOX certifications, signed by defendants Ritter and Esteves, nearly identical to that set forth in ¶99, *supra*.

146. The statements above in ¶¶128, 130, 135-137, 142-145 were knowingly or recklessly false and misleading when made because:

(a) The 3Q 08 statements above concerning Regions' accounting for loan losses and non-accruals were false and misleading because, as set forth more fully above in ¶¶57-89, defendants had embarked on a Company-wide practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009, causing Regions' impaired loans and loan loss reserves to be materially understated in violation of GAAP as set forth in ¶¶191-212;

- 79 -

(b)   The 3Q 08 statements above concerning Regions' internal practices and procedures for identifying and dealing with problem loans were false and misleading because,  as set forth more fully above in ¶¶57-89, and contrary to their assurances, defendants had embarked on a practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009;

(c)   The 3Q 08 statements above concerning Regions' accounting for goodwill were false and misleading because, as set forth more fully above in ¶¶21-56, Regions still carried more than $6 billion in goodwill as a result of the AmSouth merger, even though the value of AmSouth and Regions had declined dramatically since the merger, and the entire market value of the combined company was significantly below its book value, demonstrating goodwill impairment under GAAP, as set forth in ¶¶159-190; and

(d)   The 3Q 08 SOX certifications by defendants Ritter and Esteves were false and misleading because, as set forth more fully above in ¶¶57-89, these defendants knew that Regions had embarked on a practice of intentionally and substantially underreporting "non-accrual" and other problem loans each and every reporting period throughout 2008 and at least through the first quarter of 2009, in violation of the Company's own internal controls and GAAP.

- 80 -

147.   On November 10, 2008, the *Birmingham Business Journal* issued an article entitled "Loan charge-offs mount at Birmingham banks," which stated in relevant part:

Net charge-offs, the gross amount of loans charged off as bad debt, minus money recovered on collateral of earlier charge-offs, are on the rise as the financial crisis deepens at local banks.

***If a bank has a high level of charge-offs, it likely means they delved into hazardous lending practices, banking experts say***.

***"You are what you eat, and charge-offs are an indication of risky loans that have been made," said Bankrate.com senior financial analyst Greg McBride***.

Specifically referencing Regions, the story warned:

Richard Bove, banking analyst with New York-based Landenburg Thalmann & Co. Inc., said in a research note that ***despite the company's "high level of charge-offs," its "nonperforming assets keep rising***."

According to Bove's calculations, all types of Regions' non-performing loans, including foreclosures and loans more than 90 days past due, climbed to $2.4 billion in the quarter, a more than 9 percent increase.

***Bove said Regions was itching to get into the Florida market for years, and it was one of the reasons behind its $10 billion acquisition of AmSouth Bancorp.  Now that the Sunshine State has been hammered by the housing slump, "it appears the company has reversed course and is moving out of Florida assets as quickly as it can," he said***.

***Regions' hike in charge-offs indicate "the bank should probably have been writing off loans at a faster rate," he said.  "The fact that it did not do so indicates that the future write-offs and reserve builds will be sizable.  This will meaningfully penalize earning***."

148.   On November 11, 2008, Regions participated in the Merrill Lynch Banking & Financial Services Conference.  In her opening remarks, defendant Esteves stated:

You can see by the map 2000 the MSAs that have experienced the steepest declines, some of which have dropped in excess of 20% year over year.  *Although we have had varying degrees of housing-related exposures in each of these, Florida is just one of the 16 states where we operate, and our non-Florida portfolio with a couple of exceptions is holding up pretty well*.

\*         \*         \*

*We've developed and implemented a comprehensive plan to proactively manage our residential homebuilder portfolio exposure*.  We've placed management of all exit credits in our special assets group and significantly increased that group's staffing.  We've established an aggressive distressed loan disposition program through which we will dispose of loans on properties as opportunities are identified.

*We've strengthened and instituted more frequent credit servicing of the portfolio*.   We centralized management of the homebuilder portfolio, shifting experienced residential real estate lenders to oversee and actively manage that portfolio as part of their proactive workout program.

Our specifically tailored approach calls for frequent borrower contacts, continuous local market review, and comprehensive internal analysis of our resolution and exit options.  We've tightened our credit policies, being especially selective with respect to new loan growth.  Lastly, we've increased use of dedicated commercial real estate lending and credit specialists.  And let me reemphasize that we have centralized our underwriting since the merger.

\*         \*         \*

To close and to summarize, Regions has an attractive, diversified franchise in high-growth demographic areas. . . .  *We are aggressively managing credit issues by identifying problems early and selling loans as the market allows. . . .  And we have a plain vanilla balance sheet*.

- 82 -

149.   Suddenly, on January 20, 2009, before the market opened, Regions reported *a net loss of $5.6 billion for 4Q 08*, stating the loss "was largely driven by a *$6 billion non-cash charge for impairment of goodwill*." Regions' January 20th release also disclosed:

– *Accelerated disposition of problem assets*, with approximately $1 billion in non-performing assets sold or transferred to held for sale, resulting in approximately $479 million of losses

– *Net loan charge-offs rose to an annualized 3.19 percent of average loans*

– *Increased loan loss provision to $1.150 billion*, $354 million above net charge-offs; raised allowance for credit losses to 1.95 percent of loans.

150.   If defendants' January 20, 2009 disclosures were to be believed, the "results of goodwill impairment testing at the end of the fourth quarter [*suddenly*] indicated that the estimated fair value of Regions' banking reporting unit was less than its book value, *requiring a $6 billion non-cash charge*."   But $6 billion impairments do not happen overnight, and Regions had falsely stated quarter after quarter that its goodwill was not impaired.  Likewise, Regions' CEO and CFO falsely certified each quarter those financial filings were accurate and that Regions' internal controls were solid.

151.   On this partial disclosure revealing Regions' prior overstatement of goodwill and a surge in its loss provision and net charge offs, investors hammered the stock on heavy volume thereby damaging class members.  On January 20,

- 83 -

2009, *Bloomberg* issued an article entitled "Regions Plunges to 23-Year Low on

$6.24 Billion Loss," which stated in relevant part:

> Regions fell $1.47 to $4.60 at 4 p.m., the lowest price since March 13, 1985.  The bank has lost more than three-quarters of its market value in the past 12 months.

152.   As a result of this disclosure, rating agencies began slashing the

Company's ratings, further decimating the stock price and damaging class

members.  On February 2, 2009, *Bloomberg* published an article entitled "Regions

Declines After Moody's Downgrade on Defaults," which stated:

> Regions Financial Corp., Alabama's biggest bank, fell 16 percent in New York trading after Moody's Investors Service downgraded the lender on the prospects of more borrower defaults in Florida.

> "Regions has seen nearly a doubling of nonperforming assets over the past year, largely in the residential homebuilder and home-equity portfolios," Moody's said in a statement today on the Birmingham-based bank.

> The bank dropped 54 cents to $2.92 at 4 p.m. in New York Stock Exchange composite trading and has plunged almost 90 percent in the past 12 months.

> The debt rating was cut to A3 from A2 and may be dropped further, Moody's said.

153.   The Company's annual financial report on Form 10-K filed with the

SEC on February 25, 2009 finally admitted how much damage the residential loan

portfolio was causing, ***and that it had been occurring since at least 2007***:

> As of December 31, 2008, residential homebuilder loans, home equity loans secured by second liens in Florida and condominium loans represented approximately 9.3% of our total loan portfolio.  ***These portions of our loan portfolio have been under stress for over a year***

- 84 -

*and, due to weakening credit quality, we increased our loan loss provision and our total allowance for credit losses*.  In addition, we have implemented several measures to support the management of these portions of the loan portfolio, including reassignment of experienced, key relationship managers to focus on work-out strategies for distressed borrowers.

154.   According to this same Form 10-K, defendants explained that the $6 billion writedown of goodwill was caused by the following:

The primary cause of the goodwill impairment in the General Banking/Treasury reporting unit was the continued and significant decline in the estimated fair value of the unit.  This was evidenced by rapid deterioration in credit costs, *continued compression of the net interest margin*, costs of preferred stock investment by the U.S. Treasury and *continued declines in the Company's overall market capitalization* compounded by investor anxiety caused by financial crises affecting the U.S. banking system during the fourth quarter of 2008.

155.   Finally, in May 2009, the Board of Governors of the Federal Reserve revealed the results of its "Supervisory Capital Assessment Program," loosely referred to in the media as the bank "stress tests."  The stress tests looked at the capital adequacy of 19 of the largest banks and financial institutions in the country to determine whether they were adequately capitalized.  According to the Federal Reserve, the stress tests evaluated each institution based on its 4Q 08 financial results.  For Regions, that meant the quarter in which Regions finally wrote down its goodwill and dramatically increased its loan loss provisions.

156.   Based on those results, the Federal Reserve determined Regions needed to raise a whopping $2.5 billion.  In order to meet the capital raising requirements of the Federal Reserve, before the market opened on May 20, 2009,

- 85 -

Regions announced it would raise half that amount, $1.25 billion, in a stock offering. Because this was perceived to be dilutive to current shareholders, as a result of this announcement Regions share price declined almost 7% that day, closing at $4.89 per share on very large volume.

157.   After the close of the market that same day, Regions announced that it had priced that offering. To the dismay of current shareholders, Regions was selling an astounding 400 million shares at $4 per share. On this news, the following day the market sold off Regions' stock on massive volume, dropping it more than 16% to close at $4.10 per share. According to the *Birmingham Business Journal*:

Regions shares down

Shares of Regions Financial Corp. declined more than 16 percent after the Birmingham-based bank offered 400 million shares of common stock at $4 each to bolster itself against mounting real-estate loan losses.

Regions fell 70 cents to $4.10 in New York Stock Exchange trading as investors reacted to the capital-raising plan it announced after the market closed Wednesday.

Regulators this month directed Regions to raise funds to weather a worsening recession after "stress tests" of the capital positions of the 19 largest U.S. banks.

158.   Due to Regions required capital raising, Regions' stock fell more than 20% on massive volume over two days, causing additional damage to shareholders who had purchased during the Class Period and held their stock through May 21, 2009.

- 86 -

## DEFENDANTS' FALSE FINANCIAL STATEMENTS FAILED TO COMPLY WITH GAAP AND SEC REGULATIONS

**Regions' Recorded Materially Overstated Goodwill in Violation of Applicable Accounting Principles**

159.   Defendants caused the Company to falsely report its financial results for those periods incorporated into the Registration Statement by failing to timely write-off its impaired goodwill and increase its loan loss reserves, thereby overstating the Company's assets and net income.

160.   Regions' financial results were included in a Form 10-K and Forms 10-Q filed with the SEC.  *See* ¶¶77-99, 109-111, 121-124, 142-145.  Defendants' SEC filings claimed that the financial information presented therein was a fair statement of Regions' financial results and that the results were prepared in accordance with GAAP.

161.   Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Regions' financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

162.   GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in

compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.   Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.   17 C.F.R. §210.10-01(a).[7]

## Regions' Goodwill Accounting

163.   Regions' acquisition of AmSouth dramatically increased the size of Regions' reported goodwill or excess purchase price[8], one of the important assets on the Company's balance sheet, in addition to increasing the size of Regions' loan portfolio.   Given the precarious lending practices which had generated much of AmSouth's portfolio, Regions' reported goodwill vastly overstated the future benefit AmSouth would provide.   This became increasingly true as the real estate market plummeted and the most tenuous loans from the over-heated Florida

---

[7]     On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*.   FASB *Accounting Standards Codification* ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.   The ASC did not change existing U.S. GAAP.   These allegations use the historical references to U.S. GAAP, as references existed during the Class Period.

[8]     Regions refers to its goodwill mostly as "excess purchase price" in its SEC filings through 1Q 08.   Thereafter, it uses the term goodwill exclusively.

market began defaulting in higher amounts.  However, defendants failed to timely record impairment to Regions' goodwill.

164.   Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination.  Companies account for their business combinations using the purchase method of accounting as set forth in FASB SFAS No. 141, *Business Combinations*.  Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market value as of the date of the acquisition.  The assigned amounts may be adjusted for a period of up to one year after the date of the acquisition if new information becomes available as to the actual fair value amounts of the assets or liabilities as of the date of the acquisition.  The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill.

165.   An asset is an item which provides economic value to an entity.  FASB Statement of Concepts ("FASCON") No. 2, ¶25.  Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition.  Goodwill is intended to reflect the going concern value of the business acquired and its expected contribution to future earnings growth.  SFAS No. 141, ¶¶B101-114.

166.   The FASB concluded that goodwill should be recognized as an asset because it meets the definition of assets in FASB Concepts Statement No. 6

("Concepts Statement 6") and the criteria for asset recognition of FASB Concepts

Statement No. 5 ("Concepts Statement 5").[9]

167.   In arriving at this conclusion, the FASB considered the definition of

an asset from Concepts Statement 6:

> Assets are probably future economic benefits obtained or controlled by a particular entity as a result of past transactions or events.[10]

168.   The FASB further considered that according to Concepts Statement 6,

"future economic benefit" is the essence of an asset and then considered the future

economic benefits of goodwill:

> Concepts Statement 6 states that "the most obvious evidence of future economic benefit is a market price."[11] Because goodwill does not have the capacity to contribute directly to future net cash inflows, it is not priced separately in the marketplace, but rather is priced in combination with other assets with which it produces future net cash inflows. That capacity is reflected by the premium that an entity as a whole commands in comparison to the sum of the fair values of its component parts.[12]

169.   In its observations relating to the relevance of goodwill as an asset,

the FASB cited studies that empirically examined the relationship between

---

[9]    SFAS No. 141, Summary at 7.

[10]   Concepts Statement 6, ¶25 (as quoted in SFAS No. 141, ¶B109).

[11]   Referenced to Concepts Statement 6, ¶173.

[12]   SFAS No. 141, ¶B112.

goodwill and the market value of business entities.[13]  The studies "generally found a positive relationship between the reported goodwill of entities and their fair market values, thereby indicating that investors in the markets behave as if they view goodwill as an asset."[14]

170.   Following an acquisition, companies are required to account for their goodwill in accordance with SFAS No. 142, *Goodwill and Other Intangible Assets*. SFAS No. 142 requires that a company review its goodwill to determine if the asset is impaired. ***Goodwill must be tested at least annually for impairment, and more often when events or circumstances arise that indicate the goodwill could be impaired***. SFAS No. 142, ¶¶18-29.  SFAS No. 142 states:

> Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount.  Examples of such events or circumstances include:
>
> a.     A significant adverse change in legal factors or in the business climate
>
> b.     An adverse action or assessment by a regulator
>
> c.     Unanticipated competition
>
> d.     A loss of key personnel

---

[13]     SFAS No. 141, n.35 cites, as examples, five studies published in accounting journals that provide empirical evidence that investors behave as though they view goodwill as an asset.

[14]     SFAS No. 141, ¶B129.

e.      A more-likely-than-not exception that a reporting unit or a significant portion of a reporting unit will be sold or otherwise disposed of

f.      The testing for recoverability under Statement 121 of a significant asset group within a reporting unit

g.      Recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

SFAS No. 142, ¶28.

171.   Testing for goodwill impairment is a two-step process.  The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment.   A company performs goodwill testing at a reporting unit level.  In the first step, a company will compare the fair value of a reporting unit to its carrying value.  If the fair value of the unit exceeds its carrying amount, then goodwill is deemed to not be impaired and no further testing is required.  However, if the carrying value of the unit exceeds its fair value, then a second step is performed to measure the amount of the impairment.  SFAS No. 142, ¶¶17-22.

172.   SFAS No. 142, ¶35 requires that a company make certain disclosures concerning its goodwill:

The following information shall be disclosed in the financial statements or the notes to the financial statements for each period for which a statement of financial position is presented:

*      *      *

c.      The changes in the carrying amount of goodwill during the period including:

- 92 -

(1)     The aggregate amount of goodwill acquired

(2)     The aggregate amount of impairment losses recognized

(3)     The amount of goodwill included in the gain or loss on disposal of all or a portion of a reporting unit.

Entities that report segment information in accordance with Statement 131 shall provide the above information about goodwill in total and for each reportable segment and shall disclose any significant changes in the allocation of goodwill by reportable segment. If any portion of goodwill has not yet been allocated to a reporting unit at the date the financial statements are issued, that unallocated amount and the reasons for not allocating that amount shall be disclosed.

SFAS No. 142, ¶45.

173.   Regions operates in three primary business segments: General Banking/Treasury, Investment Banking/Brokerage/Trust and Insurance. It considers reporting units for goodwill impairment purposes to be its operating segments. The General Banking/Treasury is the Company's primary segment which provides commercial, retail and mortgage banking services. Regions allocated substantially all of its acquired AmSouth operations, including its toxic Florida loan portfolio to the General Banking reporting unit.

174.   Regions' acquisition of AmSouth in late 2006 occurred at a time when the housing market had already begun to show signs of slowing. As set forth above, the AmSouth acquisition was a risky acquisition. AmSouth engaged in aggressive lending practices concentrated in high-risk markets. Despite the size and risk associated with AmSouth's loan portfolio and the slowing in the real estate market, Regions failed to perform adequate due diligence on AmSouth. In a

- 93 -

rush to close the deal, Regions perfunctorily performed its formal due diligence in a matter of days.

175.   The acquisition was completed on November 4, 2006 in an all stock transaction valued at $9.9 billion.  Regions paid a premium for AmSouth over the fair value of its assets and liabilities and initially recorded $6.2 billion as goodwill. This acquisition caused a sharp increase in Regions' goodwill.  The Company's overall goodwill balance jumped from $5 billion at year end 2005 to $11.2 billion at year end 2006.

176.   *At the time of the acquisition, over 71% of AmSouth's reported fair value of its assets belonged to its loan portfolio*.  AmSouth's loan portfolio was grossly overstated due to its gross understatement of its loan loss reserves.  *As of November 4, 2006, AmSouth reported a total loan portfolio of $34.8 billion while only recording an allowance for loan losses of $336 million or less than one percent*.

177.   Regions failed to adjust the amount of goodwill it recorded from its acquisition of AmSouth downward in the year following the acquisition as it was required to do under GAAP.  *In fact, Regions not only failed to decrease its goodwill balance but actually increased the balance by a net $337 million, increasing the goodwill associated with the AmSouth acquisition to $6.6 billion for year end 2007*.  It did so despite growing evidence indicating that serious problems existed at the time of the acquisition with AmSouth's loan portfolio.

- 94 -

178.   In its fiscal year 2007 Form 10-K, Regions also failed to comply with the disclosure requirements of SFAS No. 142, ¶45, by failing to disclose whether or not it tested for goodwill at a reporting unit level and by failing to provide information about its goodwill on a reportable segment basis.  It was not until Regions' filing of its 2Q 08 Form 10-Q, after the SEC had sent its comment letter to Regions, that Regions made its goodwill disclosure more transparent.

179.   At year end 2007, when Regions' annual impairment test was scheduled, the Company performed a test but utilized assumptions so unreasonable that it resulted in no impairment charge related to its AmSouth operations. According to Regions, the Company's impairment evaluation for fiscal year 2007 purportedly indicated that none of its goodwill was impaired.

180.   Even the SEC questioned the validity of Regions' goodwill balance related to the AmSouth acquisition not being impaired at the end of fiscal year 2007.  On June 17, 2008 the SEC provided a comment letter to Regions after the agency reviewed the Company's Form 10-K filed on February 26, 2008.  The comment letter included a question asking Regions to explain how it determined its goodwill balance was not impaired at the end of 2007.  The SEC specifically asked Regions how the goodwill balance could not be impaired at the end of 2007 *given the fact that the Company was trading at a market value that was below its book value*.

- 95 -

181.   Notably, Regions did not provide balance sheets of the bank segments in any of its Forms 10-K and 10-Q during the Class Period, and the goodwill impairment test was required to be performed on a segment basis.  "An entity that is not required to report segment information in accordance with Statement 131 [SFAS No. 131, *Disclosures about Segments of an Enterprise and Related Information*] is nonetheless required to test goodwill for impairment at the [segment] reporting unit level.  SFAS No. 142, ¶31.  Although Regions has not provided segment balance sheets during the Class Period, a basic indicator of goodwill impairment can be obtained by considering the consolidated balance sheets of the segments, including General Banking/Treasury, Investment Banking/Brokerage Trust and Insurance.   This is a particularly appropriate indicator to use with Regions in the absence of segment data because Regions has disclosed in its response to a letter from the SEC, dated June 17, 2008, requesting further information about Regions' goodwill, that the General Banking/Treasury segment's goodwill balances were $10,715,201,000 and $10,715,201,000 as of December 31, 2007 and March 31, 2008, respectively, representing 93.2% and 93.1% of the total goodwill balances reported during those respective quarters.

182.   To apply the equity premise to measure impairment of Regions' combined segments, plaintiffs compared the market value of Regions' stockholders' equity with Regions' reported book values of equity as of December 31, 2007, March 30, 2008, June 30, 2008 and September 30, 2008.  During each of

those valuation dates, the reported stockholders' equity was materially greater than the market value of stockholders' equity, indicating the Regions failed step one of the goodwill impairment test for all of those valuation dates.

183.  The FASB has recognized that such valuations based on quoted market prices as of the valuation dates do not necessarily represent controlling interests.  "An acquiring entity often is willing to pay more for equity securities that give it a controlling interest than an investor would pay for a number of equity securities representing less than a controlling interest.  That control premium may cause the fair value of a reporting unit to exceed its market capitalization."  SFAS No. 142, n.16.

184.  A "control premium," however, does not apply in all circumstances, and the use of a control premium depends upon the market conditions that exist as of each valuation date.  Depending on market circumstances, no control premiums and even discounts relative to quoted market prices may apply.  For example, when Wells Fargo agreed to acquire Wachovia in early October 2008, Wells Fargo paid only about 23% of Wachovia's reported book value, and even that acquisition and price required active government participation and encouragement to incentivize Wells Fargo to make that acquisition.  After 3Q 07, the trend in banking acquisitions took a marked downturn.  The Standard & Poor ("S&P") 500 index – which appears to be correlated with the price-to-book premiums that banks were willing to pay to acquire other banks – was in a declining trend, falling from

- 97 -

1525.75 as of September 28, 2007 to 1468.36 as of December 31, 2007.  The S&P 500 continued to fall through the first three quarters of 2008, to a level of 1166.36 as of September 30, 2008.   The number of bank acquisition deals also fell markedly, from a peak of 28 deals in January 2007 to 12 deals in October 2007. The slowing economy, weak housing market, declining stock market and uncertainty in financial stocks depressed bank valuations by December 31, 2007, and conditions only continued to grow dramatically worse in the following three quarters of 2008.  Furthermore, the assumption of a control premium in Regions' case would necessarily mean that one or more market participants would be likely to offer such a control premium to acquire Regions, and there was no evidence of that during the Class Period.

185.   The following chart shows the indications of goodwill impairment under step one of SFAS No. 142 as of December 31, 2007, March 30, 2008, June 30, 2008 and September 30, 2008. For illustration purposes only, plaintiffs have also shown the indicated amounts of impairment assuming a 10% control premium to the closing stock market prices of Regions' common stock for each valuation date, although there was no empirical support for such a control premium given the national and local economic conditions and Regions' unique circumstances during the Class Period:

| Date | Market Value of Stockholders' Equity | Reported Stockholders' Equity | Reported Goodwill | Step #1, Implied Impairment Without Control Premium | Step #1, Implied Impairment With 10% Control Premium |
|---|---|---|---|---|---|
| 12/31/2007 | $16,474,616,914 | $19,823,029,000 | $11,491,673,000 | ($3,348,412,086) | ($1,700,950,395) |
| 3/31/2008 | $13,722,458,000 | $20,021,921,000 | $11,510,096,000 | ($6,299,463,000) | ($4,927,217,200) |
| 6/30/2008 | $7,580,268,000 | $19,708,494,000 | $11,515,095,000 | ($12,128,226,000) | ($11,370,199,200) |
| 9/30/2008 | $6,642,777,600 | $19,705,279,000 | $11,515,095,000 | ($13,062,501,400) | ($12,398,223,640) |

186.   Given the deterioration of the banking sector by the end of 2007 and the fact that Regions was trading at a market value that was below its book value as of the end of 2007, it defies logic that the goodwill balance would not be impaired as this time, even assuming *arguendo*, that a control premium would apply.

187.   Despite the continued decline in Regions' stock price, the continued downward spiral in the real estate market and the collapse of Bear Stearns, Regions again failed to conduct an impairment test and failed to properly record an impairment charge for 1Q 08.

188.   On October 23, 2008, *Bloomberg* columnist Jonathan Weil ("Weil") further questioned Regions' goodwill assessment in his commentary entitled "Regions Financial Must Think We're All Stoned," which provided in pertinent part:

> So far this year, the Birmingham, Alabama-based regional bank says it has earned $622.5 million, including $79.5 million of net income last quarter.  In reality, Regions probably has lost billions.  The bosses just won't admit it.
>
> ***It all comes down to that pneumatic, intangible asset known as goodwill, which is about as valuable as the air in a paper sack.  As of***

- 99 -

*Sept. 30, according to Regions, the bank's goodwill was worth $11.5 billion, slightly more than the quarter before.  That's about 59 percent of Regions' book value, and $4.1 billion more than what the stock market says the entire company is worth*.

There is one scenario I can envision in which that goodwill figure would be justified.  That would be if another big bank is offering right now to buy Regions for a huge premium.  There's no reason for us to think that's happening, notwithstanding the Treasury Department's recent jawboning, encouraging U.S. banks to merge their way out of their problems.

Barring an undisclosed deal in the works, Regions executives would have to be nuts to believe that goodwill number.  Maybe they think the rest of us are just stoned.  A Regions spokesman, Tim Deighton, declined to comment.  The bank's chief financial officer, Irene Esteves, didn't respond to my e- mails.

It's become standard fare for banks to insult the public's intelligence by publishing asset values that defy logic.  Saying Regions' goodwill is worth $11.5 billion would be like a hen bragging that her unlaid egg weighs more than she does.

189.  Ultimately, in 4Q 08, Regions reported a $6.2 billion loss for the quarter.  The massive loss was due in substantial part to a $6 billion goodwill charge attributable to the Company's AmSouth operations.

190.  Had Regions properly written off the impaired goodwill associated with the AmSouth acquisition at year end 2007 – as it should have –or even in any of its first three quarters in 2008, the Company's reported net income and diluted earnings per share ("EPS") would have been dramatically lower.  By the end of 3Q 08 Regions' $6 billion write-off of goodwill would have resulted in estimated diluted EPS of negative $8.50.

**Regions Recorded Materially Understated Loan Loss
Reserves in Violation of Applicable Accounting Principles**

191.   The American Institute of Certified Public Accountants ("AICPA")

Audit and Accounting Guide states:

> *Finance receivables normally are the most significant portion of a
> finance company's total assets*. . . .  A finance company should maintain
> a reasonable *allowance for credit losses*. . . .  *The allowance for loan
> losses reduces the carrying amount of loans receivable to the amount
> that is estimated to be collectible*.

192.   During a November 2000 speech at the AICPA National Conference

for Banks and Savings Institutions, the Deputy Chief Accountant of the SEC stated

the following:

> In plain English, the allowance for loan losses must reflect, on a timely
> basis, the changes in the credit quality of an institution's loan portfolio.
> *As credit quality deteriorates, the allowance should be adjusted upward
> in a timely fashion to reflect the additional losses that have been
> incurred*.

193.   Under GAAP, Regions was required to have adequate reserves for: (1)

estimated credit losses for loans specifically identified as being impaired; (2)

estimated credit losses for loans or groups of loans with specific characteristics that

indicate probable losses; and (3) estimated credit losses inherent in the remainder

of the portfolio based on current economic events and circumstances.

194.   The SEC also provides explicit guidance on the proper accounting for

loan losses that defendants were required to follow, but did not.  Staff Accounting

Bulletin ("SAB") No. 102 states in pertinent part:

- 101 -

It is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a ***disciplined and consistently applied process***.  A registrant's loan loss allowance methodology generally should:

*        *        *

- ***Consider all known relevant internal and external factors that may affect loan collectability; [and]***

*        *        *

- ***Be based on current and reliable data*** . . . .

SAB No. 102 also provides:

Factors that should be considered in developing loss measurements include the following:

- Levels of and trends in delinquencies and impaired loans; [and]

*        *        *

- Effects of any changes in risk selection and underwriting standards, and other changes in lending policies, procedures, and practices . . . .

The SEC further states that:

For many entities engaged in lending activities, the allowance and provision for loan losses are significant elements of the financial statements.  Therefore, the staff believes it is appropriate for an entity's management to review, on a periodic basis, its methodology for determining its allowance for loan losses.

195.   Regions' loan loss reserves from the first quarter of 2008 through the first three quarters of 2008 were materially inadequate and did not reflect the high risk of loss inherent in its mortgage loan portfolio, which included AmSouth's ARMs from the over-stimulated Florida real estate lending market between 2004

- 102 -

and 2006.  The Company's reserves therefore violated GAAP and SEC rules. Further, the Company's understated reserves resulted in overstatements of net income, retained earnings, total assets and total shareholders equity, as set forth on Regions' consolidated balance sheets and income statements.  Because those overstated balance sheet and income statement items were components of the Company's Tier 1 capital ratio, those capital ratios were also overstated for the first three quarters of 2008 for this reason alone, and others described herein.

**Defendants Concealed Impairments on Certain High-Risk Loans It Acquired from AmSouth**

196.   For the first three quarters of 2008 Regions failed to take adequate specific reserves related to the impairment of its residential homebuilder portfolio, which included a significant concentration of loans in the troubled Florida housing market obtained from its acquisition of AmSouth in 2006.  SFAS No. 114, *Accounting by Creditors for Impairment of a Loan* and Emerging Issues Task Force ("EITF") Topic No. D-80, *Application of FASB Statements No. 5 and No. 114 to a Loan Portfolio* clearly describe that an evaluation of loan impairment must be made in context of current information and events.  For example, SFAS No. 114, ¶8 states:

> *A loan is impaired when, based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement*. As used in this Statement and in Statement 5, as amended, all amounts due according to the contractual terms means that both the contractual

- 103 -

interest payments and the contractual principal payments of a loan will be collected as scheduled in the loan agreement.

197.   SFAS No. 114, ¶10 states:

"The conditions for accrual . . . are not inconsistent with the accounting concept of conservatism. ***Those conditions are not intended to be so rigid that they require virtual certainty before a loss is accrued***. . . . They require only that it be ***probable*** that an asset has been impaired or a liability has been incurred and that the amount of loss be ***reasonably*** estimable."

198.   As of the 1Q 08, it was probable that a significantly greater portion of the loan portfolio containing the Florida (and Georgia) real estate loans acquired from the AmSouth acquisition were impaired and as a result, defendants were required, under GAAP, to estimate the loss exposure and set up appropriate reserves (in the form of a valuation allowance) at that time.  SFAS No. 114, ¶13 states:

[If] the present value of expected future cash flows . . . is less than the recorded investment in the loan (including accrued interest, net deferred loan fees or costs, and unamortized premium or discount), ***a creditor shall recognize an impairment by creating a valuation allowance with a corresponding charge to bad-debt expense*** . . . .

199.   To calculate the Company's loss exposure, Regions was required under GAAP, to evaluate the likelihood of future cash flows (in the form of repayments of principle and interest).  SFAS No. 114, ¶13 states:

When a loan is impaired . . . ***a creditor shall measure impairment based on the present value of expected future cash flows*** discounted at the loan's effective interest rate . . . .

- 104 -

200.   Regions' decision to purchase AmSouth in 2006 significantly increased its presence in the over-stimulated Florida real estate lending market. This factor, along with AmSouth's lack of experience in lending and servicing ARMs required Regions to record and expense over hundreds of millions of dollars more in impaired loans by the end of 2007.   By failing to accrue properly for hundreds of millions of dollars more in additional impaired loans, defendants' reported financial results were materially false and misleading violating GAAP and SEC rules.

**Regions Failed to Reserve Adequately for Groups of**
**Loans with Characteristics that Indicated Probable Losses**

201.   Even where loans were not delinquent and impaired under GAAP, defendants were required to set reserves to reflect the risks associated with loans with similar characteristics to those that were impaired.   EITF Topic No. D-80 states:

- ***Simply because a portion of the allowance is designated as "unallocated," it is not thereby inconsistent with GAAP***.   The important consideration is whether the allowance reflects an estimate of probable losses, determined in accordance with GAAP, and is appropriately supported.

    *          *          *

- . . . [S]ome loans that are specifically identified for evaluation may be individually impaired, while other loans, that are not impaired individually pursuant to FAS 114, may have ***specific characteristics that indicate that there would be probable loss in a group of loans with those characteristics***.   Loans in the first category must be accounted for under FAS 114 and ***loans in the second category should be accounted***

- 105 -

*for under FAS 5*.  Under FAS 5, *a loss is accrued if characteristics of a loan indicate that it is probable that a group of similar loans includes some losses even though the loss could not be identified with a specific loan*.  [fn]  Moreover, current GAAP . . . emphasize that *the loss does not have to be virtually certain in order to be recognized*.

202.   Similarly, SFAS No. 5, *Accounting for Contingencies*, ¶22 states that

"*accrual shall be made even though the particular receivables that are uncollectible may not be identifiable*."

203.   Regions violated GAAP by ignoring the probable loss characteristics in groups of very high risk mortgage loans on the distressed Florida and Georgia markets that were increasingly suffering from delinquencies.  It was not until year end 2008, well after the housing market had already collapsed, that Regions significantly increased its write-offs and provision for loan losses.  Throughout the Class Period, the Company had taken much smaller write-offs and reserves for these mortgage loans with high risk characteristics, ignoring red flags and experience that these types of loans were suffering high delinquency and default rates.  As a result, Regions' reported Class Period financial results understated the loan loss reserves by more hundreds of millions of dollars.

**Defendants Also Violated GAAP and
SEC Disclosure Requirements**

204.   Regions' financial statements also violated GAAP as a result of defendants' failure to adequately disclose the material loss contingencies and significant concentrations of risk related to the loans acquired from the AmSouth

- 106 -

acquisition that had imploded due to the housing downturns in the Florida and Georgia real estate markets.

205.   Under GAAP, a loss contingency is an existing condition, situation or set of circumstances involving uncertainty as to possible loss.  *See* SFAS No. 5, ¶1. The collectability of mortgage loans is an example of a loss contingency.  GAAP requires that an estimated loss from a loss contingency "be accrued by a charge to income if both of the following conditions are met: (a) ***[i]nformation available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statement***"; and "***(b) [t]he amount of loss can be reasonably estimated***." *See* SFAS No. 5, ¶8.

206.   Even if no accrual is made for a loss contingency because one or both of the above conditions of SFAS No. 5 are not met, or if an exposure to loss exists in excess of the amount accrued, defendants were still required to disclose the contingency when there is at least a "***reasonable possibility***" that a loss or an additional loss may have been incurred.[15]  SFAS No. 5, ¶10.  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible

---

[15]     GAAP defines "[r]easonably possible" as "[t]he chance of the future event or events occurring is ***more than remote but less than likely***."  SFAS No. 5, ¶3(b).

loss or range of loss or state that such an estimate cannot be made.  *See* SFAS No. 5, ¶10.

207.  SFAS No. 107, *Disclosures about Fair Value of Financial Instruments*, required Regions to disclose "all significant concentrations of credit risk arising from all financial instruments, whether from an individual counterparty or groups of counterparties."  Group concentrations of credit risk exist if a number of counterparties have similar economic characteristics that would cause their ability to meet contractual obligations to be similarly affected by changes in economic or other conditions.  As alleged herein, Regions' mortgage loans from the afflicted Florida and Georgia markets clearly represented a significant concentration of credit risk.

208.  If a significant concentration of risk represents a material contingency, the risk must be disclosed in the Company's interim financial statements in accordance with Accounting Principles Board Opinion (APB") No. 28, *Interim Financial Reporting*.  The purpose behind these GAAP provisions is to warn investors about  concentrations  of risk that *may* result in losses under changed conditions – not to wait until those losses become substantial (which they already were by the end of 2007) – and then disclose the concentration of risk *after* the losses have already harmed investors.

209.  Similarly, AICPA Statement of Position ("SOP") No. 94-6, *Disclosure of Certain Significant Risks and Uncertaintie*s, requires disclosures to

- 108 -

be made in financial statements regarding any vulnerabilities arising due to the fact that the business is exposed to certain risks and uncertainties that might have a "severe impact" on future operations. SOP 94-6 defines a "severe impact" as a "significant financially disruptive effect on the normal functioning of the entity." For Regions, the Florida and Georgia mortgage loans acquired from the AmSouth acquisition presented a group concentration of credit risk that threatened to, and ultimately did, severely impact the Company's financial position.

**Defendants' Provision for Loan Losses and Net**
**Charge-Offs of Loans Were Understated Until Year End 2008**

210.  Ultimately, at year end 2008, Regions finally announced dramatic increases in its write-offs and in its provision for loan losses. For fiscal year 2008, Regions' net charge-offs totaled $1.5 billion or 1.59% of average loans in 2008 versus $270.5 million or 0.29% of average loans in 2007. Regions' provision for loan losses increased to $2.1 billion in 2008 versus $555 million in 2007.

211.  *Bloomberg* columnist Weil questioned Regions' accounting for its loan loss reserves in his commentary on October 23, 2008:

> Irrational goodwill isn't the only thing weird about Regions' accounting, either.
>
> As of Sept. 30, Regions had a $1.5 billion loan-loss allowance, equivalent to just 83 percent of its nonperforming assets, which were $1.8 billion. A year earlier, Regions' allowance was at 175 percent of nonperforming assets. A year before that, it was at 249 percent.
>
> Keeping Up

- 109 -

Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets. It's the reserve a lender sets up on its balance sheet in anticipation of bad loans. At Regions, the allowance hasn't kept up.

212.   The illustrations below demonstrate how Regions' provision for loan losses and net charge-offs of loans failed to "keep up" and timely reflect the high risk of loss inherent in the Company's mortgage loan portfolio.  Even though Regions' total loan balance increased significantly (over $30 billion) after the AmSouth acquisition, the Company's corresponding provision for loan losses and net charge-offs combined did not cover even 1% of the total loan balance at the end of 2007.  It was not until 4Q 08 that Regions belatedly increased its provision for loan losses and net charge-offs well after the housing market had already collapsed.

| Regions Bank | | | | |
|---|---|---|---|---|
| (Dollars in Thousands) | **Q1 2007** | **Q2 2007** | **Q3 2007** | **Q4 2007** |
| Provision for Loan Losses | $47,000 | $60,000 | $90,000 | $358,000 |
| Net Charge-Offs of Loans | $46,022 | $53,907 | $63,121 | $107,472 |
| Total Loan Balance | $94,168,000 | $94,014,000 | $94,374,000 | $95,379,000 |

| Regions Bank | | | | |
|---|---|---|---|---|
| | **Q1 2008** | **Q2 2008** | **Q3 2008** | **Q4 2008** |
| Provision for Loan Losses | $181,000 | $309,000 | $417,000 | $1,150,000 |
| Net Charge-Offs of Loans | $125,758 | $208,951 | $416,384 | $795,992 |
| Total Loan Balance | $96,385,000 | $98,267,000 | $98,712,000 | $97,419,000 |





### Regions' Failure to Maintain Adequate Controls Over Its Financial Reporting and Disclosures Violated Applicable Accounting Principles and SEC Regulations

213.   The SEC defines "disclosure controls and procedures" as follows, in relevant part,

> controls and other procedures . . . of an issuer that are designed to ensure that **information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. 78a et seq.) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms**.

17 C.F.R. §240.13a-15(e) (emphasis added).

214.   "Internal control over financial reporting" is defined by the SEC:

[A] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and **the preparation of financial statements for external purposes in accordance with generally accepted accounting principles** and includes those policies and procedures that:

(1)   Pertain to the maintenance of records that, in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2)   Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

17 C.F.R. §240.13a-15(f) (emphasis added).

215.   Exchange Act Rule 13a-15 requires the Company's principal executive officer and principal financial officer to annually certify the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's disclosure controls and procedures, and provide management's assessment of the effectiveness (or deficiencies in the effectiveness, as applicable) of the Company's internal controls over financial reporting, as of the end of each fiscal year.  17 C.F.R. §240.13a-15(b)(1) and (c).

216.   In the Company's 2007 Form 10-K, defendants misled investors regarding the effectiveness of the Company's disclosure controls and procedures,

- 112 -

and internal control over financial reporting, insofar as they falsely misrepresented that the Company's disclosure controls and procedures, and internal controls over financial reporting were effective when they were not, for the reasons set forth above.

217.   In addition, the Company's 2007 Form 10-K contained the SOX certifications, signed by defendants Ritter and Yother.  As alleged in detail above, the statements made in the certification were each materially false and/or misleading when the certifications were signed on February 26, 2008.

### LOSS CAUSATION/ECONOMIC LOSS

218.   During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Regions common stock and operated as a fraud or deceit on Class Period purchasers of Regions common stock by misrepresenting the Company's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Regions' business was not as healthy as represented, defendants falsely concealed the extent of its credit and goodwill impairment and the threat to its entire business from its failure to properly account for its non-accrual loans and loan loss reserves.  Later, when the defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Regions common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of

- 113 -

Regions common stock during the Class Period, plaintiffs and other members of the class suffered economic loss, *i.e.*, damages, under the federal securities laws.

219. As a result of the Company's subsequent corrective disclosures, the price of the stock dropped significantly throughout the latter half of 2008 and early 2009, as set forth more fully herein. Although the stock traded above $23 per share early in the Class Period, at the end of the Class Period it closed below $5 per share.

## CLASS ACTION ALLEGATIONS

220. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Regions common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

221. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Regions has more than one billion shares of stock outstanding, owned by hundreds if not thousands of persons.

222.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the Exchange Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

(c)    whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Regions common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

223.    Plaintiffs' claims are typical of those of the Class because plaintiffs and the Class sustained damages from defendants' wrongful conduct.

224.    Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Class.

225.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

**For Violation of §10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

226.   Plaintiffs repeat and reallege each and every allegation contained above.

227.   During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

228.   Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)   employed devices, schemes and artifices to defraud;

(b)   made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of Regions common stock during the Class Period.

- 116 -

229. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Regions common stock. Plaintiffs and the Class would not have purchased Regions common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

230. Plaintiffs repeat and reallege each and every allegation contained above.

231. The Individual Defendants acted as controlling persons of Regions within the meaning of §20(a) of the Exchange Act. By reason of their positions within the Company, their actions throughout the Class Period and their ownership of Regions stock, the Individual Defendants had the power and authority to cause Regions to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiffs and the members of the Class damages, including interest;

C.    Awarding plaintiffs reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  February 28, 2011          ROBBINS GELLER RUDMAN
                                     & DOWD LLP
                                   ANDREW J. BROWN


                                        s/ ANDREW J. BROWN
                                   _____
                                        ANDREW J. BROWN

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101-3301
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   Lead Counsel for Plaintiffs

                                   WARD & WILSON, LLC
                                   PATRICK C. COOPER (ASB-4959-O77P)
                                   2100 Southbridge Parkway, Suite 580
                                   Birmingham, AL  35209
                                   Telephone:  205/871-5404
                                   205/871-5758 (fax)

ROGER BEDFORD & ASSOCIATES,
P.C.
ROGER H. BEDFORD, JR. (ASB-3651-
D60R)
P.O. Box 370
303 North Jackson Avenue
Russellville, AL  35653
Telephone:  256/332-6966
256/332-6967 (fax)

Co-Liaison Counsel

610459_1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 28, 2011, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on February 28, 2011.

s/ ANDREW J. BROWN
ANDREW J. BROWN

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:       andrewb@rgrdlaw.com

# Mailing Information for a Case 2:10-cv-02847-IPJ

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger H Bedford , Jr**
  senbedford@aol.com

- **Andrew J Brown**
  AndrewB@rgrdlaw.com

- **Betsy P Collins**
  bcollins@burr.com

- **Patrick C Cooper**
  patrickccooper@yahoo.com

- **Victor L Hayslip**
  vhayslip@burr.com

- **Tricia L McCormick**
  tmccormick@rgrdlaw.com

- **Kip Nesmith**
  knesmith@burr.com

- **Walker Steven Stewart**
  wstewart@burr.com

- **James S Ward**
  jward@wardwilsonlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)