FILED
2011 Jun-07  PM 12:01
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| LOCAL 703, I.B. OF T. GROCERY AND FOOD EMPLOYEES WELFARE FUND, Individually and on Behalf of All Others Similarly Situated | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CV: 10-2847-IPJ |
| REGIONS FINANCIAL CORPORATION, C. DOWD RITTER, IRENE M. ESTEVES, and ALTON E. YOTHER, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

### Procedural Background

Pending before this court is defendants', Regions Financial Corporation ("Regions"), C. Dowd Ritter ("Ritter"), Irene M. Esteves ("Esteves"), and Alton E. Yother ("Yother"), motion to dismiss (doc. 38) the amended complaint of plaintiffs, Local 703, I.B. of T. Grocery and Food Employees Welfare Fund ("Local 703") (doc. 31), and defendants' brief and evidentiary materials in support (doc. 39); plaintiffs' response in opposition (doc. 41); and defendants' reply (doc.

48).

## Factual Background

Defendant, Regions, is a Delaware corporation that operates throughout the South, Midwest, and Texas.  Regions provides consumer and commercial banking, trust, securities brokerage, mortgage and insurance products and services. Regions provides traditional commercial, retail, and mortgage banking services, as well as other financial services in the fields of investment banking, asset management, trust mutual funds, securities brokerage, insurance, and other specialty financing.  Amended Compl., ¶ 16 (doc. 31).

Defendant Ritter served as President, CEO, and a director of Regions since the acquisition of AmSouth on November 4, 2006.  Ritter also served as Chairman of Regions' Board of Directors ("Board") after Jackson W. Moore ("Moore") resigned the chairmanship in January 2008.  Prior to the acquisition of AmSouth, Ritter served as President and CEO of AmSouth and AmSouth Bank and Chairman of the Board of AmSouth Bank since 1996.  Ritter served as Chairman of the AmSouth Board from September 1996 to October 1999 and from January 2001 through the acquisition.  Ritter signed the 2008 interim financial reports and the Sarbanes-Oxley ("SOX") certifications that accompanied the reports.  On

December 18, 2009, three days after Regions announced that it was not going to

pay executive bonuses in 2009 in order to comply with the government's Troubled

Asset Relief Program, Regions announced that Ritter would resign as of March 31,

2010, which he did.  Amended Compl., ¶ 17 (doc. 31).

Defendant Esteves served as CFO of Regions since April 1, 2008.  Esteves

signed the 2008 interim financial reports and the SOX certifications that

accompanied the reports.  On February 22, 2010, Regions announced that Esteves

had also resigned from Regions.  Amended Compl., ¶ 18 (doc. 31).

Defendant Yother served as CFO of Regions from April 13, 2007, until

April 1, 2008.  Yother signed the 2007 annual financial report and the SOX

certification that accompanied the report.  On February 13, 2008, Regions

announced that Yother resigned, effective April 1, 2008.  Amended Compl., ¶ 19

(doc. 31).

According to the company's 2008 shareholder proxy statement:

Because annual cash incentive payments require the achievement of
measurable results based on goals and objectives set at the beginning of
the year, payouts are strongly performance-based and may be highly
variable – ranging from nothing to more than two times an executive's
base pay.  The goals and objectives at the beginning of the year for the
CEO will relate primarily to the achievement of expected financial
performance of the Company for the year.

Amended Compl., ¶ 95 (doc. 31).  According to the company's 2008 shareholder

proxy statement, Ritter, Yother, and Esteves earned $9.3 million, $5.6 million, and $2.4 million, respectively.  According to the company's 2009 shareholder proxy statement, Ritter and Esteves earned $9.7 million and $2.4 million, respectively. *Id*., ¶ 96 (doc. 31).

On November 4, 2006, Regions bought AmSouth for $10 billion in a stock-for-stock purchase.  $6 billion of the purchase price was attributed to goodwill, the amount by which the purchase price exceeded the fair value of AmSouth's assets and liabilities.  Amended Compl., ¶ 21 (doc. 31).

AmSouth was heavily invested in residential real estate markets at the time of the acquisition, particularly in Florida and Georgia.  Amended Compl., ¶ 21 (doc. 31).  From late 2006 through 2008, the real estate and credit markets deteriorated.  Regions contends this was reflected in its financial results by consistent increases in its nonperforming assets and net loan charge-offs, and further, each of Regions' SEC filings and earnings releases contained disclosures warning of the risks of continued economic decline and the potential impact on Regions' performance.  Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Compl., at 12-14 (doc. 39); *see e.g.*, Regions' 2007 10-K (doc. 11-1).

Defendants stated that they were "implementing several measures to support

the management of this [troubled] portion of its portfolio, including reassignment of highly experienced, key relationship managers to focus on work-out strategies for distressed borrowers."  This was in reference to the Company's Special Assets Department and the Special Asset Officers ("SAOs").  Amended Compl., ¶ 51, 57 (doc. 31).  The SAOs working in this group were assigned, by geographic region, large pools of loans that had been identified as "substandard" or worse according to Regions' internal risk-rating.  SAOs were then tasked with either trying to work with the borrower in order to arrange a mutually acceptable means to repay the loan, or determine that the loan was simply not recoverable.  In these instances where it became likely that Regions would never recover anything on the loan, it was classified as "non-accrual," and Regions was required to allocate an appropriate reserve for it and/or write it down under the applicable accounting rules.  *Id.*, ¶ 58 (doc. 31).

The Head of Special Assets at Regions during this time was Jeff Kuehr ("Kuehr").  But as part of Regions' "reassignment of highly experienced, key relationship managers," defendants now required the Special Assets Officers to justify their decisions – especially the decision that a loan had become a "nonaccrual" loan – with Tom Neely ("Neely") (former Head of Problem Asset Management), Michael Willoughby ("Willoughby") (former Chief Credit Officer),

and Wells (former Chief Risk Officer).  *Id.*, ¶ 60 (doc. 31).

Regions determined that CW1 is Bill Teegarden, CW2 is Brian Hamilton,

CW3 is Tom Aderhold, CW4 is Gregory Klopfenstein, and CW5 is Oscar Bruni.

Corrigan Aff., ¶ 5-12 (doc. 39, Ex. L); Sides Aff. (doc. 39, Ex. M).  Three of these

former Regions employees have provided affidavits that defendants contend to

show that the allegations attributed to them are not consistent with the information

they provided to Plaintiffs' investigator.  *See* Hamilton Aff., ¶ 6-8 (doc. 39-15);

Klopfenstein Aff., ¶ 6 (doc. 39-16); Bruni Aff., ¶ 6-9 (doc. 39-17).

Confidential Witness ("CW") 1 was an SAO at Regions from 2005 through

March 2010, who managed a portfolio of "sub-standard" risk rated loans (*i.e.*,

loans that were rated a seven or worse – on a scale of one to nine – on the

Regions' internal risk rating scale).  The portfolio of special asset loans that this

witness managed was comprised of loans from Georgia and South Carolina, and

included commercial real estate loans.  The portfolio increased in size from $400

million in 2007 to $1.6 billion in 2009.  Amended Compl., ¶ 61 (doc. 31).  As a

Special Assets Officer, CW1 states that he/she was responsible for making risk

recommendations on loans he/she managed, including identifying loans that

should be classified as non-accrual.  Once per month, the SAOs, including CW1,

manually completed forms, which CW1 referred to as the "non-accrual forms."

These forms were two to three pages in length, and included details about the loan

balances, a narrative about why collection was unlikely and an estimated amount

of the loss.  These forms were routed to the Credit Managers.  Then a meeting was

held each month to discuss the "recommendations for non-accruals."  Attendees at

the monthly meetings usually included all of the SAOs, Neely, Willoughby and

Wells, among others.  Plaintiffs contend that at the monthly meetings, Neely

would "challenge" the recommendations from the SAOs regarding non-accruals,

and claim Neely's mandate was to try to keep loans from being designated non-

accrual, making comments like "can't they borrow money from their mom" or

"isn't there any glimmer of hope that we will get some sort of payment."  *Id*., ¶ 63

(doc. 31).  CW1 stated that after monthly meetings, Neely worked with the credit

managers to get the risk ratings reduced from non-accrual to sub-standard, and that

after the following month or quarter they would be switched back, the delay done

with the purpose of "making numbers."  *Id.*, ¶ 66-67 (doc. 31).

Plaintiffs contend this process continued throughout 2008-2009 and is

corroborated by other SAOs.  For example, CW2 is a former Special Assets

Officers in the Birmingham, Alabama office who was employed from 2000

through May 2009.  CW2 relates the same process was followed for his/her

portfolio of loans, which were "business loans" issued to businesses in Alabama

and Atlanta, Georgia.  Similarly, CW3, the former Head of Special Assets for

Florida during the Class Period, confirmed that the notion that Regions did not

properly classify nonperforming loans as non-accruing assets in a timely manner

was "good information."  CW3 began at AmSouth in July 2000, and joined

Regions after the merger.  CW3 left the Company in June 2009 as a result of

his/her concern about how special assets and recommendations regarding non-

accrual loans were handled at the Company.  *Id*., ¶ 68 (doc. 31).

Plaintiff contends that defendants were kept aware of this process through

both the reporting structure and periodic reports.  For instance, former Chief

Credit Officer Willoughby and former Chief Risk Officer Wells frequently

attended the monthly and quarterly meetings with the Special Assets Officers.

Willoughby also reported to Wells, who in turn met frequently with defendants

throughout the Class Period, and even participated in conference calls and analyst

events with defendants on behalf of Regions.  In addition to this direct reporting

structure, defendants were also able to monitor the results of the Special Assets

Department via risk-adjusted return on capital ("RAROC") reporting.  CW4 is a

former Vice President of Finance (employed with the "management accounting

side of the bank"), who was employed at Regions from 2006 through the Spring of

2008.  CW4's job duties specifically included supporting internal management and

providing reports that detailed performance metrics and RAROC data.  According

to CW4, the RAROC reports were produced on a monthly and quarterly basis, and

at the consolidated financial results of operations level. *Id.*, ¶ 71.  Managers, such

as the Branch Managers, all the way up to executives received hard copies of the

RAROC reports.  Branch Managers received a condensed version of the reports

that were "very detailed," but only three to four pages in length and specific to

their respective markets.  By contrast, Ritter and the other executives received

"white books."  The "white books" were hard copies of the RAROC reports that

were "hundreds of pages" in length and contained risk-adjusted performance data

broken down by market, region and line of business.  CW4 states that there was a

"reasonably decent review process" of the data in the "white books" by defendant

Ritter and other members of the executive team.  The executives, including

defendants Ritter, Yother, and later Esteves, met at least monthly in Management

Committee meetings, during which the data in the "white books" were reviewed.

*Id.*, ¶ 72-74.  According to CW4, the RAROC reports provided performance

metrics that management, including the defendants, used to evaluate the financial

condition of Regions from a risk-adjusted perspective.  CW4 also listened to the

quarterly analyst calls during his/her employment with Regions and during the

Class Period. According to CW4, during "every single quarterly conversation with

9

the analysts, someone from the financial world asked Dowd [Ritter] about loans in Florida and bad commercial real estate."  Ritter responded to the inquiries from analysts about the loans in Florida, saying, "[n]o, no, we are just fine. We are doing just great." The loans in Florida are "not a problem."  *Id*., ¶ 69-74, 78 (doc. 31).

According to CW1, in late 2008, Willoughby instructed Neely and the Special Assets Officers that there should be "no more emails or memos" about the removal of non-accrual loans from the non-accrual list.  *Id*., ¶ 81 (doc. 31).

According to CW1, at the end of 2009's first quarter and consistent with earlier practices, Neely personally removed $150 million of non-accrual loans on March 31, 2009, only to replace them after the close of the quarter.  CW1 knows of the event because he/she spoke with Tate[1] about it just after it happened.  This is corroborated by another former SAO.  CW5 was employed at Regions as a Senior Vice President of Special Assets from July 31, 2008 to July 1, 2009.  CW5 managed a portfolio of special assets comprised mainly of commercial real estate loans for the Eastern Florida region, with a "legal balance" of approximately $500 million. According to CW5, in March 2009, a $20 million loan he/she

---

[1] Milton Tate worked out of Gainesville, Florida, and he maintained the spreadsheet that tracked the risk ratings on special assets.  Amended Compl., ¶ 64 (doc. 31).

recommended as non-accrual was not classified as such until the beginning of the

next quarter in April 2009.  According to CW5, in March he/she had determined

that the loan was non-accrual.  CW5's determination was reviewed and approved

by Kuehr.  The loan had been classified as non-accrual in Regions' automated

"AFS" system, following the quarterly meeting in early to mid March 2009.

However, toward the end of March 2009, CW5 noticed that the risk rating on the

loan had been improved in the AFS system and changed to "sub-standard" prior to

the end of the quarter.  CW5 was "surprised" by the change.  CW5 was not certain

how the change came about, including who made or directed the change.  *Id*., ¶ 81-

86 (doc. 31).

On June 17, 2008, the SEC requested more information from Regions

regarding its methodology for computation of goodwill in its 2007 10-K, pointing

out that Regions' stock was trading below book value.  Memorandum of Law in

Support of Defendants' Motion to Dismiss Amended Compl., Ex. H (doc. 39-8).

Regions responded on July 1, 2008, with a detailed explanation of its methodology

for computation of goodwill and stated:

> During the fourth quarter of 2007 and through the filing of our Form
> 10-K for the year ended December 31, 2007 on February 26, 2008, we
> noted a trend of lower trading value relative to book value. However,
> management could not conclude that this was a long-term trend,
> particularly when our stock price was trading above book value in the

fourth quarter of 2007. Further, given the relatively small difference between our stock price and our book value per share, we determined that a potential buyer would offer a control premium for our business franchise that would adequately cover these differences between trading prices and book values.

Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Compl., Ex. I (doc. 39-9).  On July 10, 2008, the SEC responded that it had completed its review of Regions' 2007 10-K and had no further comments. Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Compl., Ex. J (doc. 39-10).

Late in the third quarter and through the fourth quarter of 2008, the failure of many of the largest financial institutions in the country (Fannie Mae, Freddie Mac, Merrill Lynch, Lehman Brothers, and others) led the United States' economy on a drastic downturn.  Compl., ¶ 40-42 (doc. 1).  In response, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, which, among other things, established the Troubled Asset Relief Program ("TARP"), which Regions eventually participated in on October 21, 2008.  Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Compl., at 17-18 (doc. 39); Amended Complaint, ¶ 138 (doc. 31).

Regions contends that, as shown in its SEC filings and earnings releases, it tested goodwill for impairment at least four times during 2007 and 2008.

12

Specifically, Regions tested its goodwill for the 2007 10-K, and then in the second through fourth quarters of 2008.  Amended Complaint ¶ 97, 121, 144 (doc. 31). Regions contends that each test showed its goodwill was not impaired prior to the fourth quarter of 2008.

On January 20, 2009, before the market opened, Regions reported a net loss of $5.6 billion for the fourth quarter of 2008, stating the loss "was largely driven by a $6 billion non-cash charge for impairment of goodwill."  Amended Compl., ¶ 149 (doc. 31).

Regions' stock price was at a class period high of $23 on February 27, 2008. After the January 20, 2009, announcement Regions' stock price fell $1.47 to $4.60.  Amended Compl., ¶ 151 (doc. 31).

Since then the Federal Reserve has opened an investigation into Regions' classification of loans as "non-accrual," and the manipulations described herein by various former employees.  CW5 was interviewed by Robert Ward ("Ward"), Senior Investigator with the Division of Banking Supervision and Regulation, Board of Governors Federal Reserve out of Washington D.C. in approximately August 2009. CW5 was uncertain who else Ward interviewed.  Ward asked CW5 specifically about the March 2009 incident.

In addition, the Company's Audit Committee of the Board is now in the

process of conducting its own investigation.  According to CW1, the New York-based law firm Sullivan & Cromwell was hired by the Audit Committee for this purpose, and has a list of the $150 million of assets that were removed from the non-accrual list in March 2009.

## Legal Standards

In reviewing a motion to dismiss, the court must "accept the allegations of the complaint as true and construe them 'in the light most favorable to the plaintiff.'"  *Simmons v. Sonyika*, 394 F.3d 1335, 1338 (11th Cir. 2004) *(citing Hill v. White*, 231 F.3d 1334, 1335 (11th Cir. 2003)).  A motion to dismiss is granted "only when the movant demonstrates 'beyond a reasonable doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sonyika*, 394 F.3d at 1338 (*citing Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1187 (11th Cir. 2004) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("When ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint"); *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir. 1994) (same).

Further, FED. R. CIV. P. 9(b) states that "[i]n alleging fraud or mistake, a

party must state with particularity the circumstances constituting fraud or mistake." This particularity requirement is met when the complaint sets forth "'(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).

The Private Securities Litigation Reform Act ("PSLRA") enhances the requirements of FED. R. CIV. P. 9(b) in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Second, for "each act or omission alleged" to be false or misleading, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Additionally, the 11th Circuit has held "that scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific Atlanta,*

15

*Inc.*, 374 F.3d 1015, 1017-1018 (11th Cir. 2004).

## Legal Analysis

To state a claim for a violation of § 10(b), plaintiffs must allege: (1) the existence of a material misrepresentation (or omission), (2) made with scienter (i.e., "a wrongful state of mind"), (3) in connection with the purchase or sale of any security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiff's economic loss. *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 633 (11th Cir. 2010). In defendants' motion to dismiss, they challenge whether plaintiffs sufficiently pled an actual misrepresentation of material fact, scienter, and loss causation.

Accepting the allegations of plaintiffs' amended complaint as true and construing them in the light most favorable to plaintiffs, defendants' motion to dismiss is due to be denied. Defendants have failed to demonstrate beyond a reasonable doubt that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief.

I.     *Misrepresentation of Material Fact*.

In order to state a claim under § 10(b) of the Securities Act, the Complaint

16

must allege a misstatement or omission of material fact. *Thompson,* 610 F.3d at 633.  A statement of opinion is only actionable under § 10(b) if "defendants deliberately misrepresented a truly held opinion."  *Plumbers' Union Local No. 12 Pension Fund v. Swiss Reinsurance Co.,* 753 F.Supp.2d 166, 182 (S.D.N.Y. 2010).

Defendants cite to *Fait v. Regions Financial Corp.*, 712 F.Supp.2d 117 (S.D.N.Y 2010), to show that defendants' calculations of goodwill and loan loss reserves are not statements of fact but rather are matters of opinion.  The court in that case went on to find that the complaint was "devoid of any allegation that defendants did not truly hold those opinions at the time they were made public."  *Id*., at 124.  However, in this case, plaintiffs have pled many facts showing that the defendants had information that did not support defendants' opinions.  For example, plaintiffs have brought forth statements of CWs showing how defendants improperly handled and classified loans, defendants were aware of the collapsing commercial real estate market in Florida yet continued to push for more growth there, and continued to ignore the RAROC reports signaling a negative risk-adjusted bottom line.

Additionally, defendants' misstatements are not protected by the PSLRA's safe harbor and the bespeaks doctrine, which attempt to protect statements that are both "forward-looking" and "accompanied by meaningful cautionary statements

17

identifying important factors that could cause actual results to differ materially

from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).

First, that section of the PSLRA safe harbor does not apply to misstatements

concerning loan loss reserves and goodwill in the Company's reported financials.

15 U.S.C. 78u-5(b)(2)(A) ("this section shall not apply to a forward-looking

statement . . . that is . . . included in a financial statement prepared in accordance

with generally accepted accounting principles"). Second, even if statements are

forward-looking, cautionary language of future risks does not protect defendants if

the risks warned against had already occurred. *See SEC v. Merchant Capital,*

*LLC*, 483 F.3d 747, 769 (11th Cir. 2007). Here, defendants allegedly already

knew of increased loan loss reserves and its effect on goodwill before making any

cautionary statements.


*A.  Plaintiffs' Allegations Are Sufficient Regarding Loan Loss Reserves.*

Plaintiffs have pled sufficient allegations that Regions' loan loss reserves

were false and misleading. In particular, plaintiffs interviewed several CWs who

explained how defendants mishandled loans in order to manipulate their financial

reporting numbers. CW1 described how loans that were recommended to be

classified were not until the following month or quarter. CW1 further stated that

Willoughby instructed Neely and the SAOs that there should be "no more emails or memos" about the removal of non-accrual loans from the non-accrual list.

Defendants attempt to argue that plaintiffs' allegations are too speculative and that the CW statements are not sufficient to establish falsity. In support of their argument, defendants cite cases that actually support plaintiffs' allegations. For instance, defendants cite *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1251 (11th Cir. 2008) stating that the estimates of fraud based on limited examples provided by confidential witnesses is "too shaky a foundation on which to make any reasonable calculus of the total amount of the fraud." The court in that citation is stating that the dollar amount is unreliable, and therefore, can not be used to infer that defendants had knowledge, or scienter, of the fraud. However, with regard to there being a misstatement of material fact, the court actually states that "we agree with the district court's observations that the amended complaint's allegations, if accepted as true, establish that Home Depot stores processed improper RTV chargebacks." *Id.*, at 1247. Like *Mizzaro*, other cases support finding that plaintiffs' allegations are sufficient. *See e.g.*, *Hubbard v. BankAtlantic Bancorp, Inc.*, 625 F.Supp.2d 1267, 1276 (S.D. Fla. 2008)(upholding sufficiency of allegations of falsity based on a confidential witness stating "Bank employees intentionally mischaracterized loans into less risky categories,

19

particularly categorizing loans that should have been in the LAD portfolio into

other categories to justify smaller reserves, thus protecting the bottom line").

### B. Plaintiffs' Allegations Are Sufficient Regarding Goodwill.

As mentioned above, plaintiffs have sufficiently pled allegations that

Regions' loan loss reserves were false and misleading, supported by CW

statements that showed defendants were aware of the misclassification of loan loss

reserves.  Further, loan loss reserves impact the income reported by Regions,

which was the measure by which the company tested its goodwill[2].  Thus,

plaintiffs have sufficiently pled allegations that defendants' goodwill was

overstated, false, and misleading.

### C. Additional Misleading Statements.

Defendants contend that the statements highlighted by plaintiffs regarding

Regions' accounting of non-performing assets as well as its management style are

non-actionable statements of puffery.  *See Woodward v. Raymond James*

---

[2] Regions used an income based approach to testing its goodwill for impairment, as opposed to using the company's stock price to calculate its fair value.  Memorandum of Law in Support of Defendants' Motion to Dismiss Amended Compl., at 31-32 (doc. 39)(*citing* Ex. I (doc. 39-9)).

*Financial, Inc.*, 732 F.Supp.2d 425, 433 (S.D.N.Y. 2010).  However, in the *Woodward* case, the court found that statements about the defendants' loan portfolio were classic puffery due to the fact that the amended complaint did not adequately allege that the statements were actually false.  In this case, plaintiffs' have brought forth statements by CWs alleging a scheme, with defendants' knowledge, that strayed from the legitimate company procedures.  Thus, statements by defendants' such as – "[w]e believe that we are prudently managing our credit risk in establishing the necessary reserves" – are more than puffery.  *See Novak v. Kasaks*, 216 F.3d 300, 315 (2nd Cir. 2000)("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was "in good shape" or "under control" while they allegedly knew that the contrary was true.  Assuming, as we must at this stage, the accuracy of the plaintiffs' allegations about AnnTaylor's "Box and Hold" practices, these statements were plainly false and misleading").

*II.  Scienter.*

The court concludes that plaintiffs have adequately pled a strong inference of scienter when viewing the allegations collectively.  Defendants contend that the global financial crisis is the cause here, and the court finds that inference

plausible.  However, the inference that defendants knowingly or recklessly ignored the falsity of their external statements and the financial statements is at least as plausible as the global financial crisis inference.

*A. Standard of Review*.

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In this Circuit, § 10(b) and Rule 10b-5 require a showing of either an "intent to deceive, manipulate, or defraud," or "severe recklessness."  *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008)(*quoting Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1284 (11th Cir. 1999)).  A strong inference of scienter is one that is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. V. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). The Court must also "consider the complaint in its entirety"to determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id*., at 322-323.

B. *Plaintiffs' Allegations in Support of Strong Inference of Scienter.*

In a recent case, a strong inference of scienter was found to be supported by allegations similar to those plaintiffs' allege in the case before this Court – (1) motive by defendants for incentive compensation by making the company appear more financially healthy than it was; (2) defendants' access to internal reports; (3) defendants' awareness of macroeconomic events contradicting their public statements and reports; (4) the magnitude of the company's false accounting systems; (5) the signing of false Sarbanes-Oxley certifications; and (6) a government inquiry or investigation into the company's accounting practices.  *See* Notice of Recent Authority, Ex. A (*Frank v. Dana Corp.*, No. 09-4233, slip op. (6th Cir. 2011)) (doc. 49-1).

*1. Motive.*

Though incentive compensation, without more, may be insufficient to allege scienter, as defendants contend, "the Court must assess whether such allegations, considered in conjunction with the remainder of Plaintiff's allegations, on the whole raise an inference of recklessness or knowing disregard."  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 689-690 (6th Cir. 2004); *see also In re Wellcare Mgmt. Grp., Inc. Sec. Litig.*, 964 F.Supp. 632, 639 (N.D.N.Y. 1997)("if scienter is

supported by more than just that [the executives] stood to receive larger bonuses if profits were fraudulently increased, the Court will not disregard, as irrelevant, allegations that incentive compensation was affected by the alleged fraudulent conduct"). Thus, the fact that defendants had compensation tied to company performance is a possible motive that may be considered, collectively, with the other allegations of scienter. *See* Notice of Recent Authority, Ex. A, at 9 (doc. 49-1).

*2. Access to Internal Reports; Awareness of Events Contradicting Public Statements and Reports.*

Like the executives in *Frank v. Dana Corp.*, defendants had access to reports showing the true state of affairs regarding Regions' loans and the deteriorating markets, particularly in Florida. Defendants received hard copies of the RAROC reports, called "white books," which contain data on risk-adjusted performance for each market, region, and line of business. As plaintiffs allege, the defendants met at least monthly in Management Committee meetings to discuss the data in the "white books." Further, defendants had access to accounting systems and internal reports that showed contrary information to what was in their public statements and financials. *See Frank v. Dana Corp.*, at 8 ("Plaintiffs point

to Burns's and Richter's positions as chief executive officer and chief financial officer respectively as evidence that they had access to accounting systems and internal information that were contrary to their positive external statements").

Late in the third quarter and through the fourth quarter of 2008, many of the largest financial institutions in the country (Fannie Mae, Freddie Mac, Merrill Lynch, Lehman Brothers, and others) were failing.  In response, on October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, which, among other things, established the Troubled Asset Relief Program ("TARP"), in which Regions eventually participated.  Additionally, during "every single quarterly conversation with the analysts, someone from the financial world asked Dowd [Ritter] about loans in Florida and bad commercial real estate."

These allegations clearly show that defendants had access to and were aware of a financial situation that was not as strong as they were suggesting to the public.

3. *Magnitude of False Statements*.

"While alleging a misapplication of [GAAP] standing alone is insufficient, such allegation when combined with a drastic overstatement of financial results

can give rise to a strong inference of scienter . . . . [and] the totality and magnitude of the . . . accounting violations [may] constitute strong circumstantial evidence of reckless or conscious misbehavior." *N.M. State Inv. Council v. Ernst & Young LLP*, 2011 U.S. App. LEXIS 7680, at \*27-\*28 (*quoting Carley Capital Grp. v. Deloitte & Touche*, 27 F.Supp.2d 1321, 1339-1340 (N.D.Ga. 1998). Defendants' significant and sudden increase in loan loss reserves along with its $6 billion goodwill write-down, considered collectively with all of the allegations, supports a strong inference of scienter. "Failure to take an impairment charge may constitute securities fraud when "the need to write down [the asset]...was 'so apparent' to [the defendant] before the announcement, that a failure to take an earlier write-down amounts to fraud.'" *Iron Workers Local No. 25 Pension Fund v. Oshkosh Corp.*, 2010 U.S. Dist. LEXIS 30693, at \* 42 (E.D.Wis. 2010). Defendants admitted in the company's 10-K in February 2009 that many of its loans, particularly those in Florida, "ha[d] been under stress for over a year and, due to weakening credit quality, [they] increased [their] loan loss provision and [their] total allowance for credit losses." Amended Complaint, ¶ 153 (doc. 31). Coupled with allegations of defendants' knowledge of the scheme to manipulate classifications of loans, amongst other allegations, it was apparent to defendants that the financials were inaccurate long before their adjustment in January 2009.

*4. Signing of False Sarbanes-Oxley Certifications; Federal Reserve Investigation.*

Though neither defendants' Sarbanes-Oxley certifications and allegedly deficient internal controls nor a Federal Reserve investigation on its own may be enough to find a strong inference of scienter, like in *Frank v. Dana Corp.*, they are factors that can be considered collectively with all other allegations.

"'[A] Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements.'  A certifier would be severely reckless . . . only if he 'had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions.'" *Mizzaro*, 544 F.3d at 1252 (*quoting Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). As mentioned throughout this opinion, plaintiffs have alleged many facts regarding defendants' knowledge of a scheme of misclassifying loans, and therefore, falsely stating both loan loss reserves and goodwill.

*III.  Loss Causation.*

Loss causation "requires the Plaintiff to allege that the security's share price

27

'fell significantly after the truth became known.'" *Waterford Township General Employees Ret. Sys. v. SunTrust Banks, Inc.,* 2010 WL 3368922, at *4 (quoting *Dura Pharms. Inc.,* 544 U.S. at 341-42).  Stated differently, the plaintiff must show "the untruth was in some reasonably direct, or proximate, way responsible for his loss." *In re Coca-Cola Enters. Inc. Sec. Lit.*, 510 F. Supp. 2d 1187, 1203 (N.D. Ga. 2007).  However, "'the plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury he has suffered; 'he need only show that it was 'substantial,' i.e., a significant contributing cause.'" *Robbins v. Koger Properties, Inc.*, 116 F.3d 1441 (11th Cir. 1997)(*quoting Bruschi v. Brown*, 876 F.2d 1526 (11th Cir. 1989)).  Further, "[u]nlike the pleading standard for materiality or scienter, the pleading standard for loss causation in securities fraud cases does not impose 'any special . . . requirement . . .'  Plaintiffs must, consistent with Rule 8 of the Federal Rules of Civil Procedure, provide only a 'short and plain' statement adequate to give defendants 'some indication of the loss and the causal connection that the plaintiff has in mind.'" *In re Immucor Inc. Sec. Litig.*, 2006 U.S. Dist. LEXIS 72335, at *57-*58 (N.D. Ga. 2006)(*quoting Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346-347 (2005)).  The court in *In re Immucor* found that plaintiffs had satisfied this notice pleading standard:

Plaintiffs' Amended Complaint gives Defendants notice of both the loss

> alleged -- a 17% drop in Immucor stock prices -- and the causal nexus --
> the 17% drop followed closely after an announcement of a formal SEC
> investigation, alleged by Plaintiffs to be the disclosure of the relevant
> truth to the market. Even though loss causation may be difficult for
> Plaintiffs to prove, the Court finds the Amended Complaint provides
> Defendants with sufficient notice of Plaintiffs claims to meet the
> minimal pleading standard of Federal Rule of Civil Procedure 8.

*In re Immucor*, at *60. Similarly, plaintiffs here have given defendants notice of both the loss alleged – a $1.47 (24%) drop from the close of trading the day before – and the causal nexus – the 24% drop followed closely after the January 20, 2009, disclosure.


*IV. Statute of Limitations.*

Plaintiffs' allegations regarding defendants' fraudulent statements of loan loss reserves is not barred by the two year statute of limitations. "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim . . . that arose out of the conduct, transaction, or occurrence set out . . . in the original pleading." FED. R. CIV. P. 15(c)(1)(B). The initial complaint – filed October 20, 2010, within the statutory period – alleged defendants made material misrepresentations in the same Class Period SEC filings referenced in the Amended Complaint. *See* Complaint ¶ 31-33, 35, 39, 49 (doc. 1). Further, plaintiffs do allege that defendants improperly accounted for loan loss

29

reserves during the Class Period.  *Id*., ¶ 57-59.  In addition, defendants failed to

meet their burden of proof in establishing a statute of limitations defense.  *Tello v.*

*Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1292 (11th Cir. 2005)("It is beyond

dispute that the defendants have the burden of proof in establishing the elements

of the affirmative defense of the statute of limitations").  Defendants have failed to

show that prior to February 22, 2009, there were sufficient facts available for

plaintiffs to allege a strong inference of scienter.

## V. *Control Persons Claims*.

Since the Amended Complaint sufficiently pleads that defendants were

primary violators of § 10(b), plaintiffs have adequately pled that defendants also

violated  § 20(a) of the Securities Exchange Act and are subject to liability as

control persons.

**Conclusion**

Having considered all of the foregoing, the court is of the opinion that defendants' motion to dismiss (doc. 38) is due to be **DENIED**, which the court shall do by separate order.

**DONE** and **ORDERED** this the 7th day of June 2011.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

31