FILED
2012 Mar-21  PM 03:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| LOCAL 703, I.B. OF T. GROCERY AND FOOD EMPLOYEES WELFARE FUND, et al., Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) | <u>CLASS ACTION</u> |
| Plaintiffs, | ) ) | CIVIL ACTION NUMBER 2:10-cv-02847-IPJ |
| vs. | ) ) | |
| REGIONS FINANCIAL CORPORATION, et al., | ) ) ) | |
| Defendants. | ) | |

_____

## <u>DECLARATION OF CHRISTOPHER M. JAMES, Ph.D.</u>

I, Christopher M. James, Ph.D., declare pursuant to 28 U.S.C. § 1746 as follows:

1.    My name is Christopher M. James.  I have been retained by counsel for Regions Financial Corporation ("Regions") to evaluate whether Plaintiffs' assertions that the common stock of Regions "traded in an efficient market during the Class Period," and, in particular, that "the price of Regions' common stock

reacted to new, company-specific information during the Class Period"[1] are based on sound economic principles and are consistent with the facts in this matter.

2.      A true and correct copy of my report that accurately reflects my qualifications and opinions is attached as Exhibit A.

3.      I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of March, 2012.

_____

Christopher M. James, Ph.D.

---

[1] *See* Plaintiffs' Memorandum of Law in Support of Motion for Class Certification, November 18, 2011, pp. 18, 21.

# REPORT OF

## Christopher M. James, Ph.D.

**Local 703, I.B. of T. Grocery and Food Employees Welfare Fund et. al.**
**v.**
**Regions Financial Corporation, et. al.**

**March 21, 2012**

EXHIBIT A

## I.    Qualifications

1.  I am the William H. Dial / SunBank Eminent Scholar in Finance and Economics and
    Professor of Finance at the University of Florida.  I am also a consultant to the Federal
    Reserve Bank of San Francisco.  Prior to joining the faculty of the University of
    Florida, I taught at the University of Oregon and the University of Michigan.  I have
    also held positions at the Federal Reserve Board of Governors, the Federal Deposit
    Insurance Corporation ("FDIC"), and the United States Treasury Department.  From
    2004 through 2010, I served as the SEC-approved independent distribution consultant
    for the Janus Mutual Fund complex.

2.  My academic research has been in the areas of securities pricing, corporate finance,
    bank lending, and financial institutions.  I have published numerous articles on issues
    related to corporate finance, interest rate risk management, mutual fund performance,
    and how information is incorporated into securities prices.

3.  I served on the Board of Directors and the Advisory Board to SunTrust Bank of Florida
    between 1989 and 2005.  As part of my Board duties, I served on the executive
    committee of the Bank.  The executive committee approved all major investment
    activity (e.g., credit extensions, mortgages, and loan restructurings).  From 1995 to
    2002, I also served on the academic board of the Turnaround Management Association.

4.  I serve on the editorial boards of four scholarly journals, including the Journal of
    Financial Economics.  I served as an associate editor of the Journal of Finance from
    1988 through 2000, and as editor of the Journal of Financial Intermediation from 1988
    through 1999.  I have provided consulting services to a number of government agencies
    and corporate entities on issues concerning the valuation of corporate assets and
    corporate restructuring.  I have also provided expert witness testimony on issues
    concerning price impact, loss causation, estimation of damages, bank product pricing,
    mutual fund performance and pricing, and corporate restructurings.  A copy of my
    curriculum vitae is attached as Exhibit 1.  A list of my deposition and trial testimony

1

over the past four years is included in Exhibit 2.  As part of this engagement, I have reviewed numerous materials, including the (Corrected) Amended Complaint for Violations of the Federal Securities Laws, in re:  Local 703, I.B. of T. Grocery and Food Employees Welfare Fund, et al. vs. Regions Financial Corporation, et al., filed February 28, 2011 ("Complaint"), Plaintiffs' Memorandum of Law in Support of Motion for Class Certification filed on November 18, 2011 ("Motion for Class Certification"), analyst reports, SEC filings, public press articles, and stock price data. A list of documents and data I have relied upon in forming my opinions for this report is provided in Exhibit 3.

5.  I am being compensated for my time and services on an hourly basis.  I am charging my regular hourly rate of $800.  I have been assisted in this matter by the staff of Cornerstone Research, an economics and finance consulting firm, who worked under my direction.

## II.    Assignment

6.  Plaintiffs assert that the common stock of Regions Financial ("Regions" or "the Company") traded in an efficient market during the purported Class Period (February 27, 2008 – January 19, 2009), and in particular, that "[t]he price of Regions' common stock reacted to new, company-specific information during the Class Period."[1] I have been retained by Maynard Cooper and Gale, P.C., counsel for the Defendants, to evaluate whether Plaintiffs' assertions are based on sound economic principles and are consistent with the facts in this matter.

## III.   The Scientific Approach to Analyzing Stock Price Reaction to New Information

7.  In their Motion for Class Certification, Regions' stock price reaction on two particular days, October 21, 2008 and January 20, 2009, is the only evidence that Plaintiffs offer

---

[1] Motion for Class Certification, November 18, 2011, pp. 18, 21.  Regions' stock price closed at $23.22 on February 27, 2008, the first day of the purported Class Period. January 19, 2009 (the last day of the purported Class Period) was Martin Luther King, Jr. Day (Monday) and the U.S. markets were closed.  The last trading day during the purported Class Period was January 16, 2009 (the preceding Friday).  January 20, 2009 (Tuesday) was the first trading day following the end of the purported Class Period.

2

to support their claim that "Regions' stock price immediately responded to the release of Company-specific 'unexpected news events'" during the purported Class Period.[2]

8. Plaintiffs claim that Regions' stock price reacted negatively to the Company's public announcements on October 21, 2008:

> [After] the Company's October 21, 2008 public announcements of a "$417 loan loss provision – $108 million increase from the second quarter, primarily the result of an aggressive stance taken in disposing of non-performing assets" as well as its decision to participate in the U.S. government's Troubled Asset Relief Program ("TARP") bailout program, "Regions' stock price declined dramatically from a closing price of $11.29 on October 21, 2008 to a closing price of $8.94 on October 24, 2008 – a loss of more than 20%."[3]

9. Plaintiffs also claim that Regions' stock price reacted negatively to the Company's January 20, 2009 announcement related to increased loan loss provision and goodwill impairment:

> [Following] Regions' January 20, 2009 announcement of a net loss of $5.6 billion for the fourth quarter of 2008 (largely driven by $6 billion non-cash charge for impairment of goodwill), in addition to an increased loan provision of $1.15 billion, "Regions fell $1.47 to $4.60 at 4 p.m., the lowest price since March 13, 1985."[4]

10. However, Plaintiffs' claim is not based on scientific analysis. As discussed in more detail below, Plaintiffs do not provide evidence for either of these days that the new information, if any, changed the total mix of information available to investors, or that Regions' stock price movements were not due to market or industry factors or other company-specific information unrelated to the "unexpected news events" as Plaintiffs claim.

---

[2] Motion for Class Certification, November 18, 2011, p. 21.

[3] Motion for Class Certification, November 18, 2011, pp. 21–22. Loan loss reserves and loan loss provisions, while not identical, are related entities. Loan loss reserves for a given period are calculated as the sum of the loan loss reserves from the prior period and the loan loss provisions for the current period, less the net charge-offs during the period.

[4] Motion for Class Certification, November 18, 2011, p. 21. Regions' stock price closed at $4.60 on January 20, 2009.

11. In addition, although the Complaint identifies multiple days when alleged misrepresentations were made, Plaintiffs do not provide analysis of Regions' stock price reaction on these days. It is my understanding that determining whether the alleged misrepresentations altered the total mix of information on the market is a key element in establishing investor reliance on these alleged misrepresentations under the "fraud-on-the-market" theory.

12. To assess whether an announcement or alleged misrepresentation altered the total mix of information on the market, it is necessary to perform a scientific analysis. Part of this scientific analysis involves a determination of whether the announcement or alleged misrepresentation contained *new* information and, if so, whether the content of the new information *could* impact stock prices, since investors would not rely on old information or new information that has no bearing on a company's stock price in making their purchase (or sale) decisions. For example, information about non-cash accounting items may not be new information in that investors have already taken such items into account or the information may not have an impact on stock prices because these accounting items have no bearing on a company's future cash flows.

13. The scientific analysis should also evaluate, using scientific methods, whether the announcement or alleged misrepresentation did have an impact on the stock price. Financial economists typically use an event study to measure the effect of new information on security prices. If, as Plaintiffs claim, the announcement or alleged misrepresentation altered the total mix of public information known to the market, then one would expect the event study to find statistically significant price movement on that day. Finding no price impact indicates that the announcement or alleged misrepresentation did not change the total mix of publicly available information.

## IV.    Summary of Opinions

14. From an economic perspective, Regions' announcement of goodwill impairment and increased loan loss reserves would not necessarily be expected to have a significant impact on Regions' stock price. Goodwill impairment and loan loss reserves are

accounting adjustments that have no direct cash-flow implications. As a result, they do not have a direct impact on future cash flows, and hence, on the stock price. Regions' goodwill and loan loss reserves were widely discussed by market participants throughout the purported Class Period.

15. Based on my analysis of Regions' daily stock price movements, there is no evidence that, after controlling for market and industry effects, the release of company-specific information related to the alleged misrepresentations on October 21, 2008 and January 20, 2009 had any impact on Regions' stock prices. I find no evidence that the $6 billion goodwill impairment taken by Regions in the fourth quarter of 2008 ("Q4 2008") had any effect on Regions' stock price. I also find no evidence that the increased loan loss reserves and loan loss provisions reported by Regions on October 21, 2008 and January 20, 2009 had any effect on Regions' stock price.

16. Regions' stock price decline on January 20, 2009 was similar to those of other companies in the banking industry on that day.

17. There is also no evidence, based on the results of my analysis, that the alleged misrepresentations identified in the Complaint had an impact on Regions' stock price.

18. Based on my analysis of the four dates after the end of the purported Class Period identified by Plaintiffs, I find no evidence that the release of information related to the allegations caused a decline in Regions' stock price.

19. In summary, Plaintiffs have not provided a scientific analysis to support their claim that Regions' stock traded in an efficient market and that its price reacted to new, company-specific information during the purported Class Period. My analysis shows that the information related to the company-specific announcements and alleged misrepresentations identified by Plaintiffs were known to the market during the purported Class Period.

20. My analysis also finds no evidence, based on widely accepted scientific methods, that the information related to allegations had an impact on Regions' stock price.

5

Therefore, if, as assumed by Plaintiffs, Regions' stock traded on an efficient market, these alleged misrepresentations and related company-specific information did not alter the total mix of public information that was known to the market. Because the alleged misrepresentations did not change the total mix of information available on the market, investors could not have relied on them when making their purchase (or sale) decisions. Therefore, Plaintiffs' claim that Regions' stock price reacted to "unexpected news events" related to the alleged misrepresentations during the purported Class Period is inconsistent with the claim that Regions' stock traded in an efficient market.

## V.    Market Efficiency

21. An efficient market is one "in which security prices reflect all publicly available information"[5] and new public information is quickly and fully incorporated into prices. If the market for a firm's stock is efficient, then the firm's stock is fairly priced with respect to all public information. Market efficiency implies that future stock price changes are driven by new information, and information that is already known to the market does not impact stock prices.

22. It is my understanding that courts have established criteria that are probative of whether a stock trades in an efficient market. Specifically, *Cammer v. Bloom* considers several factors as determinants of market efficiency.[6] One of these "Cammer factors" is empirical evidence showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the security's price. Although Plaintiffs have argued that "the market for Regions' stock was efficient during the Class Period,"[7] they have failed to show, using scientific methods, that the alleged misrepresentations and related company-specific information identified in the Complaint had any immediate impact on Regions' stock price.

---

[5] Brealey, R. A. and S. C. Myers, Principles of Corporate Finance, Sixth Edition, New York: McGraw-Hill Irwin, 2000, p. 1071. This is the definition of semi-strong efficiency. Throughout my report I refer to semi-strong efficiency when I discuss an "efficient market."

[6] *Cammer v. Bloom*. 711 F. Supp. 1264 (D.N.J. 1989) Court Opinion filed on April 19, 1989.

[7] Motion for Class Certification, November 18, 2011, p. 18.

23. If Plaintiffs are correct in their assertion that the market for Regions' stock was efficient during the purported Class Period, then a news event that did not impact Regions' stock price indicates that the news did not alter the total mix of public information known to the market. If, on the other hand, a news event impacted the price of Regions' stock price, but the news event repeated information that was already publicly available earlier, then the market on which Regions' stock traded was not efficient.

24. I show below, using widely accepted scientific methods and based on the assumption of an efficient market for Regions' stock, that the alleged misrepresentations and related company-specific information identified in the Complaint did not have any impact on Regions' stock price. Therefore, if, as assumed, Regions' stock traded on an efficient market, these alleged misrepresentations and related company-specific information did not alter the total mix of public information that was known to the market. This finding is consistent with my review of analyst reports and public press, which shows that information related to Regions' goodwill and loan loss reserves was widely discussed throughout the purported Class Period. Given this public knowledge, if Regions' stock price had reacted to the alleged misrepresentations and related company-specific information, as Plaintiffs contend, then Regions' stock could not have been trading in an efficient market during the purported Class Period.

**VI.    Non-Cash Nature of Goodwill, Loan Loss Reserves and Loan Loss Provisions and Common Knowledge about Regions' Goodwill, Loan Loss Reserves and Loan Loss Provisions during the Purported Class Period**

25. From an economic perspective, there are two main reasons why Regions' announcement of goodwill impairment and an increase in loan loss reserves and loan loss provisions would not necessarily be expected to have a significant impact on Regions' stock price. First, goodwill impairment, loan loss reserves and loan loss provisions are accounting adjustments that have no concurrent cash-flow implications. Second, Regions' potential write-down of goodwill and increasing loan loss reserves and loan loss provisions were widely discussed by market participants throughout the purported Class Period.

7

*Goodwill*

26. A company's stock price reflects the present value of all expected future cash flows. Whether and to what extent a company's stock price reacts to news will depend on the degree to which news is perceived to provide new information about the company's expected future cash flows. News about non-cash accounting items that do not necessarily have a bearing on current or future cash flows would not impact stock prices.

27. Goodwill is created when a firm acquires another firm for a price that is in excess of the estimated fair value of assets and liabilities. Goodwill, in essence, represents unidentifiable intangible benefits from an acquisition. Goodwill impairment is a non-cash bookkeeping adjustment, and bears no direct relationship to the current or future cash flows of a company, and thus, to the company's stock price.[8]

28. My review of public press and analyst reports indicates that Regions' goodwill was widely discussed by market participants throughout the purported Class Period and a possible impairment was expected by the market. For example, an analyst at Stanford Group Company stated as early as April 2008 that "One wildcard to look out for starting this quarter: goodwill impairment charges from past high-premium acquisitions."[9] Similarly, a few months into the purported Class Period, an analyst at Friedman, Billings, Ramsey & Co., Inc. noted that "RF is trading near trough multiples by all valuations due to the myriad of issues facing financial institutions. Although the shares trade significantly below book value, we believe investors should ignore this metric, as book value is inflated due to goodwill associated with the acquisition of AmSouth."[10] A Barclays Capital analyst also noted that "a goodwill impairment charge

---

[8] "[An] asset write-down is not expected to have any effect on cash flows. Therefore, when a firm announces a write-down, there should be no market reaction. The firm is simply reducing the carrying value of an asset." Bunsis, H., "A Description and Market Analysis of Write-off Announcements," *Journal of Business Finance & Accounting*, 1997, Vol. 24 (9 & 10), 1385–1400 at 1390.
Moreover, goodwill is excluded from calculations of tangible or regulatory capital per the recommendations on banking laws and regulations issued by the Basel Committee on Banking Supervision (Basel II). Basel Committee on Banking Supervision, "*International Convergence of Capital Measurement and Capital Standards*," June 2004.

[9] Stanford Group Company, "RF: Q1 Earnings Preview; Lowering 2008 and Initiating 2009 Estimates; Maintaining Hold Rating," April 10, 2008.

[10] FBR Capital Markets, "Credit Deterioration Approaching 1992 Recession Levels – Reinitiating Coverage at Underperform," June 16, 2008.

is possible" prior to Regions' announcement on January 20, 2009.[11]  Following the
January 20, 2009 announcement, a JP Morgan analyst commented that "[o]verall, we
are not that concerned over the goodwill charge.  It shows the challenges that the
market is already aware of and does not impact TCE [tangible common equity]
levels."[12]

29. Moreover, my review of the public press indicates that goodwill impairment concerns
were not specific to Regions at this time.  There is discussion in the public press
regarding the fact that many companies in the banking industry were writing down
intangible assets during the Class Period, and that further write-downs were expected as
the market continued to deteriorate.  For example, an article in The Business Journal
noted that "Earnings at FDIC-insured banks tumbled by more than 86 percent in the
second quarter, while its list of troubled banks swelled to its largest since 2003....
Expenses for goodwill impairment and other charges to intangible assets were also
significantly higher than last year..."[13]

30. I also find that while the Regions-AmSouth merger was initially viewed favorably by
market participants at the time of the merger in 2006, Regions market capitalization
was lower than its stockholders' equity throughout the purported Class Period (see
Exhibit 4).  The gap between the market's valuation of Regions and the value of its
stockholders' equity reported on the Company's balance sheet indicates that the market
had already discounted Regions' goodwill during the purported Class Period.[14]

31. There was also almost no discussion of Regions' $6 billion goodwill impairment during
Regions' January 20, 2009 conference call with analysts.  Of the 11 analysts who asked
questions during the "Question-and-Answer" segment of the call, only one analyst

---

[11]  Barclays Capital, "4Q08 Preview: Moving to HFS," January 14, 2009.
[12]  JP Morgan, "Regions Financial: 4Q08 First Look:  Wider than Expected Loss on Reserve Build; CRE Losses Jump-ALERT," January 20, 2009.
[13]  The Business Journal, "FDIC's 'Troubled Bank' List Grows," August 27, 2008.
[14]  The stockholders' equity reported on Regions' balance sheet is equal to the difference between the book value of Regions' assets (including goodwill) and the book value of Regions' liabilities.  Thus the book value of Regions' equity is higher than the market capitalization, i.e., the market value of Regions' equity, during the purported Class Period.

(Jefferson Harralson of Keefe, Bruyette & Woods) mentioned Regions' goodwill impairment. However, even Mr. Harralson's question pertained to tangible common equity (TCE) and Regions' liquidity position excluding the effect of the goodwill impairment charge: "[If] you take out the goodwill impairment, the balance sheet grew by about $8 billion due to the debt and the TARP money, could you talk about how you're thinking about the TCE ratio and as juxtaposed against liquidity do you plan on shrinking this balance sheet at all going forward to help the TCE ratio out, or do you think that you just kind of amass liquidity and run with a lower TCE."[15] The lack of discussion of the $6 billion goodwill impairment on the day of its announcement is consistent with the analysts expecting the impairment charge and understanding that it has no impact of Regions' stock price.

*Loan Loss Reserves and Loan Loss Provisions*

32. Loan loss reserves are accounting entries that reflect a bank's subjective estimate of losses on loans due to defaults and nonpayment. A bank estimates the amount of loans in its portfolio that it believes it may not recover, and records this amount as a reserve on its balance sheet. Loan loss provisions are non-cash adjustments to the reserves. Increases in loan loss reserves are thus simply accounting adjustments that have no concurrent cash-flow implications.

33. My review of analyst reports and public press indicates that the market was aware during the purported Class Period of possible increases in Regions' loan loss reserves and loan loss provisions. Analysts were focused on Regions' loan loss metrics throughout the purported Class Period, and analyst commentary indicates that the market expected Regions to increase its loan loss reserves and loan loss provisions significantly in the face of the deteriorating market conditions.

34. For example, an analyst at Stanford Group Company noted prior to the start of the purported Class Period that "In our opinion the large loan loss provision that Regions expects to record this quarter represents an aggressive action that we applaud. That

---

[15] Regions Financial Corporation Q4 2008 Earnings Call Transcript, January 20, 2009.

said, we have little reason to be optimistic in regards to the outlook for credit quality as we progress throughout 2008."[16] An analyst at Punk, Ziegel & Co. similarly noted in April 2008 that "These numbers mean that Regions will be reporting high loan loss provisions for some time, probably well into 2010."[17] A Merrill Lynch analyst also noted that there may be material reserve building in the future: "As a percentage of nonperforming loans, RF's loan loss reserve declined to 140% in 1Q08 from 186% in 4Q07 and 317% in 1Q07. We estimate that this will continue to trend down to about 88% by the end of '08, leaving considerable risk that material additional loan loss reserve building will be necessary."[18] In January 2009, a week prior to Regions' announcement of increased loan loss reserves for Q4 2008, a Barclays Capital analyst stated that "Our expectation is for provisions to increase over 100% to $825MM… And, while our estimate is high, we would not be surprised if provisions came in even higher, given RF's aggressive push to move these loans off its books over time."[19]

35. Moreover, the purported Class Period coincides with a severe recession and a historically unprecedented financial crisis that had a profound impact on the markets in general and on the banking industry in particular. During this period, the market expected increasing loan loss provisions throughout the banking industry. For example, a July 2008 Forbes article noted that "[It's] going to get a lot worse. Loan losses and delinquencies are mounting and aren't expected to crest until later this year. That'll force banks to set aside billions of more dollars in extra reserves."[20] Similarly, a December 2008 industry report by Barclays Capital stated that "For the banks, this outlook implies higher loan losses in 2009…with losses not peaking until late 2009 or more likely in 1H10 and heavy loan loss reserve building through 2Q09…. Loan losses in 3Q08 were at record levels and very likely going higher. [The] majority of banks indicated NCOs [net charge offs] would be higher in 4Q08 amid real estate related

---

[16] Stanford Group Company, "RF: Credit Deterioration To Impact Q4 and 2008; Lowering Estimates and Maintaining Hold Rating," January 4, 2008.
[17] Punk, Ziegel & Co., "Fighting the Residential Real Estate Battle," April 16, 2008.
[18] Merrill Lynch, "Downgrading to Sell," May 16, 2008.
[19] Barclays Capital, "4Q08 Preview: Moving to HFS," January 14, 2009.
[20] Forbes, "More Bank Woes," July 22, 2008.

issues and a slowing economy. Also, during 9 of the past 11 years, 4Q marked the highest loan loss quarter of the year…. Loan loss provisions in 2008 should total $133 billion, up almost 150%, as losses rise and banks build reserves by $55 billion."[21]

36. Like other banks, Regions was affected by the recession and the financial crisis, and Regions experienced the same issues with respect to loan loss reserves during the purported Class Period as did other companies in the banking industry. For example, an analyst at FIG Partners noted that "[Regions' credit] quality deteriorated, as expected [in line] with peers."[22] Similarly, an FBR Capital Markets analyst stated that, "Consistent with peers, Regions is experiencing a rapid increase in nonperforming assets (NPAs) and net charge-offs (NCOs)…."[23]

37. Assuming that Regions' stock traded in an efficient market, and because the potential for increasing loan loss reserves and loan loss provisions and Regions' goodwill impairment were widely discussed and expected throughout the purported Class Period, any negative impact related to the alleged misrepresentations would already be reflected in Regions' stock price prior to the alleged disclosures. Therefore, Plaintiffs' claim that Regions' stock price reacted immediately to the October 21, 2008 and January 20, 2009 announcements regarding goodwill, loan loss reserves and loan loss provisions would be inconsistent with market efficiency.

38. The finding that likely increases in Regions' loan loss reserves and loan loss provisions and potential impairment of the Company's goodwill was widely known to the market is confirmed by the results of a scientific statistical analysis (event study), which show that alleged disclosures during the purported Class Period did not have an impact on Regions' stock price.

---

[21] Barclays Capital, "Industry Overview: Asset Quality Outlook," December 16, 2008.
[22] FIG Partners, "2Q EPS Struggled, But Can RF Avoid More Equity? Loss Recognition Still Remains," July 23, 2008.
[23] FBR Capital Markets, "Credit Deterioration Approaching 1992 Recession Levels – Reinitiating Coverage at Underperform," June 16, 2008.

## VII.    Price Impact of New Information and Event Study Methodology

39. From an economic perspective, whether new information significantly alters the total
    mix of publicly available information with respect to a company is assessed by
    examining how the securities prices of the company reacted to the release of the
    information.  Economists commonly use a method known as an "event study" to test
    statistically whether the release of information has a significant impact on the securities
    prices of a company.

40. The event study is a scientific and objective methodology that is widely employed in
    academic research on the behavior of securities prices.[24]  The prices of a company's
    securities (such as common stock) in an efficient market reflect the total mix of
    publicly available information about the company's future earnings prospects, and only
    new material information about the company's earnings prospects changes securities
    prices.  This new material information includes company-specific information as well
    as information that is *not* specific to the company, but nonetheless affects the
    company's future earnings prospects, such as information about the broad economy and
    information about the particular industry in which the company operates.  The goal of
    an event study analysis is to remove such broad economic and industry effects from
    daily price movements and develop a model to quantify the "normal" level of
    company-specific price movements.  This "normal" level of company-specific price
    movements can then be used to determine whether price movements on specific days,
    after adjusting for market and industry effects, are abnormal, or "statistically
    significant."

41. A statistically significant stock price movement on a particular trading day typically
    indicates that new, material, company-specific information about the company's future
    earnings prospects has entered the total mix of publicly available information on that

---

[24] See, for example, Campbell, J., A. W. Lo, and A. C. MacKinlay, The Econometrics of Financial Markets, Princeton
University Press, 1997, Chapter 4, pp. 149–180.
For a discussion of the use of event studies in litigation see, Mitchell, M. L. and J. M. Netter, "The Role of Financial
Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer*,
1994, Vol. 49, 545–590.

trading day. The relatively smaller movements on other days are typically the result of normal volatility due to trading activity, and do not reflect the price impact of material, firm-specific information. Such small movements are not statistically distinguishable from general market and industry trends or the normal, volatile trading behavior of the company's stock.

42. The first step in an event study is to derive a relationship that explains a company's stock price movements based on broad economic and industry-specific factors. Typically, event studies use a regression model to estimate this relationship. This estimated relationship is then used to predict a stock's expected return on any given day based on market and industry returns, i.e., given the market and the industry returns on a given day, one predicts what the return of the stock on that day would be, absent the release of any company-specific information. The difference between the stock's actual return and this expected (or "predicted") return is called the "residual" return. Residual returns that do not cross a particular statistical threshold are viewed as indistinguishable from zero.[25] Residual returns that cross the threshold, which is typically set at a 95 percent confidence level, are "statistically significant" and reflect a measure of the impact of the new information on the company's stock price.[26]

43. Event studies estimate the relationship between a company's stock price movements and the market and industry returns over a period of time. In this case, the most appropriate period to use for estimation is the purported Class Period. This is because there is a marked difference in the volatility of Regions' stock during 2008 and the

---

[25] Few, if any, days will have residual returns that are exactly zero.

[26] 95 percent confidence level means that, statistically speaking, the researcher is 95 percent confident that the residual return is not due to random chance.

volatility in earlier periods.[27] The statistical significance of the residual return on any given day is determined by comparing it to the "normal" volatility of residual returns over the estimation period. Due to the market turmoil during the credit crisis, the volatility of the overall market and especially the volatilities of bank stocks were much higher in 2008 compared with earlier years. Exhibit 5 shows the volatility of the S&P 500 index (as measured by the VIX index) and the implied volatility of Regions' stock price.[28] The higher volatility during 2008 means that any model estimated using a period before the purported Class Period would underestimate the "normal" volatility during the purported Class Period and therefore would set an artificially low threshold for evaluating the statistical significance of residual returns during the purported Class Period. For this reason, I use the purported Class Period to estimate the regression model in the event study.[29] In my analysis, I exclude the dates that are identified in the Complaint as alleged misrepresentation days, as well as days on which Plaintiffs allege the release of company-specific information related to the allegations, so that they do not affect the regression model estimation.[30]

44. Regions' common stock traded on the New York Stock Exchange ("NYSE") throughout the purported Class Period. Therefore, I used the NYSE Composite Index ("NYSE Index") as a proxy for market-wide influences. For the industry index, I used an index constructed from the returns of the companies listed as "peers" in the Proxy

---

[27] A commonly used statistical test shows that the volatility of Regions' stock price returns during the purported Class Period was different from its volatility during a one year period before the beginning of the purported Class Period. I have also performed a statistical test to determine whether the relationship between Regions' stock price returns and market and industry returns is the same before and during the purported Class Period. I estimated the relationship between Regions' stock price movements and the market and industry returns using two time periods: February 27, 2008 to January 19, 2009 (the purported Class Period) and January 31, 2007 to January 28, 2008. I then tested whether the coefficient estimates that describe the relationship between Regions' stock price movements and the market and industry returns are statistically the same in the two regressions. They were not. When analyzing the stock price reaction to specific events during a time period, it is not appropriate to control for market and industry effects using estimates from another period where the relationship between the returns of a company and market and industry returns are different.

[28] Implied volatility is the volatility of a stock price estimated from option prices. VIX is a key measure of market expectations of near-term volatility conveyed by S&P 500 stock index option prices.

[29] Using a period that includes the event days instead of a period preceding the event days to estimate the event study model is common in cases like this one where there is a compelling statistical reason. See, MacKinlay, C. A., "Event Studies in Economics and Finance," *Journal of Economic Literature*, 1997, Vol. 35(1), 13–39.

[30] Dates excluded are: February 27, 2008; April 15, 2008; April 16, 2008; May 7, 2008; June 10, 2008; June 17, 2008; July 22, 2008; August 5, 2008; September 2, 2008; September 4, 2008; September 9, 2008; September 30, 2008; October 21, 2008; October 23, 2008; October 31, 2008; November 10, 2008; and November 11, 2008.

statement filed by Regions on March 12, 2008.[31]  Exhibit 6 shows Regions' stock price performance and the performance of the NYSE Index and the banking peers index (Industry Index) during the purported Class Period.

45. Exhibit 7 shows the results of the regression model.  The coefficient estimate of 1.56 on the NYSE Index indicates that a one percent change in the value of NYSE Index predicts a 1.56 percent change in the Regions' stock price.  The t-statistics associated with this coefficient estimate (16.79) indicates that the relationship between the NYSE Index returns and Regions' stock price returns is statistically significant (as indicated by the asterisk next to the NYSE Index coefficient estimate).[32]  Similarly, the coefficient estimate of 1.38 on the Industry Index predicts a 1.38 percent change in Regions' stock price for every one percent change in the Industry Index, after controlling for the market effect.[33,34] As indicated by the asterisk, this coefficient estimate is also statistically significant.  The intercept of negative 0.0009 has a t-statistic of 0.35 (absolute value), and is not statistically different from zero.  The

---

[31]  Companies listed in the Regions Financial Proxy statement filed on March 12, 2008 as peer group companies are: BB&T Corp, Comerica Inc., Fifth Third Bancorp, Keycorp, M&T Bank Corp, National City Corp, PNC Financial Services Group Inc., Sovereign Bancorp Inc., SunTrust Banks Inc., US Bancorp, Wachovia Corp, Washington Mutual Inc., and Wells Fargo & Co.  Although this peer group was selected for compensation review purposes, this peer group is appropriate for the event study because it is tailored by asset size and core business services, and therefore is representative of Regions' industry influences.
The index is constructed as an equal-weighted index (i.e., returns of all companies are weighted equally to construct the index returns).  Constructing the index using each company's market-capitalization does not change the results qualitatively.
I also performed my analysis using the S&P 500 Regional Banks Index as a proxy for industry influences.  Regions was a member of this index in 2008 and continues to be a member.  The results of my analysis are not sensitive to the choice of the industry index.
For the remainder of this report, I will discuss the results from the analysis that uses the peer group constructed from Regions' March 2008 proxy statement ("Industry Index").
[32]  A t-statistic with an absolute value greater than 1.96 indicates that the coefficient estimated is statistically significantly different from zero at the 95 percent confidence interval.
[33]  In the regression analysis, I removed the impact of the market returns (i.e., NYSE Index) from the industry returns (i.e., I "orthogonalized" the Industry Index).  Orthogonalization involves running a one-factor regression model (the Industry Index against the NYSE Index) and using the residuals from this regression.  This procedure controls for the potential relationship between the NYSE Index and the Industry Index and yields lower variances (i.e., higher accuracy) for coefficient estimates.
[34]  In the regression using the S&P 500 Regional Banks Index as the proxy for industry effects, the estimated coefficient of market effect (NYSE Index) is 1.56 and the estimated coefficient (orthogonalized) for the industry effect is 1.53.  Both coefficient estimates are statistically significant.

adjusted R-squared of the regression is 0.78. This means that 78% of the variation in Regions' returns is explained by the model.[35]

46. To determine whether company-specific information entering the market on a given day had an impact on Regions' stock price, I performed a statistical analysis to test the significance of the residual returns on each day. The statistical analysis evaluates whether the stock price change falls outside of the bounds of its "normal" volatility, after controlling for market and industry influences. Residual returns that cross the threshold based on the normal volatility indicate that the stock price movements for those dates are related to the total mix of new company-specific information. The "normal" volatility of the stock returns is measured by the standard error of the residual returns, which is called the Root Mean Squared Error (RMSE). The RMSE in the regression model is 0.04 (4 percent).

47. To construct the threshold of statistical significance for residual returns, I use the 95 percent confidence interval, which is the standard level used in event study analysis. The residual return for a given day crosses the 95 percent confidence threshold if the absolute value of its t-statistic is greater than 1.96. The t-statistic is a measure of how far the residual return is from zero and is calculated by dividing the residual return by its standard deviation. That is, any residual return that is 1.96 times larger (in absolute value terms) than the "normal" volatility is considered "abnormal" or statistically significant. In this case, the residual return of Regions' stock price is statistically significant when the absolute value of the residual return exceeds 7.84 percent (4.0 percent * 1.96). Thus, residual returns which are greater than 7.84 percent or smaller than negative 7.84 percent are statistically significantly different from zero.

---

[35] The high R-squared of the regression is in part due to the fact that the stock price of Regions, the Industry Index (i.e., Regions banking peers), and the market in general, decreased dramatically during the Class Period. Regions' stock price declined by 78.8 percent from February 27, 2008 through January 20, 2009.

**VIII.    There is No Evidence That the Release of Company-Specific Information Identified by the Plaintiffs Had Any Impact on Regions' Stock Price**

48. In their Motion for Class Certification, Plaintiffs identify two days (October 21, 2008 and January 20, 2009) when company-specific information about goodwill impairment and increase in loan loss reserves was released.[36] Plaintiffs claim that this information caused a price reaction on each of these days. I have examined Regions' stock price movements on October 21, 2008 and January 20, 2009 using the event study methodology. If the announcements on these days altered the total mix of public information available to the market and caused Regions' stock price to decline, I would expect the event study to show a statistically significant negative residual return on these days. The results of the event study for these two days are summarized in Exhibit 8. As shown in Exhibit 8, neither October 21, 2008 nor January 20, 2009 is associated with a statistically significant decrease in Regions' stock price, after controlling for market and industry effects.

*October 21, 2008*

49. On October 21, 2008, Regions released its earnings for the third quarter of 2008 ("Q3 2008"). Among other financial announcements, Regions reported that its provision for loan losses was $417 million, and that its loan loss reserves increased from $1.536 billion in the second quarter of 2008 to $1.546 billion in Q3 2008.[37]

50. Plaintiffs contend that "Regions' stock price immediately responded to the release of Company-specific 'unexpected news events'" when Regions announced new information about its loan loss provisions on October 21, 2008.[38] However, I find no evidence of a statistically significant price decline on this day. On October 21, 2008, Regions released its third quarter 2008 earnings before the markets opened and Regions' stock price increased 6.11 percent during the day. On the same day, the

---

[36] Motion for Class Certification, November 18, 2011, p. 21.

[37] Regions Financial, SEC Form 8-K filed on October 21, 2008, Ex. 99.2.

[38] Motion for Class Certification, November 18, 2011, p. 21.

18

NYSE Index fell 3.75 percent and the Industry Index increased 0.30 percent.[39]  After controlling for industry and market effects, Regions' residual price *increase* was 3.78 percent.  This positive return is statistically insignificant, i.e., it is not statistically different from the "normal" level of fluctuations of Regions' stock price during the purported Class Period.

51.  Plaintiffs associate the Regions' stock price decline over the four days from October 21, 2008 to October 24, 2008 with Regions' October 21, 2008 announcement.[40]  Such a claim is inconsistent with the efficiency of Regions' stock.  In an efficient market, new public information is quickly and fully incorporated into prices.  In fact, Plaintiffs assert elsewhere that "during the Class Period, Regions' stock price immediately responded to the release of Company-specific 'unexpected news events.'"[41]

52.  My review of analyst reports confirms that Regions' announcement of increased loan loss reserves and loan loss provisions on October 21, 2008 did not alter the total mix of information available to investors.  As discussed above in Section VI, analysts were aware during the purported Class Period that Regions might experience higher level of losses in its loan portfolio, in line with the rest of the banking industry.  Reports published after Regions' October 21, 2008 announcement confirmed this expectation.  For example, a report by Citi Investment Research on October 21, 2008 stated that "[t]he provision for loan losses increased 35% linked quarter to $417 million. This was not significantly above our $413 million expectation…"[42]

53.  Further, analysts commented that Regions' more aggressive approach to managing credit issues and increase in its loan loss provisions and reserves was a positive development.  For example, on October 21, 2008, an analyst at Fox-Pitt Kelton, wrote

---

[39]  The peer index return on October 21, 2008 after orthogonalization (i.e., removing the impact of the market return) was 5.99 percent.

[40]  "[A]fter the Company's October 21, 2008 public announcements … 'Regions' stock price declined dramatically from a closing price of $11.29 on October 21, 2008 to a closing price of $8.94 on October 24, 2008 – a loss of more than 20%.'" Motion for Class Certification, November 18, 2011, pp. 21–22.

[41]  Motion for Class Certification, November 18, 2011, p. 21.

[42]  Citi Investment Research, "3Q08 Review – TARP Capital Should Help Alleviate Key Concerns," October 21, 2008.

that "[i]n our view, it seems like Regions has a better grasp of its credit quality issues and we are encouraged that the company is selling its problem assets."[43]  On the same day, an analyst at Sandler O'Neill + Partners commented that "investors will continue to view positively a more aggressive approach to identifying, writing down, and disposing of problem loans."[44]

54. My review of analyst reports following the October 21, 2008 announcement indicates that the market viewed Regions' TARP announcement favorably.  As discussed earlier, Regions' stock price *increased* following the October 21, 2008 announcement.  For example, an analyst at SunTrust Robinson Humphrey noted that "the prospect that RF will augment its capital base soon through the TARP" impacted the performance of the stock on October 21, 2008.[45]  An analyst at Sandler O'Neill + Partners also attributed the stock performance on October 21, 2008, in part, to Regions eligibility to participate in the TARP program and to management's stated intention not to issue common stock, "which likely reduces that risk in investors eyes, at least over the near term."[46]  As analyst reports indicate, the market's positive reaction to Regions' TARP announcement was unrelated to allegations about loan loss reserves and goodwill.  Further, Regions' October 21, 2008 announcement also included other news unrelated to the allegations such as "continued NIM [net interest margin] compression, depressed fee income due to light Morgan Keegan results, and weak deposit flows."[47]  Given this confounding company-specific information, even if one were to assume that Regions' stock price reacted to the October 21, 2008 announcements, the price reaction

---

[43] Fox-Pitt Kelton, "3Q08 Review: Making Progress But Still A Way To Go," October 21, 2008.

[44] Sandler O'Neill + Partners, "Post Conf. Call; Getting More Aggressive on Credit and Says Eligible for TARP," October 21, 2008.

[45] SunTrust Robinson Humphrey, "Maintain Neutral, Despite NPA Growth Slowing," October 21, 2008.
An analyst at Citigroup Global Markets noted that "We estimate that this capital infusion would boost the Tier-1 risk weighted capital ratio from 7.47% to 8.47% at the low-end of the range, and up to 10.42% at the high-end of the range, on a pro-forma basis. The company plans to use this capital for both organic and acquisition-related opportunities." Citi Investment Research, "3Q08 Review – TARP Capital Should Help Alleviate Key Concerns," October 21, 2008.

[46] Sandler O'Neill + Partners, "Post Conf. Call; Getting More Aggressive on Credit and Says Eligible for TARP," October 21, 2008.

[47] Credit Suisse, "3Q08 Earnings-Credit Clean-Up but More to Come," October 21, 2008.
Net interest margin is the difference between interest income generated (e.g., from loans issued) and the interest paid out to lenders (e.g., to deposit holders), relative to amount of interest earning assets.

on this date is not necessarily attributable to news identified by Plaintiffs as related to the allegations, as opposed to other company-specific news released at the same time.[48]

***January 20, 2009***

55. On January 20, 2009 Regions announced its earnings for the fourth quarter of 2008. Among other financial announcements, Regions reported loan loss provisions of $1.15 billion in Q4 2008 and an increase in its loan loss reserves from $1.546 billion in Q3 2008 to $1.9 billion in Q4 2008.[49]  Plaintiffs claim that on this date, "defendants were forced to finally announce a huge increase in loan loss reserves, and a colossal $6 billion write down of goodwill" and that Regions' stock price immediately responded to the release of Company-specific "unexpected news events."[50]

56. Contrary to Plaintiffs' claim, however, event study results show that Regions' residual stock price return on this day was not statistically significant.  On January 20, 2009, Regions' stock price declined 24.22 percent.  On the same day, the NYSE index declined 6.11 percent and the Industry Index declined 18.61 percent.[51]  Once the market and industry effects are controlled for, the residual decline in Regions' stock price on January 20, 2009 was 1.53 percent, which is not statistically significant.  Therefore, there is no scientific evidence that Regions' stock price reacted negatively to Regions' firm-specific announcements on January 20, 2009.

---

[48]  Academic literature emphasizes the importance of controlling for the effect of confounding information on event days. For example, Cornell and Morgan state that "one must estimate the impact on security prices of the disclosure of that information, and only that information....Without a detailed understanding of the information misrepresented or omitted, the information eventually revealed, the differences between those sets of information, and the other information available to the market, litigants and lawyers cannot be confident that what the market model measures is really the economic effect of the fraud." Cornell, B. and R. G. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review*, 1989–1990, Vol. 37, 883–924, at pp. 894, 923.
Similarly, Marais and Schipper write that one "must link the share-price reaction to the alleged correction of the allegedly defective prior disclosures or omissions," and that this link can be broken if price changes on the alleged correction date can also be attributed "to other information revealed at the same time." Marais, M. L. and K. Schipper, "Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions (New)," in *Litigation Services Handbook: The Role of the Financial Expert* (Roman L. Weil et al. ed., 2005).

[49]  Regions Financial, SEC Form 8-K filed on January 20, 2009, Ex. 99.2.

[50]  The Complaint, p. 6; Motion for Class Certification, November 18, 2011, p. 21.

[51]  The peer index price decline on January 20, 2009 after orthogonalization (i.e., removing the impact of the market return) was 9.44 percent.

57. This finding is consistent with the earlier discussion that goodwill impairment and increases in loan loss reserves and loan loss provisions are accounting items that have no direct impact on future cash flows, and that there was widespread information about Regions' goodwill and loan losses throughout the purported Class Period.

58. In the analyst reports issued following Regions' January 20, 2009 earnings announcement, there is no discussion that associates the goodwill impairment to Regions' stock price movement on January 20, 2009.[52] Moreover, certain analyst reports that mention Regions' announcement of the goodwill impairment highlight that it is a non-cash item and specify that it did not impact either tangible or regulatory capital levels.[53]

59. Analyst reports and public press articles also indicate that Regions' increasing loan loss reserves and loan loss provisions were in line with the industry experience and were expected by the market. For example, a Dow Jones News Service article commented that:

> "Recent earnings make it clear the economy is taking a toll on banks' commercial loan book. Unlike previous quarters, when commercial credit trends were mixed, results reported so far for the fourth quarter point to a broad deterioration in loans to mid-market and large companies. The damage strikes as bankers are already struggling to hold onto capital. Regions Financial Corp. (RF) was only the latest of the regional banks to report a sharp rise in loan losses among commercial and industrial, and commercial real estate, loans."[54]

60. Even if one were to assume that Regions' stock price reacted to January 20, 2009 company-specific announcements, the stock price reaction would not necessarily be attributable to news related to Plaintiffs' allegations. Regions' January 20, 2009 earnings release contained other company-specific information unrelated to the allegations. For example, an analyst at Sandler O'Neill + Partners noted that "[o]ther

---

[52] I reviewed 20 analyst reports published between January 20, 2009 and January 21, 2009. These analyst reports are listed in Exhibit 3.

[53] For example, see Barclays Capital, "4Q08 Initial Look," January 20, 2009 and Bank of America Merrill Lynch, "Significant clean-up in the quarter, but still more to come," January 21, 2009.

[54] Dow Jones News Service, "Regions Financial, Others Suffer Comml Loan Deterioration," January 20, 2009.

negatives included NIM [net interest margin] compression, lower deposit service charges, and higher core expenses."[55] The same analyst also stated he believed that "today's steep decline in the stock price (down > 24%) effectively priced in investors' increased concern about the prospect of a dilutive capital raise."[56]

61. In sum, there is no evidence that Regions' stock price declined as a result of Regions' October 21, 2008 and January 20, 2009 announcements of company-specific information related to the allegations.

*Market and Industry Factors and Regions' Stock Price Performance on January 20, 2009*

62. The analysis discussed above shows that there is no evidence that Regions' stock price decline on January 20, 2009 was caused by the release of company-specific information related to the allegations, rather than by other unrelated factors, such as large declines in the general market and the banking industry on that day. On January 20, 2009, U.S. financial stocks suffered large declines in their prices. The performance of U.S. financial stocks on this day matched their biggest percentage decline ever: "U.S. financial stocks plunged Tuesday, falling almost 17% to match their biggest percentage decline ever as investors panicked at the likelihood that there is no end in sight for the sector's need for capital, and no easy way to raise it."[57]

63. Exhibit 9 shows the stock price declines of individual banks included in the S&P 500 Banks Industry Group Index. As shown in Exhibit 9, Regions' stock price decline on January 20, 2009 was in line with the price declines of other regional and national banks. Further, banks with company specific information on that day, as well as banks that did not have any announcements, experienced price declines. For example, on January 20, 2009, Friedman Billings & Ramsey lowered their target for Wells Fargo

---

[55] Sander O'Neill + Partners, "4Q08 First Look: Core Loss Comes in Worse than Expected," January 20, 2009.
[56] Sander O'Neill + Partners, "Post Conf. Call; Lowering Ests.; Maintain HOLD," January 20, 2009.
[57] MarketWatch, "Banks battered as sector matches worst day ever," January 20, 2009.

based on greater credit costs and an expected dividend cut.[58]  Wells Fargo's stock price

subsequently fell 23.82 percent on January 20, 2009.[59]  BB&T, which did not have any

announcements, press releases, or SEC filings between January 16, 2009 (after market

closed) and January 20, 2009, experienced an 11.09 percent decline on January 20,

2009.[60]  Similarly, Huntington Bancshares fell 16.45 percent on January 20, 2009, again

without any press releases, announcements, or SEC filings between January 16, 2009

(after market closed) and January 20, 2009.

64. The general decline in bank stock prices was discussed in analyst reports and public

press articles.  For example, a Bloomberg article published during trading hours on

January 20, 2009 reported that:

> "[The] financial sector is down more than 10% this session
> alone...JPMorgan Chase (JPM 19.61, -3.21), Bank of America (BAC 5.84, -
> 1.34), and Citigroup (C 3.12, -0.38) have also fallen to new multiyear lows
> as investors sell financial stocks in a near-indiscriminate fashion."[61]

65. Another Bloomberg article stated that:

> "U.S. bank stocks plunged, led by Bank of America Corp., on concern that
> mounting losses will force companies to slash dividends, raise more money
> and face further government oversight.... [The] KBW Bank Index, which
> includes the biggest U.S. national and regional banks, declined to as low as
> 27.18, the lowest level since early 1995."[62]

66. Similarly, two different Associated Press articles reported that:

> "Fear that the global banking crisis is worsening sent financial stocks
> plunging Tuesday, with many companies' shares down by double-digit
> percentages and Citigroup Inc. diving to a 17-year low.  Disheartening news

---

[58]  Bloomberg, "Wells Fargo:  FBR cuts tgt to $12; expects a dividend cut," January 20, 2009.

[59]  As another example, the Royal Bank of Scotland (RBS) announced its fourth quarter 2008 earnings on January 19, 2009.  RBS forecasted the biggest lost ever reported among U.K. companies.  There were also concerns among investors of nationalization.  RBS's stock price subsequently dropped 67 percent in trading on the London Stock Exchange on January 19, 2009 (the London Stock Exchange was open on this date).  Bloomberg, "RBS Plummets Amid Concern Bank May Be Nationalized (Update2)," January 19, 2009.

[60]  As discussed earlier, January 16, 2009 was the last trading day during the purported Class Period, and January 20, 2009 was the first trading day after the purported Class Period.

[61]  Bloomberg, "Market Update: Financials Undercut Broader Market," January 20, 2009.

[62]  Bloomberg, "U.S. Bank Stocks Decline, Led by Bank of America (Update1)," January 20, 2009.

came from U.S. and British banks: They are still suffering losses from loans and are warning that those losses will not subside anytime soon. Regional banks as well as the big money center banks are struggling."[63]

"Richard E. Cripps, chief market strategist for Stifel Nicolaus, said…[the markets] continued to trade on the problems in the financial sector. 'There's just tremendous fear and uncertainty in the banking sector,' Cripps said. 'Even those closest to the issue, like executives and analysts, there's a feeling of tremendous uncertainty. They're not giving any positive guidance because they just don't know. Lacking that [certainty] we're left to our worst fears, and that's what you're looking at with bank stocks.'"[64]

### IX.   Plaintiffs Fail to Show that Alleged Misrepresentations Had Any Impact on Regions' Stock Price

67. Plaintiffs assert that "defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Regions common stock."[65] However, Plaintiffs provide no scientific analysis or other evidence to show that any of the misrepresentations alleged in the Complaint had an impact on Regions' stock price.

68. I have examined the days that are associated with misrepresentations as alleged in the Complaint. Plaintiffs claim that, on these days, Regions allegedly disseminated "false and misleading" financial results related to its loan losses and goodwill. If an alleged misrepresentation had an impact on Regions' stock price, I would expect the event study to show a statistically significant positive residual return on that day. The results of the event study are summarized in Exhibit 10.

69. As shown in Exhibit 10, none of the alleged misrepresentation days, except September 2, 2008, are associated with a statistically significant increase in Regions' stock price. Eight of the alleged misrepresentations days are, in fact, associated with *negative* residual returns (seven of the eight negative residual returns are statistically insignificant). Four of the alleged misrepresentation days are associated with positive

---

[63] Associated Press, "US banks stocks pummeled as worries mount," January 20, 2009.
[64] Associated Press, "Wall Street Falls Amid Further Banking Worries," January 20, 2009.
[65] Complaint, p. 113.

residual returns, but these returns are statistically indistinguishable from zero (i.e., the residual returns are statistically insignificant).

70. On September 2, 2008, which is the only alleged misrepresentation date associated with a statistically significant positive residual return, Regions' stock price increased 19.20 percent while the NYSE index lost 1.01 percent and the industry index gained 2.76 percent. After controlling for market and industry factors, Regions' residual price increase was 14.77 percent. However, on this day, there is new information entering the market that was unrelated to the allegations. According to the Complaint, after the close of the market on August 29, 2008, Integrity Bank ("Integrity") was closed by the FDIC and sold to Regions.[66]

71. My review of analyst reports following this announcement indicates that the market viewed the acquisition of Integrity as a positive event for Regions. For example, a JP Morgan analyst noted:

> "With the market on high alert for signs of stress at banks, we view the FDIC approval of RF to assume the deposit accounts of Integrity as an indication that Regions itself is deemed to be a sound institution by regulators. ... Regions' ability to take advantage of the recent bank failure is a modest positive and shows us that even in a strained market environment, mid-cap banks are in a position of relative strength."[67]

72. Similarly, a Sandler O'Neill + Partners analyst commented:

> "We view the transaction as a net positive for RF in that it provides additional deposit funding... [It] also allows RF to boost its market share in metro Atlanta...and to gain instant access to new customers... More [importantly]...we think the fact that federal regulators approved RF as the

---

[66] Complaint, p. 68.

[67] JP Morgan, "Regions Becomes the First in Our Coverage to Take Advantage of Bank Failure – ALERT," September 2, 2008.

The academic literature also generally finds a statistically significant positive stock price reaction to the announcement of acquisition of failed banks. See, for example, James, C. and P. Wier, "An Analysis of FDIC Failed Bank Auctions," *Journal of Monetary Economics*, 1987, Vol. 20, 141–153.

buyer…limits the risk that RF would be subject to any near-term regulatory enforcement action and/or mandatory capital raises."[68]

73. In summary, my analysis shows that there is no evidence that any of the misrepresentations alleged in the Complaint had an impact on Regions' stock price.

**X.    Plaintiffs Fail to Show that Regions' Stock Price Reacted to Information Released to the Market After the Purported Class Period**

74. Plaintiffs also identify four dates after the end of the purported Class Period on which they claim that information related to the allegations was released to the market.[69] However, Plaintiffs provide no analysis or evidence to support their assertion that Regions' stock price declined as a result of these announcements. Based on my analysis of these four dates, I find no evidence that Regions' stock price declines (if any) on these four dates are attributable to the release of information related the allegations.

75. According to the results of the event study, as shown in Exhibit 11, there is no statistically significant price decline on two of the four dates (February 25, 2009 and May 20, 2009) identified by Plaintiffs. On the other two days (February 2, 2009 and May 21, 2009), company-specific confounding information (i.e., company-specific information unrelated to the allegations) was released to the market, so Regions' stock price declines on these dates are not necessarily attributable to the information related to the allegations.

76. On February 2, 2009, Moody's Investors Service downgraded the ratings of Regions. According to Moody's this downgrade reflected "the company's concentrations in residential home builder and home equity, particularly in Florida," and the fact that "Regions has seen nearly a doubling of nonperforming assets over the past year, largely in the residential homebuilder and home equity portfolios."[70] On February 2, 2009,

---

[68] Sandler O'Neill + Partners, "Upgrading from SELL to HOLD; RF Assumes Deposits of Latest Failed Bank," September 2, 2008.

[69] The four dates identified by Plaintiffs are February 2, 2009; February 25, 2009; May 20, 2009; and May 21, 2009 (Complaint, pp. 84–86).

[70] Moody's Investor Service, "Moody's downgrades Regions (senior to A3); outlook negative," February 2, 2009.

Regions residual price decline was 13.70 percent, which was statistically significant. Moody's report and ratings downgrade reflected Regions' Q4 2008 results, which were already known to the market. Plaintiffs' allegation that Regions' stock price reacted to information related to the allegations on February 2, 2009 is inconsistent with the claim that Regions' stock traded in an efficient market.

77. On May 20, 2009, before the market opened, "Regions announced it would raise…$1.25 billion, in a stock offering," in order to maintain adequate capitalization as required by the Federal Reserve.[71] The offering was to consist of $1.0 billion in common stock and $250 million in mandatory convertible preferred securities.[72] After the market closed on the same day, Regions announced that it had priced a $1.6 billion stock offering ($600 million more than the offering announced during market hours).[73] Analyst commentary indicates that the statistically significant stock price decline on May 21, 2009 was likely due to the dilution from the stock offering, and not to the new information related to allegations. For example, a Citigroup analyst stated that "[t]he success of the capital plan…is accomplished at a considerable cost to existing shareholders through sizable dilution."[74] Similarly, an analyst at Sandler O'Neill + Partners noted that the "Pro forma impact of…capital raise and TRuPs exchange – with higher than expected common raise comes steeper than expected dilution. … [W]e estimate 84% dilution to the share count… We expect the stock to trade lower on today's open. … [W]hile we think the market anticipated a high degree of dilution to some extent, we suspect that the amount of dilution implied by this raise comes in at or above the high end of investors' expectations."[75]

78. Thus, because no new information directly related to the allegations was released to the market on February 2, 2009 and May 21, 2009, Plaintiffs' allegation that Regions'

---

[71] Complaint, pp. 85–86; Business Wire, "Regions Announces $1.25 Billion Capital Raise," May 20, 2009, 6:00 AM.
[72] As discussed earlier, there was no statistically significant movement in Regions' stock price on May 20, 2009.
[73] Complaint, p. 86.
[74] Citigroup, "RF Prices Offerings as Part of $2.5 Bln Capital Plan," May 21, 2009.
[75] Sandler O'Neill + Partners, "RF Prices Offering; Larger than Expected but with Substantial Dilution," May 21, 2009.

stock price reacted to such information on these days is inconsistent with the claim that Regions' stock traded in an efficient market.

Christopher M. James

March 21, 2012

**Exhibit 1**

<u>VITA</u>

| | |
|---|---|
| **NAME:** | Christopher M. James |

**CURRENT
POSITION:**    William H. Dial/SunBank Eminent Scholar in Finance, University of Florida

Visiting Scholar for the San Francisco Federal Reserve Bank

**ADDRESS:**    Department of Finance, Insurance, and Real Estate, Graduate School of Business, University of Florida, PO Box 117168, Gainesville, FL 32611-7168
E-mail: christopher.james@warrington.ufl.edu

**TELEPHONE:**    Office:    352-392-3486
Home:     352-336-2765

**EDUCATION:**    B.A.       Michigan State University, 1973
M.B.A.    University of Michigan (Finance), 1977
Ph.D.     University of Michigan (Economics: Industrial Organization, Finance), 1978

**RESEARCH/
TEACHING
INTERESTS:**    Corporate Finance and Financial Institutions

**TEACHING/
RESEARCH
EXPERIENCE:**    William H. Dial/SunBank Eminent Scholar in Finance and Economics, University of Florida, 1989-present

Visiting Scholar, Federal Reserve Bank of San Francisco, 1987-1988 and 2008-2011

Visiting Professor, University of New South Wales, 1995

Consultant, FDIC, 1988-1991

U.S. Bank/ John B. Rogers Professor of Finance, University of Oregon, 1984-1989

Visiting Professor of Finance, University of Michigan, 1986

Associate Professor of Finance, University of Oregon, 1982-1984

Senior Economic Advisor, Comptroller of the Currency, Department of Treasury, 1980-1982

Assistant Professor of Finance, University of Oregon, 1978-80

Instructor, University of Michigan, 1978

**Exhibit 1**

**PAPERS AND
PUBLICATIONS:**

"The Technology of Risk and Return," Americaen Economic Review, June, 1981.

"Self-Selection and the Pricing of Bank Services, An Analysis of the Market for Bank Loan Commitments and the Role of Compensating Balance Requirements," Journal of Financial and Quantitative Analysis, December, 1981.

"An Analysis of Bank Loan Rate Indexation," Journal of Finance, June, 1982.

"An Analysis of the Impact of Deposit Rate Ceilings on the Market Values of Thrift Institutions," (with L.Y. Dann), Journal of Finance, December, 1982.

"Pricing Alternatives for Loan Commitments:  A Note," Journal of Bank Research, Winter, 1983.

"An Analysis of Intra-Industry Differences in the Effect of Regulation:  The Case of Deposit Rate Ceilings," Journal of Monetary Economics, August, 1983.

"Is Illiquidity a Bar to Buying Small Cap Stocks?" (with R.O. Edmister), Journal of Portfolio Management, Summer, 1983.

"The Relation Between Common Stocks Returns, Trading Activity and Market Value," (with R.O. Edmister), Journal of Finance, September, 1983.

"Regulation and the Determination of Bank Capital Changes:  A Note," (with J.K. Dietrich), Journal of Finance, December, 1983.

"An Analysis of the Effect of State Acquisition Laws on Managerial Efficiency:  The Case of Bank Holding Company Acquisitions," Journal of Law and Economics, April 1984, Abstracted in Regulation as "Do Corporate Takeovers Keep Managements Lean?" May/June, 1984.

"The Effect of Interest Rate Changes on the Common Stock Returns of Financial Institutions," (with M.J. Flannery), Journal of Finance, September, 1984.

"Market Evidence on the Effective Maturity of Bank Assets and Liabilities," (with M.J. Flannery), Journal of Money, Credit and Banking, November, 1984, Presented at the American Finance Association meetings in San Francisco, December, 1983.

"The Effects of Government Regulatory Agencies on Organizations in High Technology and Woods Products Industries," (with G. Ungson and B. Spicer), Academy of Management Journal, 1985.

**Exhibit 1**

"A VARMA Analysis of the Causal Relations Among Stock Returns, Real Output and Nominal Interest Rates," (with S. Koreisha and M. Partch), Journal of Finance, December, 1985.

"Access to Deposit Insurance, Insolvency Rules and the Stock Returns of Financial Institutions," (with J. Brickley), Journal of Financial Economics, July, 1986.

"The Takeover Market, Corporate Board Composition, and Ownership Structure: The Case of Banking," (with J. Brickley), Journal of Law and Economics, April, 1987.

"Returns to Acquirers and Competition in the Acquisition Market: The Case of Banking," (with P. Wier), Journal of Political Economy, April, 1987.

"An Analysis of FDIC Failed Bank Auctions," (with P. Wier), Journal of Monetary Economics, July, 1987.

"Some Evidence on the Uniqueness of Bank Loans," Journal of Financial Economics, December, 1987.

"The Use of Loan Sales and Standby Letters of Credits by Commercial Banks," Journal of Monetary Economics, November, 1988.

"Empirical Evidence on Implicit Guarantees of Bank Foreign Loan Exposure," Carnegie Rochester Conference Series on Public Policy, April, 1989.

"Heterogeneous Creditors and the Market Value of Bank LDC Loan Portfolios," Journal of Monetary Economics, December, 1990.

"Borrowing Relationships, Intermediation and the Cost of Issuing Public Securities," (with P. Wier), Journal of Financial Economics, November, 1990.

"The Losses Realized in Bank Failures," Journal of Finance, September, 1991.

"Relationship-Specific Assets and the Pricing of Underwriter Services," Journal of Finance, December, 1992.

"Management and Organizational Changes in Banking: A Comparison of Regulatory Intervention with Private Creditor Actions in Nonbank Firms," (with J. Houston), Carnegie Rochester Conference Series on Public Policy, 1993.

"The Information Content of Distressed Restructurings involving Public and Private Debt Claims," (with D. Brown and B. Mooradian), Journal of Financial Economics, February, 1993.

"Asset Sales by Financially Distress Firms," (with D. Brown and R.M. Mooradian), Journal of Corporate Finance, April, 1994.

**Exhibit 1**

"When Do Banks Take Equity in Debt Restructurings?" <u>Review of Financial Studies</u>, Winter, 1995.

"CEO Compensation and Bank Risk:   Is Compensation Structured in Banking Structured to Promote Risk-Taking?" (with J. Houston), <u>Journal of Monetary Economics</u>, November, 1995.

"Bank Debt Restructurings and the Composition of Exchange Offers in Financial Distress," <u>Journal of Finance</u>, June, 1996.

"Bank Information Monopolies and the Mix of Private and Public Debt Claims," (with J. Houston), <u>Journal of Finance</u>, December, 1996.

"Capital Market Frictions and the Role of Internal Capital Markets in Banking," (with J. Houston and D. Marcus), <u>Journal of Financial Economics</u>, November, 1997.

"Do Bank Internal Capital Markets Promote Lending?" (with J. Houston), <u>Journal of Banking and Finance</u>, November, 1998.

"Where Do Merger Gains Come From?  Bank Mergers from the Perspective of Insiders and Outsiders," (with J. Houston and M. Ryngaert), <u>Journal of Financial Economics</u>, May, 2001.

"Do Relationships Have Limits?   Banking Relationships, Financial Constraints and Investment," (with J. Houston), <u>Journal of Business</u>, July, 2001.

"Do Banks Provide Financial Slack?" (with C. Hadlock), <u>Journal of Finance</u>, June, 2002.

"What a Difference a Month Makes:  Stock Analyst Valuations Following Initial Public Offerings," (with J. Karceski and J. Houston), <u>Journal of Financial and Quantitative Analysis</u>, March 2006, Presented at Hong Kong Corporate Finance Conference, December, 2003.

"The Strength of Analyst Coverage Following IPO's," (with J. Karceski), <u>Journal of Financial Economics</u>, October 2006, Presented at 2005 American Finance Association Meetings.

"Investor Monitoring and Differences in Mutual Fund Performance," (with J. Karceski),  <u>Journal of Banking and Finance</u>, 2006, Presented at 2001 American Finance Association Meetings.

"Banks and Bubbles:  How Good are Bankers at Spotting Winners?" (with L. Gonzalez), <u>Journal of Financial Economics</u>, October 2007.

"The Role of Private Equity Group Reputation in LBO Financing", (with C. Demiroglu), <u>Journal of Financial Economics</u>,  May 2010.

**Exhibit 1**

"The Information Content of Bank Loan Covenants", (with C. Demiroglu), Review of Financial Studies, October 2010. Presented at American Finance Association Meetings 2008.

"The Use of Bank Lines of Credit in Corporate Liquidity Management: A Review of the Empirical Evidence", (with C. Demiroglu), Journal of Banking and Finance, 2011.

"Bank Lending Standards and Access to Lines of Credit", (with C. Demiroglu and A. Kizilaslan), Journal of Money, Credit, and Banking, forthcoming.

**CURRENT RESEARCH:**

"Asset Specificity, Industry Recovery Risk and Liquidity Management", (with A. Kizilaslan), revision requested, presented at American Finance Association Meetings 2012.

"Trouble Debt Restructurings: What's Changed?", (with C. Demiroglu).

"How Important Is Having Skin in the Game? Originator-Sponsor Affiliation and Losses on Mortgage Backed Securities", (with C. Demiroglu), revision requested, presented at American Finance Association Meetings 2012.

"Strategic Default, State Foreclosure Laws and the Mortgage Pricing" (with C. Demiroglu and E. Dudley), under review.

"Who Fills the Gaps? An Analysis of Long Term Debt Issuance." (with Dominique C. Badoer), working paper

"The Effects of Leverage on Operating Performance: An Analysis of Firms' Responses to Poor Performance," (with M. Ryngaert and D. Brown), working paper.

**OTHER PAPERS AND PUBLICATIONS:**

"How Important is Having 'Skin in the Game?" Economic Letter, Federal Reserve Bank of San Francisco, December 2010

"Credit Market Conditions and Use of Bank Lines of Credit," Economic Letter, Federal Reserve Bank of San Francisco, August 2009.

"Are Banks Still Special? New Evidence in the Corporate Capital-Raising Process," (with D. Smith), Journal of Applied Corporate Finance, Spring, 2000.

"Why Are Value Enhancing Mergers In Banking So Hard to Find? A Discussion of 'Is the Bank Merger Wave of the 90's Efficient? Lessons from Nine Case Studies,'" Kaplan, Steven (ed.), Mergers and Productivity, University of Chicago Press, Chicago, IL, 1999.

"Comment on Esty, Narasimhan, and Tufano," Journal of Banking and Finance, 23, 1999, 286-290.

**Exhibit 1**

"Using Internal Capital Markets to Lower Capital Costs in Banking," (with J Houston), Journal of Applied Corporate Finance, Summer, 1998.

Discussion of "Financial Institutions and Regulations: The Dilemma in a Deregulated World," Proceedings from Riksbank Conference: Forces for and Implications of Structural Changes in the Financial Sector, June, 1997.

"Evolution of Extinction: Where are Banks Headed," (with J. Houston), Journal of Applied Corporate Finance, Summer, 1996.

"RAROC at Bank of America: From Theory to Practice, Journal of Applied Corporate Finance, Summer, 1996.

"Bank Equity Positions in Distressed Firms," Saunders, Anthony and Ingo Walter (ed.), Universal Banking: Financial System Design Reconsidered, (Irwin), 1996.

"The Use of Index Amortizing Swaps by Banc One," (with C. Smith), Journal of Applied Corporate Finance, Fall, 1994.

"Private Versus Public Creditor Experience in Distressed Firm Debt Restructurings," (with D. Brown and M. Mooradian), Altman, Edward (ed.), Bankruptcy and Distressed Restructurings: Analytical Issues and Investment Opportunities, (Business One Irwin), 1994.

"Banc One's Index Amortizing Swap Strategy," (with C. Smith), Journal of Applied Corporate Finance, 1994.

"Studies in Financial Institution," (with C. Smith), Commercial Banks, 1994.

Statement of Christopher James, Professor, College of Business, The University of Florida at Gainesville at Hearing before the Senate Committee on Banking, Housing and Urban Affairs – 102nd Congress, 4/26/91 (BIF Recapitalization).

"Off-Balance Sheet Activities and the Under Investment Problem in Banking," Journal of Accounting, Auditing, and Finance, Spring, 1989.

"The Incidence of Mispriced Deposit Insurance," Presented at 1989 American Economic Association Meetings.

"Are Bank Loans Different? Some Evidence From the Stock Market," (with P. Wier), Journal of Applied Corporate Finance, Summer, 1988.

"Acquisitions in Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Weekly Letter, Federal Reserve Bank of San Francisco.

**Exhibit 1**

"Are Bank Loans Special?" Weekly Letter, Federal Reserve Bank of San Francisco.

"Off-Balance Sheet Banking," Economic Review, Federal Reserve Bank of San Francisco, Fall, 1987.

Discussion of "The Search for Financial Stability: The Past Fifty Years," Proceedings from the Federal Reserve Bank of San Francisco Conference on the Search for Financial Stability, June, 1985.

"An Analysis of FDIC Failed Bank Auction Procedures," (with P. Wier), Proceedings of a Conference on Bank Structure and Competition, May, 1985.

"Bank Holding Company Acquisitions and Managerial Efficiency," Proceedings of a Conference on Bank Structure and Competition, May, 1984.

"Market Based Measures of Risk for Banks and Savings and Loan Associations," Report prepared for the Federal Home Loan Bank Board, May, 1987.

"An Economic Analysis of Interindustry Acquisitions of Thrift Institutions," Report prepared for the Office of the Comptroller of the Currency, February, 1982.

"Loan Rate Indexation and the Allocation of Bank Credit," Proceedings of a Conference on Bank Structure and Competition, May, 1980.

**SERVICE ACTIVITIES:**

Editor: Journal of Banking and Finance, 2007-present.

Associate Editor: Journal of Financial Economics, 1993-present.

Associate Editor: Journal of Financial Services Research, 1989-present.

Associate Editor: Journal of Managerial and Decision Economics, 1988-present.

Editorial Board: Federal Reserve Bank of New York: Economic Review, 1997- 2007

Academic Board: Turnaround Management Association, 1990-2002.

Associate Editor: Journal of Banking and Finance, 1999-2001

Associate Editor: Journal of Finance, 1988-2000.

Co-Editor: Journal of Financial Intermediation, 1988-1999.

**Exhibit 1**

Associate Editor:  Journal of Financial and Quantitative Analysis, 1982-1984.

Reviewer:  Journal of Finance; Journal of Money, Credit and Banking; Journal of Financial Economics; Journal of Financial Management; Journal of Banking and Finance; Journal of Business and Economics; Journal of Monetary Economics; American Economic Review; Journal of Political Economy; Review of Financial Studies; Journal of Corporate Finance; Journal of Law and Economics; Journal of Accounting and Economics.

Program Committee:  Financial Management Association, Western Finance Association, American Finance Association, European Finance Association and Utah Winter Finance Conference.

**CONSULTING/EXECUTIVE EDUCATION ACTIVITIES:**

Board of Directors/Chairman, $ID^2$, Inc.

Board of Directors/Tutoring Zone, $ID^2$, Inc

Senior Advisor, Cornerstone Research.

Independent Distribution Consultant, Janus Funds, 2004-2010.

Consultant, Federal Reserve Bank of San Francisco 2008-present.

Advisory Board Big Brothers Big Sisters of North Central Florida 2000-present.

Advisory Board and Board of Directors, SunTrust Banks of Florida 1989-2006.

Consultant, Federal Reserve Bank of San Francisco.

Consultant, Federal Reserve Bank of New York, 1997, 2004.

Consultant, Federal Reserve Board of Governors, 1995, 1998.

Research Director, Garn Institute of Finance, Salt Lake City, Utah, 1987-1989.

Instructor, Pacific Coast Banking School: Commercial Lending, Financial Markets, Workout Lending.

Instructor, Bank Board of Directors School:  Workout Lending.

Instructor, Swiss National Bank, Gerzensee, Switzerland, Bank Safety and Soundness Regulation.

Executive Seminars on bank deregulation, valuation, venture capital, strategic management, lender liability, and asset and liability management.

**Exhibit 1**

Expert Witness:  Cases involving antitrust, portfolio management, securities valuation, bank management, valuation, and regulatory matters.

Consultant:  Product pricing, valuation, portfolio management, utilities regulation, valuation of securities, mergers and acquisitions, and risk management.

Consultant to the Office of the Comptroller of the Currency, 1982-1983: Bank and Thrift Mergers.

Consultant to the Investment Company Institute, 1983: Bank Offerings of Mutual Funds.

Consultant to the FDIC, Costs of Resolving Bank and Thrift Failures.

Recipient of a grant from MidAmerica Institute to study management compensation in banking, 1992.

Recipient of grant from Federal Home Loan Bank Board to study the information content of savings and loan accounting information.

Member:  Research Committee:  Garn Institute of Finance, 1989-1992.

Research Associate at the Business Regulation Study Center, 1980.

**AWARDS:**                Valedictorian, Michigan State University, 1973.

Harry R. Jacobs, Professional Service Award, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Oregon, 1985.

Outstanding Teaching Award: MBA Association, University of Florida, 1994, 1996, 1998, 1999, 2000, 2010.

**Exhibit 2**

## Testimony of Christopher M. James in the Previous Four Years

*In re: EPDM Antitrust Litigation*, MDL 1542 and *In re: Polychloroprene Antitrust Litigation*, MDL 1642, deposition testimony, 2008.

*Morton P. Levine, as Trustee for the Estate of Flooring America, Inc. and Related Debtors, et al.*, In the Superior Court of Fulton County State of Georgia, No. 2002CV54331, deposition, 2008.

*ASARCO LLC et al. v. Americas Mining Corp.*, In the United States District Court for the Southern District of Texas Brownsville Division, Civil Action No. 1:07-cv-00018, deposition and trial testimony, 2008.

*Molecular Diagnostics Laboratories v. Hoffmann-LaRoche, Inc.*, United States District Court for the District of Columbia, Civil Action No. 1:04CV01649, deposition, 2008.

*Accredo Health, Inc. Securities Litigation*, United States District Court Western District of Tennessee Western Division, Civil Action No. 03-2216-BP, deposition, 2008.

*The Estate of George E. Batchelor and The Batchelor Foundation, Inc. v. Deloitte & Touche, LLP*, In the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida, Case No. 02-07135-CA-04, deposition, 2008.

*Mutual Funds Investment Litigation MDL 1586 Putnam Subtrack*, United States District Court District of Maryland, Baltimore Division, deposition, 2008.

*Alfred T. Giuliano, as Trustee of Nextcard, Inc. v. Ernst & Young, LLP*, AAA Arbitration San Francisco, CA., AAA No. 74 107 1248 05JRJ, deposition and trial testimony, 2008.

*Beverly Kanawi, et al. v. Bechtel Corporation, et al.*, United States District Court Northern District of California, Case No. C 06-5566 CRB (EDL), deposition, 2008.

*Saint Francis Medical Center v. C.R. Bard, Inc.*, United States District Court for the Eastern District of Missouri Southeastern Division, Case No. 1:07-CV-0031, deposition, 2008.

*Healthsouth Corporation Securities Litigation*, United States District Court Northern District of Alabama Southern Division, Case No. CV-03-BE-1500-S, deposition, 2008, 2009.

*Metropolitan Creditors' Trust v. Ernst & Young, LLP*, CPR File No. G-06-62N, deposition and arbitration testimony, 2008, 2009.

*Aon Corporation, et al.*, United States District Court for the Northern District of Illinois Eastern Division, Case No. 04-C-6835, deposition, 2009.

**Exhibit 2**

*Alan Schein and Results Technologies, Inc. v. Ernst & Young LLP,* Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, Case No. 03-000266 CACE 03, trial testimony, 2009.

*TOUSA, INC., ET AL.,* United States Bankruptcy Court Southern District of Florida Fort Lauderdale Division, Chapter 11 Cases, Case No. 08-10928-JKO, deposition and testimony, 2009.

*John Garamendi, as Insurance Commissioner of the State of California and as Conservator, Rehabilitator, and Liquidator of the Estate of Executive Life Insurance Company v. Altus Finance S.A., et al.,* United States District Court Central District of California, Case No. CV-99-02829 AHM (CWx), deposition, 2009.

*In re: Metropolitan Securities Litigation,* United States District Court Eastern District of Washington at Spokane, Case No. CV-04-0025-FVS, deposition, 2009.

*In the Arbitration Between JewelAmerica, Inc., Zvi Wertheimer, Rachel Wertheimer and Israel Ashkenazy Against BDO Seidman, LLP,* AAA Case No. 13-107-Y-00657-08, deposition and arbitration testimony, 2009.

*Thomas Fernandez, Lora Smith, and Tosha Thomas v. K-M Industries Holding Co., Inc., et al.,* United States District Court Northern District of California, Case No. C06-07339 CW, deposition, 2009.

*In re: Charles Schwab Corp. Securities Litigation,* United States District Court Northern District of California, San Francisco Division, Master File No. C-08-01510-WHA, deposition, 2010.

*In re: Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation,* United States District Court Eastern District of New York, Master File No. 1:05-md-1720-JG-JO, deposition, 2010.

*The Kroger Co., et al. vs. MasterCard, Inc., et al.,* United States District Court Southern District of New York, Civil Action No. 05-CV-6913-DAB, deposition, 2010.

*Scott L. Zimmerman, et al. vs. Roth Capital Partners, LLC,* Superior Court for the State of California, Los Angeles County, Case No. BC 273742, deposition, 2009, trial testimony, 2010.

*In re: Refco, Inc. Securities Litigation,* United States District Court Southern District of New York, Case No. 07-MDL-1902, deposition, 2010.

*Veronica Gutierrez, et al. v. Wells Fargo & Company, et al.,* United States District Court for the Northern District of California, Case No. CV-07-5923 WHA (JCSx), deposition, 2009, trial testimony, 2010.

*FDIC v. Ernst & Young LLP,* American Arbitration Association, Case No. 74 107 Y 00375 09 GLO, deposition, 2010.

**Exhibit 2**

*In re: IMAX Corporation Securities Litigation*, United States District Court Southern District of New York, Master File No. 1:06-cv-06128-NRB, deposition testimony, 2010.

*In re: Washington Mutual, Inc. et al., v. JPMorgan Chase Bank, N.A., et al.,* United States Bankruptcy Court for the District of Delaware, Case No. 08-12229 (MFW), deposition, 2010.

*In re: Chase Bank USA, N.A. "Check Loan" Contract Litigation,* United States District Court Northern District of California, Case No. 3:09-MD-2032 MMC, deposition, 2011.

*In re: Fannie Mae Securities Litigation*, United States District Court District of Columbia, Case No. 1:04-CV-01639, deposition, 2011.

*Jan Buettgen, on Behalf of Himself and All Others v. Katherine J. Harless*, United States District Court Northern District of Texas Dallas Division, Case No. 3:09-cv-0938-K, 3:09-cv-1049-K and 3:09-cv-1552-K, deposition, 2011.

*Securities and Exchange Commission v. Stuart W. Fuhlendorf*, United States Court Western District of Washington at Seattle, Case No. 09-1292 MJP, deposition and testimony, 2011.

*PepsiCo Puerto Rico, Inc., et al. v. Commissioner of Internal Revenue*, Docket Nos. 13676-09, 13677-09, trial testimony, 2011.

*In re:  SLM Corporation Securities Litigation*, United States District Court Southern District of New York, Case No. 08 CV 1029 (WHP), deposition, 2011.

*AIG Retirement Services, Inc., now known as SAFG Retirement Services, Inc., formerly known as SunAmerica, Inc., Plaintiff, vs. Altus Finance S.A. et al., Defendants*, United States District Court, Central District of California, Western Division, Case No. CV-05-1035, deposition, 2011.

*In re:  Washington Mutual Mortgage Backed Securities Litigation*, United States District Court Western District of Washington, Case No. C09-0037, deposition, 2011.

*In re: Barnes & Noble Stockholder Derivative Litigation*, Court of Chancery of the State of Delaware, Case No. 4813-VCS, deposition, 2012.

**Exhibit 3**

# List of Documents Relied Upon

| Title | Date |
|---|---|
| **Academic Literature** | |
| Marais, M. L. and K. Schipper, "Event Study Methods: Detecting and Measuring the Security Price Effects of Disclosures and Interventions (New)," in Litigation Services Handbook:  The Role of the Financial Expert (Roman L. Weil et al. ed.) | 2005 |
| Brealey, R. A. and S. C. Myers, Principles of Corporate Finance, Sixth Edition, New York:McGraw-Hill Irwin | 2000 |
| Campbell, J., A. W. Lo, and A. C. MacKinlay, The Econometrics of Financial Markets, Princeton University Press | 1997 |
| Bunsis, H., "A Description and Market Analysis of Write-off Announcements," *Journal of Business Finance & Accounting* | 1997 |
| MacKinlay, C. A., "Event Studies in Economics and Finance," *Journal of Economic Literature* | 1997 |
| Mitchell, M. L. and J. M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* | 1994 |
| Cornell, B. and R. G. Morgan, "Using Finance Theory to Measure Damages in Fraud on the Market Cases," *UCLA Law Review* | 1989–1990 |
| James, C. and P. Wier, "An Analysis of FDIC Failed Bank Auctions," *Journal of Monetary Economics* | 1987 |
| **Public Data** | |
| CRSP | |
| Bloomberg | |
| SEC Filings | |
| Public Press | |
| **Legal Pleadings** | |
| (Corrected) Amended Complaint for Violations of the Federal Securities Laws, in re: Local 703, I.B. of T. Grocery and Food Employees Welfare Fund, et al. vs. Regions Financial Corporation, et al. | 2/28/11 |
| Plaintiffs' Memorandum of Law in Support of Motion for Class Certification | 11/18/11 |
| Cammer v. Bloom. 711 F. Supp. 1264 (D.N.J. 1989) Court Opinion | 4/19/89 |
| **Miscellaneous** | |
| Regions Financial Corporation Q4 2008 Earnings Call Transcript | 1/20/09 |
| Basel Committee on Banking Supervision, "International Convergence of Capital Measurement and Capital Standards" | June 2004 |
| **Analyst Reports** | |
| Bank of America | 1/3/08 |
| Fox-Pitt Kelton | 1/3/08 |
| FTN Midwest Securities | 1/3/08 |
| Merrill Lynch | 1/3/08 |
| Sandler O'Neill + Partners | 1/3/08 |
| SunTrust Robinson Humphrey | 1/3/08 |
| Bernstein Research | 1/4/08 |
| Credit Suisse | 1/4/08 |
| Fig Partners | 1/4/08 |
| JP Morgan | 1/4/08 |
| Keefe, Bruyette & Woods | 1/4/08 |

**Exhibit 3**

| Title | Date |
|---|---|
| Lehman Brothers | 1/4/08 |
| Stanford Group Company | 1/4/08 |
| SunTrust Robinson Humphrey | 1/4/08 |
| UBS Research | 1/4/08 |
| Morgan Stanley | 1/8/08 |
| Punk, Ziegel & Co. | 1/10/08 |
| Lehman Brothers | 1/11/08 |
| Citigroup | 1/15/08 |
| Stanford Group Company | 1/15/08 |
| Bank of America | 1/22/08 |
| Bank of America (2) | 1/22/08 |
| Citigroup | 1/22/08 |
| Citigroup (2) | 1/22/08 |
| Credit Suisse | 1/22/08 |
| Deutsche Bank | 1/22/08 |
| Fox-Pitt Kelton | 1/22/08 |
| Fox-Pitt Kelton (2) | 1/22/08 |
| Goldman Sachs | 1/22/08 |
| Goldman Sachs (2) | 1/22/08 |
| JP Morgan | 1/22/08 |
| JP Morgan (2) | 1/22/08 |
| Lehman Brothers | 1/22/08 |
| Stanford Group Company | 1/22/08 |
| Stanford Group Company (2) | 1/22/08 |
| Sandler O'Neill + Partners | 1/22/08 |
| Sandler O'Neill + Partners (2) | 1/22/08 |
| SunTrust Robinson Humphrey | 1/22/08 |
| SunTrust Robinson Humphrey (2) | 1/22/08 |
| Fig Partners | 1/23/08 |
| Keefe, Bruyette & Woods | 1/23/08 |
| Lehman Brothers | 1/23/08 |
| FTN Midwest Securities | 1/24/08 |
| UBS Research | 1/24/08 |
| Citigroup | 2/5/08 |
| Citigroup | 2/6/08 |
| Credit Suisse | 2/7/08 |
| Punk, Ziegel & Co. | 2/12/08 |
| JP Morgan | 2/13/08 |
| UBS Research | 2/13/08 |
| FTN Midwest Securities | 2/14/08 |
| Sandler O'Neill + Partners | 2/14/08 |
| UBS Research | 2/27/08 |
| Sandler O'Neill + Partners | 2/28/08 |
| Lehman Brothers | 3/4/08 |
| Stanford Group Company | 3/5/08 |
| Bank of America | 3/24/08 |
| Punk, Ziegel & Co. | 3/25/08 |
| Lehman Brothers | 3/27/08 |
| Fitch | 3/28/08 |
| Sandler O'Neill + Partners | 4/1/08 |
| Keefe, Bruyette & Woods | 4/3/08 |
| Stanford Group Company | 4/10/08 |
| Lehman Brothers | 4/11/08 |
| Credit Suisse | 4/15/08 |
| Fox-Pitt Kelton | 4/15/08 |
| Fox-Pitt Kelton (2) | 4/15/08 |
| JP Morgan | 4/15/08 |
| JP Morgan (2) | 4/15/08 |

**Exhibit 3**

| Title | Date |
|---|---|
| Keefe, Bruyette & Woods | 4/15/08 |
| Lehman Brothers | 4/15/08 |
| Merrill Lynch | 4/15/08 |
| Merrill Lynch (2) | 4/15/08 |
| Stanford Group Company | 4/15/08 |
| Sandler O'Neill + Partners | 4/15/08 |
| Sandler O'Neill + Partners (2) | 4/15/08 |
| SunTrust Robinson Humphrey | 4/15/08 |
| SunTrust Robinson Humphrey (2) | 4/15/08 |
| UBS Research | 4/15/08 |
| UBS Research (2) | 4/15/08 |
| Bank of America | 4/16/08 |
| Citigroup | 4/16/08 |
| Fig Partners | 4/16/08 |
| FTN Midwest Securities | 4/16/08 |
| Keefe, Bruyette & Woods | 4/16/08 |
| Lehman Brothers | 4/16/08 |
| Morgan Stanley | 4/16/08 |
| Punk, Ziegel & Co. | 4/16/08 |
| Stanford Group Company | 4/16/08 |
| Deutsche Bank | 4/17/08 |
| Stanford Group Company | 4/25/08 |
| Deutsche Bank | 4/30/08 |
| Lehman Brothers | 5/8/08 |
| Merrill Lynch | 5/16/08 |
| Lehman Brothers | 5/19/08 |
| Bernstein Research | 5/30/08 |
| Lehman Brothers | 6/2/08 |
| FTN Midwest Securities | 6/6/08 |
| Lehman Brothers | 6/9/08 |
| FBR Capital Markets | 6/16/08 |
| Ladenburg Thalmann | 6/23/08 |
| Sandler O'Neill + Partners | 6/25/08 |
| Keefe, Bruyette & Woods | 6/30/08 |
| Citigroup | 7/10/08 |
| Lehman Brothers | 7/11/08 |
| Bank of America | 7/22/08 |
| Citigroup | 7/22/08 |
| Citigroup (2) | 7/22/08 |
| Credit Suisse | 7/22/08 |
| Fox-Pitt Kelton | 7/22/08 |
| JP Morgan | 7/22/08 |
| JP Morgan (2) | 7/22/08 |
| Merrill Lynch | 7/22/08 |
| Sandler O'Neill + Partners | 7/22/08 |
| SunTrust Robinson Humphrey | 7/22/08 |
| SunTrust Robinson Humphrey (2) | 7/22/08 |
| UBS Research | 7/22/08 |
| Bernstein Research | 7/23/08 |
| Fig Partners | 7/23/08 |
| Fox-Pitt Kelton | 7/23/08 |
| Keefe, Bruyette & Woods | 7/23/08 |
| Lehman Brothers | 7/23/08 |
| Raymond James | 7/23/08 |
| Stanford Group Company | 7/23/08 |
| Sandler O'Neill + Partners | 7/23/08 |
| Deutsche Bank | 7/24/08 |
| Ladenburg Thalmann | 7/24/08 |

**Exhibit 3**

| Title | Date |
|---|---|
| FTN Midwest Securities | 7/25/08 |
| Morgan Stanley | 8/4/08 |
| Lehman Brothers | 8/8/08 |
| Bernstein Research | 8/21/08 |
| Lehman Brothers | 8/26/08 |
| FTN Midwest Securities | 9/2/08 |
| JP Morgan | 9/2/08 |
| Lehman Brothers | 9/2/08 |
| Sandler O'Neill + Partners | 9/2/08 |
| FBR Capital Markets | 9/8/08 |
| Keefe, Bruyette & Woods | 9/10/08 |
| Lehman Brothers | 9/10/08 |
| Citigroup | 9/22/08 |
| Barclays Capital | 9/26/08 |
| Sandler O'Neill + Partners | 10/1/08 |
| Barclays Capital | 10/14/08 |
| Barclays Capital (2) | 10/14/08 |
| Sandler O'Neill + Partners | 10/15/08 |
| JP Morgan | 10/20/08 |
| Barclays Capital | 10/21/08 |
| Citigroup | 10/21/08 |
| Citigroup (2) | 10/21/08 |
| Credit Suisse | 10/21/08 |
| Fox-Pitt Kelton | 10/21/08 |
| Fox-Pitt Kelton (2) | 10/21/08 |
| JP Morgan | 10/21/08 |
| Sandler O'Neill + Partners | 10/21/08 |
| Sandler O'Neill + Partners (2) | 10/21/08 |
| SunTrust Robinson Humphrey | 10/21/08 |
| Bernstein Research | 10/22/08 |
| Barclays Capital | 10/22/08 |
| Bank of America | 10/22/08 |
| FBR Capital Markets | 10/22/08 |
| Keefe, Bruyette & Woods | 10/22/08 |
| Merrill Lynch | 10/22/08 |
| FTN Midwest Securities | 10/23/08 |
| Fox-Pitt Kelton | 10/27/08 |
| Sandler O'Neill + Partners | 10/28/08 |
| Ladenburg Thalmann | 10/30/08 |
| Barclays Capital | 11/3/08 |
| Merrill Lynch | 11/4/08 |
| Merrill Lynch | 11/11/08 |
| Ladenburg Thalmann | 11/12/08 |
| Bernstein Research | 11/14/08 |
| Morgan Stanley | 11/21/08 |
| SunTrust Robinson Humphrey | 11/24/08 |
| Barclays Capital | 12/16/08 |
| Barclays Capital (2) | 12/16/08 |
| Ladenburg Thalmann | 12/17/08 |
| Credit Suisse | 12/23/08 |
| Fox-Pitt Kelton | 12/23/08 |
| Keefe, Bruyette & Woods | 12/23/08 |
| Morgan Stanley | 12/23/08 |
| Sandler O'Neill + Partners | 12/23/08 |
| SunTrust Robinson Humphrey | 12/23/08 |
| Credit Suisse | 1/7/09 |
| Barclays Capital | 1/14/09 |
| Barclays Capital | 1/20/09 |

**Exhibit 3**

| Title | Date |
|---|---|
| Bank of America Merrill Lynch | 1/20/09 |
| Citigroup | 1/20/09 |
| Credit Suisse | 1/20/09 |
| Fox-Pitt Kelton | 1/20/09 |
| Fox-Pitt Kelton (2) | 1/20/09 |
| JP Morgan | 1/20/09 |
| JP Morgan (2) | 1/20/09 |
| Morgan Stanley | 1/20/09 |
| Morgan Stanley (2) | 1/20/09 |
| Sandler O'Neill + Partners | 1/20/09 |
| Sandler O'Neill + Partners (2) | 1/20/09 |
| SunTrust Robinson Humphrey | 1/20/09 |
| UBS Research | 1/20/09 |
| UBS Research (2) | 1/20/09 |
| Bernstein Research | 1/21/09 |
| Barclays Capital | 1/21/09 |
| Bank of America Merrill Lynch | 1/21/09 |
| Fig Partners | 1/21/09 |
| Keefe, Bruyette & Woods | 1/21/09 |
| Ladenburg Thalmann | 1/25/09 |
| Ladenburg Thalmann | 2/8/09 |
| Barclays Capital | 2/9/09 |
| Raymond James | 2/9/09 |
| Sandler O'Neill + Partners | 2/9/09 |
| Credit Suisse | 2/11/09 |
| Fig Partners | 2/12/09 |
| Fox-Pitt Kelton | 2/25/09 |
| Barclays Capital | 3/10/09 |
| Sandler O'Neill + Partners | 3/30/09 |
| FTN Midwest Securities | 4/2/09 |
| Barclays Capital | 4/14/09 |
| Bank of America Merrill Lynch | 4/16/09 |
| Fox-Pitt Kelton | 4/16/09 |
| Sandler O'Neill + Partners | 4/16/09 |
| Sandler O'Neill + Partners (2) | 4/16/09 |
| Goldman Sachs | 4/17/09 |
| Barclays Capital | 4/21/09 |
| Bank of America Merrill Lynch | 4/21/09 |
| Fox-Pitt Kelton | 4/21/09 |
| Fox-Pitt Kelton (2) | 4/21/09 |
| Keefe, Bruyette & Woods | 4/21/09 |
| Sandler O'Neill + Partners | 4/21/09 |
| Sandler O'Neill + Partners (2) | 4/21/09 |
| Barclays Capital | 4/22/09 |
| Bank of America Merrill Lynch | 4/22/09 |
| Morgan Stanley | 4/22/09 |
| Raymond James | 4/22/09 |
| SunTrust Robinson Humphrey | 4/22/09 |
| Citigroup | 4/23/09 |
| Fig Partners | 4/24/09 |
| FTN Midwest Securities | 4/24/09 |
| Goldman Sachs | 4/27/09 |
| Fox-Pitt Kelton | 5/7/09 |
| Sandler O'Neill + Partners | 5/8/09 |
| Fox-Pitt Kelton | 5/19/09 |
| Barclays Capital | 5/20/09 |
| Credit Suisse | 5/20/09 |
| Fox-Pitt Kelton | 5/20/09 |

**Exhibit 3**

| Title | Date |
| --- | --- |
| Goldman Sachs | 5/20/09 |
| Goldman Sachs (2) | 5/20/09 |
| Keefe, Bruyette & Woods | 5/20/09 |
| Sandler O'Neill + Partners | 5/20/09 |
| Citigroup | 5/21/09 |
| FBR Capital Markets | 5/21/09 |
| Fig Partners | 5/21/09 |
| Sandler O'Neill + Partners | 5/21/09 |
| Bank of America Merrill Lynch | 5/22/09 |
| Fox-Pitt Kelton | 5/22/09 |
| Deutsche Bank | 5/26/09 |
| Goldman Sachs | 5/26/09 |
| Barclays Capital | 5/27/09 |
| Credit Suisse | 5/27/09 |
| SunTrust Robinson Humphrey | 5/28/09 |



**Exhibit 4**

## Regions' Market Capitalization vs. Stockholders' Equity
### 1/3/06 – 1/30/09

Source: CRSP; Regions Financial SEC Filings
Note: Market capitalization on each date is calculated as the product of Regions' daily closing stock price and the number of shares outstanding as of that date. Stockholders' equity as reported on Regions' balance sheet is equal to the difference between the book value of Regions' assets (including goodwill) and the book value of Regions' liabilities.



**Exhibit 5**

## Volatility of Regions' Stock
### 1/3/06 – 1/30/09

Source: Bloomberg

Note: Bloomberg calculates Implied Volatility from a weighted average of the volatilities of the closest out-of-the-money call and put options with the shortest time to maturity, provided they expire within at least 20 business days. The Chicago Board Options Exchange Volatility Index (VIX Index) is a measure of market expectations of near-term volatility conveyed by S&P 500 stock index option prices.



**Exhibit 6**

## Performance of Regions' Stock, NYSE Index, and Industry Index
### 1/2/08 – 3/31/09

Source: CRSP; Bloomberg; Regions Financial SEC Filings DEF 14A

Note: Stock prices have been adjusted for stock splits and dividends. Indices have been pegged to Regions' closing stock price on February 26, 2008 of $21.67. The following companies are included in the Industry Index while trading data are available: BB&T, Comerica, Fifth Third, Keycorp, M&T Bank, National City, PNC, Sovereign, SunTrust, US Bancorp, Wachovia, Washington Mutual, and Wells Fargo.

Exhibit 7

# Event Study Regression Results[1]

| Regression Parameter | Parameter Value [2] | Statistical Significance |
|---|---|---|
| NYSE Index | 1.56 | * |
| T-Statistic | 16.79 | |
| Industry Index [3] | 1.38 | * |
| T-Statistic | 21.71 | |
| Intercept | (0.00) | |
| T-Statistic | 0.35 | |
| # of Observations | 209 | |
| Adjusted R-squared | 0.78 | |
| Root MSE | 0.04 | |

Source: CRSP; Bloomberg; Complaint dated February 28, 2011; Regions Financial SEC Filings DEF 14A

Note:

[1] Regression coefficients are estimated using an In-Class Control Period from February 27, 2008 to January 19, 2009. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations were released are excluded from the estimation. If the information mentioned in the Complaint was released after market close on a given date, the following trading date is excluded.

[2] The impact of the NYSE Index is removed from the Industry Index returns, i.e., the Industry Index is orthogonalized. This is done by running a one-factor regression model of the Industry Index against the NYSE Index returns from February 27, 2008 to January 19, 2009. The residuals from this regression are used in the main regression. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations was released are excluded from the estimation.

[3] The following companies are included in the Industry Index while trading data are available: BB&T, Comerica, Fifth Third, Keycorp, M&T Bank, National City, PNC, Sovereign, SunTrust, US Bancorp, Wachovia, Washington Mutual, and Wells Fargo.

**Exhibit 8**

# Residual Returns on October 21, 2008 and January 20, 2009 Are Not Statistically Significant[1]

| | | | | Regression Results [2] | | |
| Date | Regions' Return | NYSE Index Return | Industry Index Return [3] | Regions' Residual Return | Statistical Significance | T-Statistic |
|---|---|---|---|---|---|---|
| 10/21/08 | 6.11% | 3.75% | 0.30% | 3.78% | | 0.99 |
| 1/20/09 | -24.22% | -6.11% | -18.61% | -1.53% | | (0.40) |

Source: CRSP; Bloomberg; Complaint dated February 28, 2011; Regions Financial SEC Filings DEF 14A

Note:

[1] Regression coefficients are estimated using an In-Class Control Period from February 27, 2008 to January 19, 2009. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations were released are excluded from the estimation. If the information mentioned in the Complaint was released after market close on a given date, the following trading date is excluded.

[2] The impact of the NYSE Index is removed from the Industry Index returns, i.e., the Industry Index is orthogonalized. This is done by running a one-factor regression model of the Industry Index against the NYSE Index returns from February 27, 2008 to January 19, 2009. The residuals from this regression are used in the main regression. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations was released are excluded from the estimation.

[3] The following companies are included in the Industry Index while trading data are available: BB&T, Comerica, Fifth Third, Keycorp, M&T Bank, National City, PNC, Sovereign, SunTrust, US Bancorp, Wachovia, Washington Mutual, and Wells Fargo.

**Exhibit 9**

# Many Companies in the Banking Industry Suffered Price Declines on January 20, 2009

| Company [1] | Stock Price Decline on 1/20/09 |
|---|---|
| **Regions Financial** | **-24.22%** |
| BB&T | -11.09% |
| Comerica | -10.29% |
| Fifth Third | -22.28% |
| First Horizon National | -9.07% |
| Huntington Bancshares | -16.45% |
| Hudson City Bancorp | -7.90% |
| Keycorp | -7.61% |
| Marshall & Ilsley | -21.26% |
| M&T Bank | -10.84% |
| People's United Financial | -4.52% |
| PNC | -11.40% |
| Sovereign | -18.03% |
| SunTrust | -24.42% |
| US Bancorp | -16.27% |
| Wells Fargo | -23.82% |
| Zions | -19.16% |
| **Average Return (excluding Regions)** | **-16.53%** |

Source: CRSP; Bloomberg

Note:

[1] Companies included are members of the S&P 500 Banks Group Industry Index as of January 20, 2009.

**Exhibit 10**

## There Is No Evidence that Regions' Stock Price Increased Following the Alleged Misrepresentations[1]

| Date | Regions' Return | NYSE Index Return | Industry Index Return [3] | Regions' Residual Return | Statistical Significance | T-Statistic |
|---|---|---|---|---|---|---|
| 2/27/08 | 0.13% | -0.08% | 0.09% | 0.09% | | 0.02 |
| 4/15/08 | 8.41% | 0.62% | 2.63% | 4.93% | | 1.29 |
| 4/16/08 | 0.89% | 2.52% | 2.98% | -2.16% | | (0.57) |
| 5/7/08 | -4.16% | -1.78% | -3.44% | -0.37% | | (0.10) |
| 6/10/08 | 0.42% | 0.90% | 2.09% | -3.03% | | (0.79) |
| 7/22/08 | 9.62% | 0.80% | 10.20% | -4.25% | | (1.12) |
| 8/7/08 | 6.61% | 1.91% | 4.47% | 1.48% | | 0.39 |
| 9/2/08 | 19.20% | -1.01% | 2.76% | 14.77% | * | 3.87 |
| 9/4/08 | -4.55% | -3.15% | -5.94% | 1.21% | | 0.32 |
| 9/9/08 | -5.64% | -3.64% | -7.14% | 2.37% | | 0.62 |
| 9/30/08 | 16.36% | 4.57% | 27.63% | -19.82% | * | (5.20) |
| 10/31/08 | 2.21% | 1.44% | 5.54% | -4.90% | | (1.29) |
| 11/11/08 | -3.37% | -2.89% | -2.46% | 1.48% | | 0.39 |

Source: CRSP; Bloomberg; Complaint dated February 28, 2011; Regions Financial SEC Filings DEF 14A

Note:

[1] Regression coefficients are estimated using an In-Class Control Period from February 27, 2008 to January 19, 2009. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations were released are excluded from the estimation. If the information mentioned in the Complaint was released after market close on a given date, the following trading date is excluded.

[2] The impact of the NYSE Index is removed from the Industry Index returns, i.e., the Industry Index is orthogonalized. This is done by running a one-factor regression model of the Industry Index against the NYSE Index returns from February 27, 2008 to January 19, 2009. The residuals from this regression are used in the main regression. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations was released are excluded from the estimation.

[3] The following companies are included in the Industry Index while trading data are available: BB&T, Comerica, Fifth Third, Keycorp, M&T Bank, National City, PNC, Sovereign, SunTrust, US Bancorp, Wachovia, Washington Mutual, and Wells Fargo.

Exhibit 11

# Regions' Stock Price Movements Following Announcements After the End of Purported Class Period[1]

| | | | | Regression Results [2] | | |
| Date | Regions' Return | NYSE Index Return | Industry Index Return [3] | Regions' Residual Return | Statistical Significance | T-Statistic |
|---|---|---|---|---|---|---|
| 2/2/09 | -15.61% | -0.56% | -1.67% | -19.70% | * | (3.59) |
| 2/25/09 | 14.29% | -1.38% | 7.52% | 3.09% | | 0.81 |
| 5/20/09 | -6.68% | 0.00% | -3.01% | -2.64% | | (0.69) |
| 5/21/09 | -16.16% | -1.51% | -2.41% | -13.68% | * | (3.59) |

Source: CRSP; Bloomberg; Complaint dated February 28, 2011; Regions Financial SEC Filings DEF 14A

Note:

[1] Regression coefficients are estimated using an In-Class Control Period from February 27, 2008 to January 19, 2009. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations were released are excluded from the estimation. If the information mentioned in the Complaint was released after market close on a given date, the following trading date is excluded.

[2] The impact of the NYSE Index is removed from the Industry Index returns, i.e., the Industry Index is orthogonalized. This is done by running a one-factor regression model of the Industry Index against the NYSE Index returns from February 27, 2008 to January 19, 2009. The residuals from this regression are used in the main regression. Dates identified in the Complaint as days with alleged misrepresentations and days when company-specific information related to these alleged misrepresentations was released are excluded from the estimation.

[3] The following companies are included in the Industry Index while trading data are available: BB&T, Comerica, Fifth Third, Keycorp, M&T Bank, National City, PNC, Sovereign, SunTrust, US Bancorp, Wachovia, Washington Mutual, and Wells Fargo.