## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

LOCAL 703, I.B. OF T. GROCERY
AND FOOD EMPLOYEES WELFARE
FUND, et al.,

     PLAINTIFFS,

vs.                                  CASE NO. CV 10-J-2847-S

REGIONS FINANCIAL CORPORATION,
et al.,

     DEFENDANTS.


## MEMORANDUM OPINION

Pending before the court are the plaintiffs' motion for class certification, memorandum, affidavit and exhibits in support of said motion (docs. 94-96), defendants' evidentiary submissions and opposition to said motion (docs. 102-104), the plaintiffs' reply and evidence in support of the reply (docs. 107 and 108), the defendants' sur-reply and evidence in support of the sur-reply (docs. 137 and 138), and the plaintiffs' response to the defendants' sur-reply (doc. 142).  Also pending before the court is the defendants' motion for class certification hearing (doc. 140). Having considered the foregoing, the court finds as follows:

## Factual Background

The plaintiffs allege that investors in defendant Regions' stock were harmed by defendants' fraudulent statements and reports concerning the performance of

Regions' investments, and specifically investments in real estate.  The named plaintiffs seek to represent a class of all persons or entities who purchased or otherwise acquired the securities of Regions during the class period and were damaged thereby.  Based on this set of facts, the plaintiffs assert claims for violations of § 10(b) of the Securities and Exchange Act, which requires: (1) the existence of a material misrepresentation (or omission), (2) made with scienter (i.e., "a wrongful state of mind"), (3) in connection with the purchase or sale of any security, (4) on which the plaintiff relied, and (5) which was causally connected to (6) the plaintiffs' economic loss.  *Thompson v. RelationServe Media, Inc*., 610 F.3d 628, 633 (11th Cir. 2010).

The price of Regions shares, traded on the New York Stock Exchange, were $23.22 per share on February 27, 2008, the first day of the proposed class period, and $4.60 per share on January 20, 2009, the last day of the proposed class period.  The defendants dispute that the decline was caused by fraud or other misdeeds on their part, instead offering that the 78.8% decrease in value was due to market factors unrelated to the plaintiffs' allegations.[1]

---

[1]For a detailed opinion concerning the facts of this case as the court has previously found them to be, see Memorandum Opinion and Order of June 7, 2011 (docs. 52 and 53).

## Standard for Class Certification

For a district court to certify a class action, the named plaintiffs must have standing and the putative class must meet each of the requirements specified in Federal Rule of Civil Procedure 23(a), as well as at least one of the requirements set forth in Rule 23(b). *City of Hialeah v. Rojas*, 311 F.3d 1096, 1101 (11th Cir.2002); *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1025 (11th Cir.2001). *See also Klay v. Humana, Inc.*, 382 F.3d 1241, 1250-1251 (11th Cir.2004).

In reviewing a motion for class certification, the court generally is bound to take the substantive allegations of the complaint as true. *Moreno-Espinosa v. J & J AG Prods., Inc.*, 247 F.R.D. 686, 687 (S.D.Fla.2007). However, the court may look beyond the pleadings to determine whether the requirements of Rule 23 have been met. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir.2009).

Federal Rule of Civil Procedure 23(a) states:

> *Prerequisites to a Class Action*. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a), Fed.R.Civ.Pro. Federal Rule of Civil Procedure 23(b) states:

> *Class Actions Maintainable*. An action may be maintained as a class

action if the prerequisites of subdivision (a) are satisfied, and in
addition:

....

(3) the court finds that the questions of law or fact common to class
members predominate over any questions affecting only individual
members, and that a class action is superior to other available methods
for fairly and efficiently adjudicating the controversy. The matters
pertinent to these findings include: (A) the class members' interests in
individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy
already begun by or against class members; (C) the desirability or
undesirability of concentrating the litigation of the claims in the
particular forum; and (D) the likely difficulties in managing a class
action.

Fed.R.Civ.P. 23(b)(3).

A district court may certify a class only if, after "rigorous analysis," it

determines that the party seeking certification has met its burden by a preponderance

of the evidence.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158–61, 102 S.Ct.

2364, 72 L.Ed.2d 740 (1982).  *See also Teamsters Local 445 Freight Div. Pension

Fund v. Bombardier, Inc*., 546 F.3d 196, 202-04 (2nd Cir.2008) (requiring plaintiffs

to meet burden by a preponderance of the evidence). "The burden of proof to

establish the propriety of class certification rests with the advocate of the class."

*Busby v. JRHBW Realty, Inc*., 513 F.3d 1314, 1322 (11th Cir.2008) (*quoting Valley

Drug Co. v. Geneva Pharm., Inc*., 350 F.3d 1181, 1187 (11th Cir.2003).

4

## **Legal Analysis**

The court considers each of the requirements for class certification in turn,

however

> It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether [a] plaintiff can succeed on the merits." *Huff v. N.D. Cass Co. of Ala.*, 485 F.2d 710, 714 (5th Cir.1973) (en banc). Thus, the principle that district courts should not evaluate the merits of plaintiffs' claims "should not be talismanically invoked to artific[i]ally limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir.1984).

*Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir.2009) (footnote and

citations omitted).

  A.  *Rule 23(a) inquiry*

    1.  *Numerosity*:

The court is satisfied that the putative class is sufficiently numerous.  The

proposed class definition includes individuals and entities who "purchased or

otherwise acquired" Regions' stock during an eleven month period.  The court takes

judicial notice of the fact that millions of shares of this stock are traded on the New

York Stock Exchange daily.[2]  *See In re HealthSouth Corp. Securities Litigation,* 257

---

[2]According to the Form 10-K for the year ending December 31, 2011, defendant Regions had 1,260,114,608 issued and outstanding shares of stock.  *See* exhibit 3 to doc. 108.

F.R.D. 260, 274 (N.D.Ala.2009) ("The court ... makes a 'common sense assumption' that the proposed Stockholder class meets the numerosity requirement..."). Defendants do not challenge class certification on numerosity grounds, and the court finds this element satisfied.

### 2. *Commonality*

To satisfy this requirement, the plaintiffs must show that class members share common questions of law or fact.  Fed.R.Civ.P. 23(a)(2).  Commonality is satisfied where the plaintiffs establish issues of law or fact common to all members of the putative class, although all questions of law or fact need not be common to the class. *See e.g. Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th  Cir.2004), citing *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir.2001); *Prado-Steinman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 n. 14 (11th Cir.2000) ("the requirements may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class at large"); *Hudson v. Delta Air Lines, Inc*., 90 F.3d 451, 456 (11th  Cir.1996); *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir.1986), cert. denied, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986).

The court finds questions of law and fact common to the class members.  The proposed class has been defined as "[a]ll persons or entities who, between February 27, 2008, and January 19, 2009 ... purchased or otherwise acquired the securities of

6

Regions... and were damaged thereby."    The plaintiffs allege a single scheme which violated federal securities law.  Such allegations, susceptible to class-wide proof, have been held to meet the commonality requirements of Rule 23(a).  *See e.g., Cooper,* 390 F.3d at 713; *In re HealthSouth Corp. Securities Litigation,* 261 F.R.D. 616, 626 (N.D.Ala.2009)(with respect to "a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable"); *In re Recoton Corp. Securities Litigation,* 248 F.R.D. 606, 618 (M.D.Fla.2006) (where a "common scheme of deceptive conduct" has been alleged, the commonality requirement should be satisfied).

Therefore, the court finds this prong of Rule 23 is satisfied.

3. *Typicality*

This element for class certification requires that a class representative's claims must be typical of the claims of the class.  Fed.R.Civ.P. 23(a)(3). Typicality subsumes the concept that the class representative must "possess the same interest and suffer the same injury as the class members."  *Cooper,* 390 F.3d at 713.  This is related to the element of commonality, but focuses on the "individual characteristics of the named plaintiff in relation to the class."  *Prado–Steiman*, 221 F.3d at 1279.  Both

requirements are designed to assure that the claims of the named plaintiff and the claims of the class are sufficiently related.  A representative's claim is typical if there is a "nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984).  However, typicality does not require identical claims or defenses, and minor factual variations will not render a class representative's claim atypical. *Id.*

The defendants assert this prong of Rule 23 is not satisfied by the representative plaintiffs for a variety of reasons.  Defendants object to District No. 9, I.A. of M. & A.W. Pension Trust ("District 9") on the basis that it sold "thousands of shares" during the class period and thus benefitted from any alleged fraud that occurred.  Defendants' opposition (doc. 103), at 40.  According to defendants, District 9 purchased shares, held them for short periods of time, and then sold them for a profit.  Defendants' opposition at 45 n. 29.  *See also* defendants' exhibit B to Affidavit of Justin Wright (submitted as exhibit C to doc. 104).  As for each listed sale District 9 made a profit on its investment, the court agrees with defendants that such named plaintiff would not be a proper class representative, as it can have

suffered no loss.[3]  Should District 9 have divested itself of all such holdings during the Class Period, then clearly its claims would not be typical of the other class members.  However, based on the allegations of the third amended complaint, the court finds that District 9 does assert it suffered damages from its investment in Regions stock.

The court also disagrees with the defendants that the Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands"), is a similarly inappropriate class representative.  Just as defendants assert District 9 did not hold its stock long enough, defendants complain that Virgin Islands has held its stock for too long.

Because Virgin Islands purchased the shares it holds in October 2008, and the allegations include that the value per share has not been higher than it was in October 2008 at any time since January 2009, the court cannot at this time find that by retaining the stock, Virgin Islands' loss was caused by "other factors."  Defendants' opposition at 42, citing *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 343, 125 S.Ct. 1627, 1631-1632 (2005).[4]  At any moment since January 2009, should

---

[3]The plaintiffs agree that District 9 sold "some" of its holdings during the Class Period. Plaintiffs' reply (doc. 107) at 12.

[4]*Dura* states in relevant part:

For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of

Virgin Islands have sold its shares, it would necessarily have entailed a loss.  Should

Virgin Islands, as a class representative, establish it paid a higher price in October

2008 due to the alleged misrepresentations, then the fact it has retained its shares does

not diminish its injury.  As the Eleventh Circuit has explained, "defendants can be

liable for knowingly and intentionally causing a stock price to *remain* inflated by

preventing preexisting inflation from dissipating from the stock price." *FindWhat*

*Investor Group v. FindWhat.com,* 658 F.3d 1282, 1315 (11th Cir.2011)(emphasis in

original), citing *Schleiche*r, 618 F.3d at 683–84 ("[Defendants are liable for securities

fraud regardless of whether their] false statements (or ... material omissions) propel

---

a share that at that instant possesses equivalent value. Moreover, the logical link
between the inflated share purchase price and any later economic loss is not invariably
strong. Shares are normally purchased with an eye toward a later sale. But if, say, the
purchaser sells the shares quickly before the relevant truth begins to leak out, the
misrepresentation will not have led to any loss. If the purchaser sells later after the
truth makes its way into the marketplace, an initially inflated purchase price might
mean a later loss. But that is far from inevitably so. When the purchaser subsequently
resells such shares, even at a lower price, that lower price may reflect, not the earlier
misrepresentation, but changed economic circumstances, changed investor
expectations, new industry-specific or firm-specific facts, conditions, or other events,
which taken separately or together account for some or all of that lower price. (The
same is true in respect to a claim that a share's higher price is lower than it would
otherwise have been-a claim we do not consider here.) Other things being equal, the
longer the time between purchase and sale, the more likely that this is so, *i.e.*, the
more likely that other factors caused the loss.

Given the tangle of factors affecting price, the most logic alone permits us to say is
that the higher purchase price will sometimes play a role in bringing about a future
loss. It may prove to be a necessary condition of any such loss, and in that sense one
might say that the inflated purchase price suggests that the misrepresentation (using
language the Ninth Circuit used) "touches upon" a later economic loss. *Ibid.* But, even
if that is so, it is insufficient. To "touch upon" a loss is not to cause a loss, and it is the
latter that the law requires. 15 U.S.C. § 78u-4(b)(4).

*Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 342-343, 125 S.Ct. 1627, 1631-1632 (2005).

the stock's price upward ... [or] were designed to slow the rate of fall.").

Similarly, the court finds that the defendants' arguments concerning the amount of information "entering the market through 2008" does not invalidate the lead plaintiffs' claims of injury.  *See* defendants' opposition, at 45.  In holding that "confirmatory information that wrongfully prolongs a period of inflation—even without increasing the level of inflation—may be actionable under the securities laws," the Eleventh Circuit specifically rejected the approach of the Fifth Circuit, which ruled that because confirmatory information is already known to the market, it will not affect stock price."[5] *FindWhat Investor Group*, 658 F.3d at 1314 n. 33.  In contrast, in this Circuit, taking actions to cause the stock to remain inflated is actionable.  *Id.*, at 1315.

Similarly, the court rejects defendants' arguments that Virgin Islands purchased their shares of stock too late in the class period to be "typical."[6]  The defendants continued to make "corrective statements" up to and through January 20, 2009.  As such, the court finds Virgin Islands purchased the shares during the applicable class

---

[5]The Eleventh Circuit also noted that the Fifth Circuit rule (that confirmatory information is not actionable) appeared to conflict with the Fifth Circuit's own recognition in *Nathenson v. Zonagen Inc.*, 267 F.3d 400 (5th Cir.2001), that fraudulent information that confirms what the market already believes is actionable if it prevents the stock price from dropping to the level the market would set if the truth were revealed. *FindWhat Investor Group*, 658 F.3d at 1315 n. 33.

[6]According to Glenville Henderson, an investment analyst for the Virgin Islands, Virgin Islands purchased 41,805 shares at $10.91 per share on October 7, 2008.  Henderson depo. at 90-91, exhibit F (doc. 104) to defendants' opposition.

period, and suffered harm that will be typical of the class.

Defendants also assert that neither of the named plaintiffs' claims are typical because their investments were made by money managers who used strategies "that did not rely on markets at all." Defendants' opposition at 43, n. 26. However, whether using "mathematical theorem" or "stocks that are 'beaten up and undervalued,'" defendants' alleged prior misrepresentations impacted the price of the stock, and thus the named plaintiffs, as purchasers, suffered the same injury as any individual who sought undervalued stocks.[7] Similarly, whether purchase decisions were made through money managers or by an individual, the alleged harm remains the same. *See e.g. Retsky Family Ltd. Partnership v. Price Waterhouse LLP,* 1999 WL 543209, 6 (N.D.Ill.1999)(This court nevertheless respectfully declines to follow the *Caremark* court in finding inadequate those investors who rely on others to make the investment decisions. As pointed out by Plaintiff, relying on an investment advisor to make decisions about investments is commonplace."). On behalf of

---

[7]Defendants object to District 9 because its money manager used a "mathematical theorem that attempts to capitalize on the random nature of stock price movements, which itself suggests that INTECH may not have considered the price of Regions stock at all." Defendants' opposition at 43, n. 26. *See* affidavit of Justin Wright, filed as exhibit C (doc. 104) to defendants' opposition. Wright states INTECH did not analyze goodwill calculations or loan loss provisions when making investment decisions on behalf of District 9. *Id.,* at ¶¶ 12-13. Such a statement is vastly different from one that had INTECH known those numbers were manipulated, it would not have considered that to be relevant information.

INTECH has since been terminated by District 9 because of its performance. Tony Rippeto depo. at 43-44 (submitted as exhibit E to defendants' opposition). Rippeto is the Director of District 9 and a trustee of the District 9 fund. Rippeto depo. at  16, 25.

District 9, Tony Rippeto testified that it hires money managers to pick stocks that out

perform the market, and that they rely on those managers to do so.  Rippeto depo. at

106-107.  Similarly, Henderson testified that Virgin Islands also uses investment

managers and relies on those managers to select specific stocks.  Henderson depo. at

31, 75-76.  Relinquishing day to day control of investment decisions to a manager

does not alter the effect on the price of a stock of fraudulent information.  The court

finds the defendants' attempted distinction on this basis to be without meaning.

For the reasons set forth *supra*, the court finds the typicality prong of Rule

23(a) to be satisfied.

### 4.  *Adequacy of representation*

Rule 23(a)(4) requires that "the representative parties will fairly and adequately

protect the interests of the class."  The underlying purpose behind this requirement

is to assure that the legal rights of absent class members are protected. *Kirkpatrick v.

J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987).  Similarly, under the PSLRA,

the court must "appoint as lead plaintiff the member or members of the purported

plaintiff class that the court determines to be most capable of adequately representing

the interests of class members." 15 U.S.C. § 77z–1(a)(3)(B)(i).

The adequacy requirement has two different prongs: "'(1) whether any

substantial conflicts of interest exist between the representatives and the class; and

(2) whether the representatives will adequately prosecute the action.'" *Valley Drug*, 350 F.3d at 1189 (*quoting In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 460–461 (N.D.Ala.2003)); *see also Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir.1985) ("The adequate representation requirement involves questions of whether plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation, and of whether plaintiffs have interests antagonistic to those of the rest of the class.").

Defendants object both to the adequacy of the named plaintiffs and the adequacy of counsel.  Defendants' opposition (doc. 103) at 46-49. Defendants complain that both lead plaintiffs have extensive, ongoing business relationships with the proposed lead counsel's law firm, Robbins, Geller.  Defendants' opposition, at 46. That firm has a portfolio monitoring agreement with both named plaintiffs, by which Robbins, Geller monitors the named plaintiffs' investments, looking for potential securities fraud claims.  *See e.g.*, Rippeto depo. at 70-71.  Should such a claim be identified, and should plaintiffs desire to pursue the same, then Robbins, Geller files an action on their behalf.  Rippeto depo. at 74, 85; Henderson depo. at 117. According to defendants, this has resulted in multiple class actions filed by one or the other of the named plaintiffs, and in which Robbins, Geller is class counsel. Defendants' opposition, at 47.

14

This concern is not without merit.  Numerous courts have held that class certification should be denied "when a class representative is closely associated with class counsel" because "he or she may permit a settlement less favorable to the interests of absent class members." *In re IMAX Sec. Litig.*, 272 F.R.D. 138, 155–56 (S.D.N.Y.2010).  *See also Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC,* 616 F.Supp.2d 461, 463 (S.D.N.Y.,2009) (recognizing that "the lead plaintiff provisions of the PSLRA were intended to curtail the vice of 'lawyer-driven' litigation, *i.e.*, lawsuits that, because of the huge potential fees available in contingent securities fraud class actions, were initiated and controlled by the lawyers and appeared to be litigated more for their benefit than for the benefit of the shareholders they ostensibly represented.").  Other courts have not found such arrangements as troubling.  *See e.g., Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 450-451 (S.D.Ohio2009); *United Food and Commercial Workers Union v. Chesapeake Energy Corp.*, 2012 WL 1072249, 11 (W.D.Okla.2012)("Lead Plaintiff has selected highly qualified counsel with extensive experience in securities litigation, including numerous class action securities lawsuits. The knowledge and experience of Robbins Geller is not only reflected in its firm resume, but has been previously recognized by a federal court which described it as 'one of the most successful law firms in securities class actions, if not the preeminent one, in the

country.' *In re Enron Corp. Securities Litig.*, 586 F.Supp.2d 732, 789–90, 797 (S.D.Tex.2008).").

Considering the adequacy of class representation under the Eleventh Circuit standard, the court considers only whether plaintiffs' counsel are qualified, experienced and generally able to conduct the litigation. *In re Theragenics Corp. Securities Litigation,* 205 F.R.D. 687, 696 (N.D.Ga.2002), citing *Kirkpatrick,* 827 F.2d at 726; *Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir.1985). As noted above, other courts have referred to plaintiffs' chosen counsel, Robbins, Geller, as "one of the most successful law firms in the securities class actions... in the country." *In re Enron Corp. Securities Litig.*, 586 F.Supp.2d at 797. Defendants do not challenge the qualifications, experience, or ability of Robbins, Geller, nor do defendants challenge the adequacy of plaintiffs' other named counsel.

Based on the foregoing, the court finds the relationship between the named plaintiffs and lead counsel is not without question. However, the court also notes that nothing in such a relationship *per se* impacts quality of representation that the absent class members will receive. Instead, the nature of the ongoing relationship between lead plaintiffs and lead counsel carries with it that lead counsel will pursue the claims

with vigor, as their future relationship with named plaintiffs depends on the same.[8]

Defendants also assert that lead plaintiffs' ignorance of various factual issues before this court makes these plaintiffs inadequate class representatives.[9] Defendants'

---

[8]In *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir.1987), the Eleventh Circuit held

> [A]dequate class representation generally does not require that the named plaintiffs demonstrate to any particular degree that individually they will pursue with vigor the legal claims of the class. Although the interests of the plaintiff class certainly would be better served if the named plaintiffs fully participate in the litigation, *see, e.g., In re Goldchip Funding Co.*, 61 F.R.D. 592, 594–95 (M.D.Pa.1974), the economics of the class action suit often are such that counsel have a greater financial incentive for obtaining a successful resolution of a class suit than do the individual class members. *See Deposit Guaranty Nat. Bank v. Roper*, 445 U.S. 326, 338–39, 100 S.Ct. 1166, 1174, 63 L.Ed.2d 427 (1980) (plurality opinion). It is not surprising, then, that the subjective desire to vigorously prosecute a class action, which the district court here found missing in the named plaintiffs, quite often is supplied more by counsel than by the class members themselves. Obviously this creates a potential for abuse. *See id.* at 339, 100 S.Ct. at 1174. Yet the financial incentives offered by the class suit serve both the public interests in the private enforcement of various regulatory schemes, particularly those governing the securities markets, and the private interests of the class members in obtaining redress of legal grievances that might not feasibly be remedied "within the framework of a multiplicity of small individual suits for damages." *Id.*

*Id.*, at 727.  *See also In re Vesta Insurance. Group Inc., Securities Litigation*, 1999 WL 34831474, 2 (N.D.Ala.1999); *Morris v. Transouth Financial Corp.*, 175 F.R.D. 694, 697-698 (M.D.Ala.1997).

[9]The court finds this argument puzzling, as the designated representative for Virgin Islands had a clear grasp of the purpose of this action.  When asked for his understanding of the allegations of the complaint, he replied

> My understanding is for the period in question, Regions Corp. along with key executives misled, basically lied to shareholders in terms of $6 billion goodwill that was placed on their balance sheets which came about from the acquisition of Amsouth; also, the misleading of shareholders in terms of loan reserves that was part of the acquisition of Amsouth; and just basically negligence on their part with the lack of proper internal controls in, if you want to say managing or recording those transactions that basically caused the stock price – which is what the shareholders are most concerned about – to plummet from where it was at the time.

Henderson depo. at 140.  He added that specifically, "after the declaration came out that they had to write down $6 billion in goodwill, that basically caused the stock to tank." *Id.*  Later, when asked whether he knew of anything specific defendant Ritter did, Henderson replied

opposition (doc. 103) at 48.  However, the law does not demand a class representative understand or even have specific knowledge of claims and issues before the court. Rather, class representatives may rely on their chosen counsel to litigate the case without such reliance making them inadequate.  *See e.g., Morris v. Transouth Financial Corp.,* 175 F.R.D. 694, 698 (M.D.Ala.1997); *citing Surowitz v. Hilton Hotels Corp*., 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966).

Thus, the court concludes that class counsel and the named plaintiffs are adequate representatives for purposes of class certification.

### B.  *Rule 23(b) requirements*

The plaintiffs assert this case is appropriate for certification under Rule 23(b)(3), Fed.R.Civ.Pro.  Numerous courts have recognized that securities fraud cases are particularly appropriate candidates for treatment under Rule 23(b)(3) since the elements of the cause of action generally relate to the acts or omissions of the defendants. *See e.g., In re Scientific-Atlanta, Inc. Securities Litigation*, 571 F.Supp.2d

---

Other than the fact of covering up what was or what had to be known as a company that was in trouble and basically coming out speaking to shareholders as if everything was okay and the company was in good shape, that's about – I don't know of anything else.

*Id.* at 153.  When questioned about the financial condition of other banks during the same time period, Henderson commented, "I think the fact or the misleading statements and actions by Regions Corp. made their drop or their drop in stock prices a little more egregious."  *Id*. at 154.  While recognizing other banks had greater losses, Henderson continued, "... a loss is a loss, and especially if it's a loss that we feel was just based out of lies and misleading, misconceptions.  I'll take a 30 percent drop in Citi versus a 14 percent drop in Regions any day in that situation."  *Id.* at 154.

1315, 1343 (N.D.Ga.2007) (citing *In re BearingPoint, Inc. Securities Litigation*, 232

F.R.D. 534, 542 (E.D.Va.2006); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591,

625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)("predominance is a test readily met in

certain cases alleging ... securities fraud." )).  As previously set forth, for certification

under Rule 23(b)(3), the court must find (1) that the questions of law or fact common

to the members of the class predominate over any questions affecting only individual

members, and (2) that a class action is superior to other available methods for the fair

and efficient adjudication of the controversy.

### 1. *Predominance*

To satisfy the predominance requirement, the plaintiffs must establish that "the

issues in the class action that are subject to generalized proof, and thus applicable to

the class as a whole ... predominate over those issues that are subject only to

individualized proof." *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005

(11th Cir.1997) (citations and quotation marks omitted).  Although related, the

predominance criterion under Rule 23(b)(3) is far more demanding that Rule 23(a)'s

requirement of commonality.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591,

623–24, 117 S.Ct. 2231, 2250, 138 L.Ed.2d 689 (1997).

Defendants assert the plaintiffs cannot establish the "predominance"

requirement for two reasons: (1) the plaintiffs have not successfully invoked the fraud

-on-the-market presumption for class wide proof of reliance and (2) even if the plaintiffs have done so, defendant Regions has successfully rebutted it.  Defendants' opposition (doc. 103), at 7.

*a. Fraud-on-the-Market*

The fraud-on-the-market theory incorporates the presumption that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Erica P. John Fund, Inc. v. Halliburton Co.,* 131 S.Ct. 2179, 2185 (2011)(quoting *Basic.*, at 246, 108 S.Ct. 978).  "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements...." *Basic.*, at 241–42, 108 S.Ct. 978 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3rd Cir.1986)).  The Supreme Court explained that

> [b]ecause the market "transmits information to the investor in the processed form of a market price," we can assume ... that an investor relies on public misstatements whenever he "buys or sells stock at the price set by the market." *Id*., at 244, 247, 108 S.Ct. 978 (internal quotation marks omitted); *see also Stoneridge, supra*, at 159, 128 S.Ct. 761; *Dura Pharmaceuticals*, 544 U.S., at 341–342, 125 S.Ct. 1627.

*Erica P. John Fund, Inc. v. Halliburton Co.,*  131 S.Ct. 2179, 2185 (2011).  The *Halliburton* Court further noted that securities fraud plaintiffs must prove certain things in order to invoke the fraud-on-the-market rebuttable presumption of reliance. *Id.* at 2185.  These include that the alleged misrepresentations were publicly known,

20

that the stock traded in an efficient market,[10] and that the relevant transactions took place between the time the misrepresentations were made and the time the truth was revealed.[11] *Id.*, citing *Basic Inc. v. Levinson*, 458 U.S. 224, 248, n. 27 (1998).

The court has previously found that the plaintiffs allege that the defendants misrepresented millions of dollars in non-accrual loans to keep the value of goodwill, as reflected in quarterly reports, artificially high. *See e.g*, Memorandum Opinion of June 7, 2011 (doc. 52), at 10.  Defendant Regions represented that the value attached

---

[10]The importance of an efficient market has been explained as

> if a company trades in an efficient market, plaintiffs would be relieved of the substantial discovery and proof burdens concerning direct reliance—which could add months of trial preparation to this dispute. *See* § 21.33 of the MCL 2d ("conducting a separate trial under Fed.R.Civ.P. 42(b) of issues that may render unnecessary or substantially alter the scope of further discovery or trial").

*Cammer v. Bloom*  711 F.Supp. 1264, 1292 n. 49 (D.N.J.1989).

[11]In *FindWhat Investor Group v. FindWhat.com*, the Eleventh Circuit explained the theory behind this concept as follows:

> Because "millions of shares chang[e] hands daily," *id.* at 243, 108 S.Ct. 978, and a critical mass of "market makers" study the available information and influence the stock price through trades and recommendations, *id.* at 248, 108 S.Ct. 978, an efficient capital market rapidly and efficiently digests all available information and translates that information into "the processed form of a market price," *id.* at 244, 108 S.Ct. 978. A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price. This is so because the market has already digested that information and incorporated it into the price. *See Greenberg v. Crossroads Sys., Inc.,* 364 F.3d 657, 665–66 (5th Cir.2004) ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.").

In *FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir.2011); citing *Basic,* 485 U.S. at 241, 108 S.Ct. 978 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160 (3d Cir.1986)).

to the company's goodwill was repeatedly tested during 2007 and 2008, and properly calculated, even though the value of its real estate investments was spiraling downward. These assurances were placed in SEC filings, press releases and other documents designed for public distribution, thus they were "publicly known" for purposes of establishing fraud-on-the-market.

The New York Stock Exchange can be presumed to be an "efficient market" for virtually all securities traded there. *See Cammer v. Bloom*, 711 F.Supp. 1264, 1292 (D.N.J.1989)(*quoting* 4 Securities Fraud and Commodities Fraud, § 8.6 (Aug.1988))("certain markets are developed and efficient for virtually all the securities traded there: the New York ... Stock Exchange[]...."). As noted by the Third Circuit:

> Securities markets like the NYSE and the NASDAQ are "open and developed," *see Oran v. Stafford*, 226 F.3d 275, 282 (3rd Cir.2000), and are therefore "well suited for application of the fraud on the market theory," *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir.1990). Accordingly, the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency. *See Oran*, 226 F.3d at 282; *see also Schleicher*, 618 F.3d at 682; *Freeman*, 915 F.2d at 199.

*In re DVI, Inc. Securities Litigation,* 639 F.3d 623, 634 (3rd Cir.2011).

The court also finds that the relevant transactions took place "between the time the misrepresentations were made and the time the truth was revealed." *Halliburton Co.,* 131 S.Ct. at 2185. Based on the foregoing set of facts, the court concludes that

22

"the market price of [Regions] shares traded on well-developed markets reflects all publicly available information, and, hence, [the] material misrepresentations" concerning non-impairment to its goodwill. *See Halliburton*, 131 S.Ct. at 2185.

The defendants do not contest the foregoing in any meaningful manner. Rather, the defendants dispute that the alleged misrepresentations and the subsequent corrective statements had any effect on the market, in support of their arguments in rebuttal to the fraud-on-the-market presumption.[12]   The defendants assert that the plaintiffs have failed to "prove materiality, and instead just assume it."  Defendants' opposition, at 10 (emphasis omitted); defendants' sur-reply (doc. 137) at 3.

> Once the presumption of reliance is successfully invoked, the court presumes "(1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." *Semerenko*, 223 F.3d at 178–79. But a defendant may rebut the presumption of reliance by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price...." *Basic*, 485 U.S. at 248, 108 S.Ct. 978; *see also Semerenko*, 223 F.3d at 179 ("The fraud on the market theory of reliance ... creates only a presumption, which a defendant may rebut by raising any defense to actual reliance.").

*In re DVI, Inc.,* 639 F.3d at 631-632.  Here, the defendants attempt to rebut the

---

[12]The defendants blame much of Regions' stock volatility on the downward spiraling market, especially for banks. *See e.g.*, defendant exhibits 1, 3, 4, 5 (doc. 102).  Clearly, many stocks lost value during the time frame identified by the plaintiffs as the Class Period.  However, as the court understands the plaintiffs' claims, they allege Regions shares would not have suffered as greatly had the alleged misrepresentations not been in place prior to the Fall of 2008.

presumption of reliance by asserting the withholding of information, producing fraudulent information, and then producing previously withheld correct information, was not material because it did not impact the price of Regions stock at anytime during the class period, as defined by the plaintiffs.  In their sur-reply, defendants refine this argument to an assertion that the plaintiffs have failed to establish the "cause and effect" factor from *Cammer v. Bloom*, 711 F.Supp.1264, 1285-87 (D.N.J. 1989 (listing five factors to consider in determining market "efficiency" and holding "it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.").  The court does not delve into the *Cammer* factors other than noting that even among courts which have applied them literally, there has been no requirement that a plaintiff show the existence of each of the five factors.[13]  *See e.g., AAL High Yield Bond Fund v. Ruttenberg,* 229 F.R.D. 676, 683 (N.D.Ala.2005) ("A

---

[13]The purpose of the *Cammer* factors is solely to aid a court in determining market efficiency. However, after suggesting the five considerations set forth in *Cammer*, that court held "the New York Stock Exchange can be presumed to be an 'efficient market' for virtually all securities traded there." *Cammer,* 711 F.Supp. at 1292(quoting 4 Securities Fraud and Commodities Fraud, § 8.6 (Aug.1988))("certain markets are developed and efficient for virtually all the securities traded there: the New York ... Stock Exchange[]....").  Given that the NYSE is recognized as the epitome of market efficiency, the court does not set forth here the five factors meant to help guide a court's determination regarding market efficiency.

plaintiff is not required to show the existence of each of these factors"); *Simpson v. Specialty Retail Concepts*, 823 F.Supp. 353, 355 (M.D.N.C.1993).

Thus the court turns to the issue of whether the plaintiffs must, at this juncture, establish a cause and effect relationship between defendant Regions' financial releases and an immediate response in the stock price.   Plaintiffs respond to defendants' argument that cause and effect is absent by asserting that they do not have to prove "loss causation" at the class certification stage.

As the Eleventh Circuit recently so eloquently explained:

Just as an efficient market translates all available *truthful* information into the stock price, the market processes the publicly disseminated falsehood and prices it into the stock as well. *See* id. at 241–42, 243–44, 246–47, 108 S.Ct. 978. The market price of the stock will then include an artificial "inflationary" value—the amount that the market mistakenly attributes to the stock based on the fraudulent misinformation. So long as the falsehood remains uncorrected, it will continue to taint the total mix of available public information, and the market will continue to attribute the artificial inflation to the stock, day after day. If and when the misinformation is finally corrected by the release of truthful information (often called a "corrective disclosure"), the market will recalibrate the stock price to account for this change in information, eliminating whatever artificial value it had attributed to the price. That is, the inflation within the stock price will "dissipate."

In a fraud-on-the-market case, the Supreme Court allows the reliance element of a Rule 10b-5 claim to be rebuttably presumed, so long as the defendant's fraudulent misstatement was material and the market was informationally efficient. *See id.* at 247, 108 S.Ct. 978 ("Because most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations ... may be presumed

for purposes of a Rule 10b–5 action."). This presumption follows directly from the efficient market hypothesis. Because an informationally efficient market rapidly and efficiently translates public information into the security's price, the market price will reflect the defendant's fraudulent statement, and everyone who relies on the market price as a reflection of the stock's value in effect relies on the defendant's misrepresentation. *Id*. at 241, 108 S.Ct. 978; *see also Peil*, 806 F.2d at 1161. "Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." *Basic,* 485 U.S. at 241-42, 108 S.Ct. 978 (quoting *Peil*, 806 F.2d at 1160).

*FindWhat Investor Group v. FindWhat.com* , 658 F.3d at 1310-1311 (emphasis is original).

Applying *FindWhat* to the facts here, the court finds the market was "informationally efficient."  Of greater concern to the court is whether the plaintiffs have shown any misstatements which were "material."  Material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities."They include any fact "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities." *SEC v. Mayhew*, 121 F.3d 44, 52 (2nd Cir.1997) (*quoting SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2nd Cir.1968) (en banc)).

Defendants allege that the misrepresentations in question had no effect on the price per share of Regions' stock, that the market "knew" Regions would increase its loan loss reserves and write down its goodwill, and the market viewed goodwill as

"immaterial."  Defendants' opposition (doc. 103) at 12.  *See also* exhibits 2, 6, 7, 9,

12-15, 17-19.  The court addresses each of these contentions in turn.

> *1.  The misrepresentations had no effect on the price per share of Regions stock:*
>
> *2.  The misrepresentations were not material because their disclosure had no price impact:*[14]

The defendants assert that the plaintiffs have no evidence to support their

allegations that the release of the information in question – that defendant Regions

was writing off $6 million in goodwill – "changed the total mix of information

available to investors..."[15]  Report of Christopher James, Ph.D., submitted as exhibit

A of defendants' evidentiary submissions (doc. 102) at 3.  The plaintiffs respond that

prior to the time of the write off, the market could not react to false statements

because these statements were in the nature of omissions, and an omission of

information cannot cause stock price movement.  Plaintiffs' reply (doc. 107) at 4.

"[T]he mere absence of a statistically significant *increase* in the share price in

response to fraudulent information does not 'sever the link' between the material

misstatements and the price of the stock. Rather, price stability may just as likely

---

[14]The court finds these arguments intertwined and thus discusses them together.

[15]Indeed, Regions' own website has a press announcement on January 20, 2009, notes "[k]ey points for the quarter include: ... [l]oss of $9.01 per diluted share for the quarter ended December 31, 2008 was largely driven by a $6 billion non-cash charge for impairment of goodwill.  Excluding goodwill impairment, Regions' loss totals 35 cents per diluted share per quarter...." Http://ir.regions.com/releasedetail.cfm?ReleaseID=633367.

demonstrate the market consequence of fraud where the alleged fraudulent statement conveys that the company has met market expectations, when in fact it has not." *In re HealthSouth Corp.*, 257 F.R.D. at 282 (emphasis in original), *quoting In re Scientific–Atlanta, Inc. Sec. Litig.*, 571 F.Supp.2d 1315, 1340–41 (N.D.Ga.2007). *See also Matrixx Initiatives, Inc. v. Siracusano*, – U.S. – , 131 S.Ct. 1309, 1318 (2011).

The plaintiffs produced evidence that following Regions' January 20, 2009, announcement of a net loss of $5.6 billion for the fourth quarter of 2008 (driven by the net loss of $6 billion charge for the impairment of good will), Regions stock fell to $4.60, a drop of $1.47.  *See* Brown declaration, ex 9 at 6.  However, defendants' expert sets forth evidence that on that same date, January 20, 2009, Wells Fargo stock fell 23.89 percent, BB&T stock fell 11.09 percent, and Huntington Bancshares fell 16.45 percent.  Dr. James' declaration, ¶ 63, and exhibit 9 thereto.  See also Dr. James' declaration at ¶¶ 64-66.  Thus, defendants argue plaintiffs have failed to show the cause and effect requirement of *Cammer, supra*.

Rather than meeting this evidence head on, the plaintiffs respond that the question of materiality is a "merits issue" and is thus unrelated to Rule 23's requirements.  Plaintiffs' reply (doc. 107) at 2-3.  The court disagrees.[16]  See

---

[16]As discussed *infra* at 31 *ff*, "materiality" is not synonymous with "loss causation."  "Loss causation" is an issue which goes to the merits of the plaintiffs' claims.

28

*FindWhat Investor Group v. FindWhat.com*, 658 F.3d at 1310 ("In a fraud-on-the-market case, the Supreme Court allows the reliance element of a Rule 10b-5 claim to be rebuttably presumed, so long as the defendant's fraudulent misstatement ***was material*** and the market was informationally efficient...." (emphasis added). Plaintiffs allege that the defendants' expert recognized that the stock price increased on two of the dates defendant Regions released false statements. Plaintiffs' reply (doc. 107) at 4. However, the information immediately predating the September 2, 2008, increase concerned Regions' purchase of Integrity Bank, which had been closed by the FDIC. *See* James declaration, ¶¶ 69-70. Plaintiffs' expert responds that the misrepresentation made by defendants on September 2, 2008, unrelated to Regions' purchase of Integrity Bank, is unreflected in the price change, because the misrepresentation involved the omission of information. *See* Steinholt declaration, ¶¶ 65-66 ("To the extent the misrepresentations involved omissions, no change in the stock price would be expected from such omissions at the time of the omission as the market cannot react to what it does not know.")

Defendants rely on the August 29, 2008, purchase of Integrity Bank to explain the increase in the stock price on September 2, 2008.[17] In contrast, when a negative

---

[17] August 29, 2008, was a Friday. The following Monday was Labor Day, hence the next day the market was open was September 2, 2008, a Tuesday.

press release was given on October 21, 2008 (a Tuesday), defendants confine their discussion of the price impact to just that date. Although plaintiffs point out Regions stock declined 20% in the three days immediately thereafter, (compare James declaration at ¶¶ 49-51, with Steinholt report at ¶¶ 70-71), allowing the plaintiffs the presumption of an efficient market requires that material information be digested by the market and effect the price immediately. This is the plaintiffs' burden to establish. *See e.g., In re Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation*, – F.R.D. –, 2012 WL 1028642, 7 (S.D.N.Y.2012).

The Eleventh Circuit defines the "test of materiality in the securities fraud context" as "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *SEC v. Gobel*, 2012 WL 1918819, 4 (11th Cir. May 29, 2012)*(quoting SEC v. Merchant Capital, LLC,* 483 F.3d 747, 766 (11th Cir.2007). A fact stated or omitted is considered material when there is a substantial likelihood that a reasonable purchaser or seller of a security would consider the fact important in deciding whether to buy or sell. *See Gobel*, 2012 WL 1918819, citing *SEC v. Pirate Investor* LLC, 580 F.3d 233, 240 (4th Cir.2009) (other citations omitted). The court finds as a matter of common sense that misstating loan loss reserves and/or the goodwill of a publicly traded company are both considerations that a reasonable buyer or seller would find important in deciding

whether to invest in a stock or divest of the same.[18]

The defendants assert other events could have caused the decrease in stock price, and direct the court to *Dura Pharmaceuticals* in support of their argument that the plaintiffs have failed to establish "price impact."   Defendants' opposition at 12-15 and n. 10 (doc. 103) .  A lack of market impact may indicate the misstatements were immaterial—a distinct basis for rebuttal. *See Semerenko*, 223 F.3d at 179 n. 7. Given an efficient market, information that does not impact a security's price is immaterial. *See Burlington*, 114 F.3d at 1425; *Oran*, 226 F.3d at 283; *Merck*, 432 F.3d at 269.  Thus, the failure of a corrective disclosure to affect the market price may serve as a rebuttal to the presumption of reliance.  Although the plaintiffs assert in their response to defendants' sur-reply that this is a "merits issue, one that will ultimately be decided by the finder of fact on a class-wide basis" (doc. 142, at 2), the court disagrees.  The plaintiff must give an indication of the materiality of the misstatements in response to the defendants' rebuttal arguments that the information releases in question had no impact on the market.

Discussing the difference between "price impact" and "loss causation" in *Halliburton*, the Supreme Court held that such a requirement, *i.e.*, that the plaintiffs

---

[18]Indeed, one industry analyst reported on January 21, 2009, that "Regions took a goodwill impairment in 4Q08, driving a high GAAP loss per share of $9.01.  The goodwill impairment accounted for $8.66 of the loss."  *See* doc.102-3, exhibit 28.

show a causal link between the alleged falsehood and the losses in order to invoke the

fraud on the market presumption, "is not justified by *Basic* or its logic." *Halliburton*,

131 S.Ct. at 2185.  The Court continued

> To begin, we have never before mentioned loss causation as a
> precondition for invoking *Basic*'s rebuttable presumption of reliance.
> The term "loss causation" does not even appear in our *Basic* opinion.
> And for good reason: Loss causation addresses a matter different from
> whether an investor relied on a misrepresentation, presumptively or
> otherwise, when buying or selling a stock.

*Halliburton*, 131 S.Ct. at 2186.  The fraud-on-the-market presumption of reliance  is

different from "loss causation."  At this juncture, plaintiffs do not bear the burden of

showing an impact on the price. *In re Salomon Analyst*, 544 F.3d at 483 ("the

Plaintiffs do not bear the burden of showing impact in price.  The point of *Basic* is

that the effect on the market price is *presumed* based on the materiality of the

information and a well-developed market's ability to readily incorporate that

information into the price of securities." (emphasis in original).

The court has evidence before it that, despite Regions' repeated assurances to

the marketplace, Regions reported a $5.6 billion net loss for the fourth quarter of

2008 due mainly to "a $6 billion non-cash charge for impairment of goodwill." Based

on this announcement, Regions shares fell significantly.[19]   Clearly, representing

---

[19]Regions asserts throughout its opposition that any misrepresentations regarding its goodwill,
predating its announcement of the $6 billion impairment to its goodwill were not "material." *See*
defendants' opposition, at 8-10.  As quoted by the plaintiffs, one article, titled "Regions Financial

Regions had assets that it did not would and could keep the value of its stock trading at an artificially high level.[20]  Just as clearly, anyone who purchased shares during the relevant time period would have paid that inflated price, believing those shares to be worth that price.

As aptly pointed out by the Third Circuit,

[l]oss causation is different from reliance, and requires "a causal connection between the material misrepresentation and the loss.*" Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); see also 15 U.S.C. § 78u–4(b)(4) (requiring a plaintiff in a private securities action to "prov[e] that the act or omission of the defendant alleged to violate [a federal securities law] caused the loss for which the plaintiff seeks to recover damages"). Although a drop in a security's price may be a result of the correction of a previous misrepresentation, it may also have been caused by "changed economic circumstances, changed investor expectations, new industry-specific or

---

Must Think We're All Stoned,"(October 23, 2008)(submitted by defendants as exhibit 21 to doc. 102) states

It all comes down to that pneumatic, intangible asset known as goodwill, which is about as valuable as the air in a paper sack.  As of Sept. 30 [2008], according to Regions, the bank's goodwill was worth $11.5 billion, slightly more than the quarter before.  That's about 59 percent of Regions' book value, and $4.1 billion more than what the stock market says the entire company is worth....

There's a bigger problem here, though.  By sticking to that goodwill valuation, Regions executives might as well be telling us we can't trust a single number of their financial statements....

Irrational goodwill isn't the only thing weird about Regions' accounting either...

Common sense tells you a bank's loan-loss allowance, in an economic decline, should be rising as a percentage of nonperforming assets....

[20]Such a statement is different from defendants' expert's statistics which support a lack of evidence that Regions' stock price increased from the misrepresentations.  *See* Exhibit 10 to Exhibit A to Declaration of James (doc. 102).  Using misrepresentations to maintain a stock price is no less of a fraud than use of the same to artificially increase the price.

firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343, 125 S.Ct. 1627. ***Therefore, at trial plaintiffs must "show that the revelation of th[e] misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.*** *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3rd Cir.2007). The requirement ensures "that the individual allegedly responsible for the misrepresentation or omission does not become an insurer against all the risks associated with the investment." *Id.* at 425 n. 3.

*In re DVI, Inc. Securities Litigation,* 639 F.3d 623, 632 (3rd Cir.2011)(emphasis added). Thus, loss causation is a trial issue. The court agrees with the plaintiffs that the same is not a relevant consideration for a court at this juncture. *See In re Salmon Analyst*, 544 F.3d at 483 ("the plaintiffs do not bear the burden of showing an impact in the price.").

> b. *Have the Defendants Rebutted Plaintiffs' Invocation of Fraud on the Market Presumption?*[21]

Even though loss causation is not an issue at the class certification state, the *Basic* presumption is rebuttable. Defendants assert none of the misrepresentations identified by the plaintiffs were, in fact, material, because the market was already aware that the statements were false. Defendants' opposition (doc. 103), at 21. Defendants assert that Regions publically announced that its loan loss provision would be incrementally increased through 2008, and in fact its Form 8-K, released

---

[21]The court finds defendants' argument at section a.3 of its brief, entitled "*The market already knew*" is subsumed within the discussion of whether defendants have rebutted the fraud on the market presumption.

April 15, 2008, and Form 10-Q, released May 7, 2008, showed an increase in loan loss reserves from $1.327 billion to $1.432 billion.  The Form 8-K released July 22, 2008, and Form 10-Q, released August 7, 2008,again showed an increase in the loan loss reserves to $1.536 billion.  Similarly, the Form 8-K released October 21, 2008, again increased loan loss reserves to $1.546 billion.  The January 20, 2009, Form 8-K, for the last quarter of 2008, increased loan loss reserves to $1.9 billion.  Based on these disclosures, defendants assert any misrepresentations were immaterial, because the market was aware the loan loss reserves were going to increase.  Defendants' response, at 21-27.

The plaintiffs respond that they do not allege that investors were unaware that Regions planned to increase its loan loss provision or even write down its good will.  Plaintiffs' response (doc. 107), at 34.  Rather, plaintiffs allege that the loan loss reserves were false and misleading, and that goodwill was overstated, false and misleading, and that the defendants intentionally misrepresented these to suggest a financial situation that was not true.  Plaintiffs' response (doc. 107), at 34, *see also* defendants' opposition (doc. 103) at 28 (stating on July 1, 2008, Regions publicly disclosed that the SEC questioned Regions' assertion its goodwill was not

impaired).[22]

Given the evidence that Regions' statements of goodwill and loan loss reserves were known by the market to be inflated, long before public corrections were made, is more troubling for the plaintiffs. If the market was already aware that Regions' statements of financial condition were false, then there could be no injury from these statements, or the later official corrective statements. While the court finds, and common sense dictates, that market knowledge that numbers will change is not the same as market knowledge that the numbers provided are false, or intentionally misleading, the misleading statements must have some effect on the market to be *material*. Providing false information already known to be false cannot supply the necessary nexus.

Thus, while the court finds that defendants may be correct in their assumption that the market knew Regions' loan loss provision was understated in any particular quarter, or that goodwill was overstated, this is not tantamount to knowledge that Regions was intentionally and falsely overstating its position to appear more financially secure than was in fact true. However, without some indication that harm resulted from such misstatements, plaintiffs lose the fraud-on-the-market presumption

---

[22]Regions was accused of "insult[ing] the public's intelligence by publishing asset values that defy logic. Saying Regions' goodwill is worth $11.5 million would be like a hen bragging that her unlaid egg weighs more than she does." Defendants' opposition (doc. 103), at 28.

of reliance.  Therefore, assuming that plaintiffs have indeed shown entitlement to the fraud-on-the-market presumption, the court next examines whether the defendants have successfully rebutted the same.

The law is clear that reliance by investors on alleged material omissions may be presumed.  *In re Dynex Capital, Inc. Securities Litigation,* 2011 WL 781215, 7 (S.D.N.Y.2011), *citing Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972); *In re Merrill Lynch Auction Rate Sec. Litig*., 704 F.Supp.2d 378, 397 (S.D.N.Y.2010).   Less clear is the law on how that presumption may be rebutted. Trying to coalesce *Halliburton* and *Basic*, has lead to varied results across the Circuits.  *Compare Connecticut Retirement Plans and Trust Funds v. Amgen Inc*., 660 F.3d 1170, 1177 (9th Cir.2011)[23] ("a plaintiff need not prove materiality at the class certification stage to invoke the presumption; materiality is a merits issue to be reached at trial or by summary judgment motion if the facts are uncontested. The only elements a plaintiff must prove at the class certification stage are whether the market for the stock was efficient and whether the alleged misrepresentations were public") with *In re Salomon Analyst Metromedia Litigation,* 544 F.3d 474, 483 (2nd Cir.2008)("[t]he burden of showing that there was a price impact is properly placed

---

[23]On June 11, 2012, the United States Supreme Court granted the petition for a writ of certiorari in *Amgen, Inc. v. Connecticut Retirement Plans. See id.,* --- S.Ct. ----, 2012 WL 692881, 1 (2012).

on the defendants at the rebuttal stage ... *Basic* made clear that defendants could 'rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price....' 485 U.S. at 248, 108 S.Ct. 978 ."); *Pennsylvania Ave. Funds v. Inyx Inc*., 2011 WL 2732544, 8 (S.D.N.Y.2011)("One way to "sever the link" is to demonstrate that the alleged misrepresentations were immaterial because they did not lead to a distortion in price. *Basic*, 485 U.S. at 248–49.").

Defendants' expert, Christopher M. James, Ph.D., asserts that the alleged misrepresentations "did not change the total mix of public information that was known to the market.  Because the alleged misrepresentations did not change the total mix of information available on the market, investors could not have relied on them when making their purchase (or sale) decisions."  *See* defendants' ex. A to doc. 102, ¶ 20.  Thus, Dr. James concludes that plaintiffs' claim that the stock price reacted to the "news events" is inconsistent with the claim that the stock traded in an efficient market.  *Id*.  He uses quotes from analysts to demonstrate that "book value is inflated due to goodwill associated with the acquisition of AmSouth" was common knowledge during the class period.  *Id*., ¶ 28.

The Court of Appeals for the Second Circuit interpreted *Basic* to mean "that a successful rebuttal defeats certification by defeating the Rule 23(b)(3)

predominance requirement. Hence, the court must permit defendants to present their rebuttal arguments before certifying a class...." *Salomon*, 544 F.3d at 485 (quotation and citation omitted).   Applying *Salomon*, the Third Circuit adopted the Second Circuit's holding that defendants have the burden "to show that the allegedly false or misleading material statements did not measurably impact the market price of the security," *In re DVI, Inc. Securities Litigation* 639 F.3d 623, 637-638 (3rd Cir.2011), citing *In re Salomon Analyst Metromedia Litigation,* 544 F.3d 474, 486 n. 9 (2nd Cir.2008).   The *Salomon* court further ruled that "Any showing that severs the link between the alleged misrepresentation and ... the price ... will be sufficient to rebut the presumption of reliance." *Id.,* at 484.   The Third Circuit ultimately disagreed with the Second Circuit's insistence that loss causation was thus a necessary step to prevent rebuttal of the presumption.   See *In re DVI, Inc. Securities Litigation* 639 F.3d 623, 636-637 (3rd Cir.2011).

Defendants make the same erroneous arguments here.   In their opposition, the defendants repeatedly assert that none of the misrepresentations were material because the marked price never reflected the misrepresentations.   Defendants mix price impact and loss causation.   Proof of the cause of plaintiffs' losses as a result of the defendants' misrepresentations is not before the court at this time.   Such a discussion is in the realm of "loss causation" and reserved for a trial on the merits.

39

As another court has found

> To demonstrate materiality at the class certification stage, plaintiffs need not submit evidence that misstatements and omissions artificially inflated the price of Sadia's ADRs at the time they were made or throughout the class period. Such a requirement would unfairly and unnecessarily heighten plaintiffs' burden at this stage. Instead, plaintiffs need only meet the "total mix" standard adopted in *Basic* and routinely applied by courts throughout the country.

*In re Sadia, S.A. Securities Litigation,* 269 F.R.D. 298, 313-314 (S.D.N.Y.2010). There is no burden on the plaintiffs to prove the alleged misrepresentations "'moved the market,' *i.e.*, had a measurable effect on the stock price." *Salomon Analyst*, 544 F.3d at 482.  By adopting the "total mix" standard of materiality, the *Basic* Court "fram[ed] the question of materiality in terms of how the information would be viewed by a reasonable investor, rather than in terms of actual impact on market price." *Salomon Analyst*, 544 F.3d at 482.

The defendants argue that the plaintiffs have not shown that the price decrease on January 20, 2009, was due to the particular announcement the plaintiffs claim because Regions released other information unrelated to the plaintiffs' allegations at the same time.  See James report, ¶ 60.  However, the entire purpose of the presumption is to avoid turning a class certification motion into a trial on the merits in the issue of reliance. *See e.g, Schleicher v. Wendt*  618 F.3d 679, 685 (7th Cir.2010)(" Defendants say that, before certifying a class, a court must determine

whether false statements materially affected the price. But whether statements were false, or whether the effects were large enough to be called material, are questions on the merits.")

The court finds that the plaintiffs have satisfied their burden to establish that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, for purposes of Rule 23(b)(3), Fed.R.Civ.Pro.

> 2. *Is a class action superior to other available methods for the fair and efficient adjudication of the controversy?*

Superiority is determined by comparing the efficiency and fairness of all available methods of adjudicating the matter. Relevant considerations include (a) the class members' interests in individually controlling separate actions; (b) the extent and nature of any litigation already begun; (c) the desirability of concentrating the litigation in this particular forum; and (d) the likely difficulties in managing a class action. See Rule 23(b)(3)(A)-(C), Fed.R.Civ.Pro.

The court finds that a class action for the pursuit of these claims is superior to potentially thousands of individual claims against Regions, each of which will require extensive expert testimony and discovery concerning the effects of the alleged misrepresentations on the value of the stock at different points in time. In fact, should

any plaintiff prove the impact of the alleged misrepresentations on the value of a share in Regions, then calculating damages for every single stockholder becomes a mere mathematical exercise, in need of no further evidence.   The court agrees with plaintiffs that the sheer number of potential plaintiffs numbers in at least the thousands.

A finding that common issues predominate over individual issues leads to an inescapable conclusion that a class action presents the more desirable vehicle for adjudicating the plaintiffs' claims. *In re HealthSouth Corp. Securities Litigation,* 261 F.R.D. 616, 646 (N.D.Ala.2009) ("...Defendants' common course of deceptive conduct injured the Bondholder Plaintiffs and every other member of the Class in the same manner. Because these claims involve many common questions of law and fact applicable to the claims of a large number of purchasers of HealthSouth bonds, a class action will be superior to other available methods for fairly and efficiently adjudicating this controversy.")..).  "As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." *In re Netbank, Inc. Securities Litigation* 259 F.R.D. 656, 676 (N.D.Ga.2009); citing *In re HealthSouth*, 257 F.R.D. at 284.  *See also Bruhl v. Price Waterhousecoopers Intern.*, 257 F.R.D. 684, 699 (S.D.Fla.2008); *In re Scientific-Atlanta, Inc. Securities Litigation*, 571 F.Supp.2d 1315 (N.D.Ga.2007).

Turning to the other factors, the court is unaware of any other litigation already begun against defendant Regions on the basis of § 10-b of the Securities and Exchange Act.  This particular forum is a logical location for such litigation as defendant Regions is headquartered here.  The court anticipates no likely difficulties in managing a class action.

The defendants do not address the above issues, but rather challenge the proposed class period.  Defendants' opposition, at 34.  Specifically, the defendants assert there is no basis for selecting February 27, 2008, as the date to begin a "class period."  *Id.*, at 34-35.  Although defendant Regions filed its 2007 Form 10-K that day, that 10-K concerned events for the fiscal year which ended December 31, 2007.

Defendants rely on *Wal-Mart Stores, Inc., v. Dukes*, 131 S.Ct. 2541 (2011), to support their position that "plaintiffs cannot just plead a post-Class Period example of loan mishandling, then plead a bunch of general facts about how it was also happening in 2008, and hope to make an entire class period based on them."  Defendants' opposition (doc. 103), at 37.  However, *Wal-Mart* does not provide the support for defendants argument that defendants believe it does.  That case had nothing to do with stock, stockholders, securities litigation, or even appropriate class periods.  Rather, the quote defendants' rely on actually states: "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is,

he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores*, 131 S.Ct. at 2551 (emphasis in original). As set forth above, the court finds this burden has been met.

Plaintiffs respond that the Class Period should properly commence on the date of filing of the 2007 Form 10-K, February 20, 2008, as that was the date that Regions made its first public filing in which allegedly "goodwill was overstated, loan loss reserves were understated and defendants included statements falsely describing the Special Assets Group...." Plaintiff's reply (doc. 107) at 48-49, n. 32. The court finds this is a logical date on which to allege the Class Period began. Should the defendants disagree, they may prove at trial that such a date does not embody the allegedly first fraudulent public statement of goodwill and loan loss reserves.

### Conclusion

Having considered the foregoing, and being of the opinion that the motion for class certification is due to be granted;

It is therefore **ORDERED** by the court that plaintiffs' motion for class certification (doc. 94) be and hereby is **GRANTED**. The court **ORDERS** the following class be certified, with the plaintiffs to bear the burden and costs of preparing the notices and notifying class members:

All persons or entities who, between February 27, 2008, and January 20,

2009 (the "Class Period"), purchased or otherwise acquired the securities of Regions Financial Corporation ("Regions"), and were damaged thereby.  Excluded from the Class are current and former defendants, members of the immediate family of any current or former defendants, the directors, officers, subsidiaries and affiliates of Regions, any person, firm, trust, corporation, officer, director, or other individual or entity in which any current or former defendant has a controlling interest, and the legal representatives, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

Counsel are directed to confer and to prepare and submit to the court a proposed notice to class members for the above described class within fifteen (15) days of today's date.

The court's previous Order appointing class counsel and class representatives is **CONFIRMED**.

It is further **ORDERED** by the court that, having found that a hearing on the motion for class certification would not be of substantial assistance, defendants' motion for a class certification hearing (doc. 140) is **DENIED**.

**DONE** and **ORDERED** this the 14th day of June, 2012.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE

45